2023-1438, -1476

# United States Court of Appeals
# for the Federal Circuit

**PROVISUR TECHNOLOGIES, INC.,**

*Plaintiff-Cross-Appellant,*

*v.*

**WEBER, INC., TEXTOR, INC., WEBER MASCHINENBAU GMBH BREIDENBACH, TEXTOR MASCHINENBAU GMBH, WEBER MASCHINENBAU GMBH NEUBRANDENBURG,**

*Defendants-Appellants.*

Appeals from the United States District Court for the Western District of Missouri in *Provisur Technologies, Inc. v. Weber, Inc.*, Nos. 5:19-cv-06021-SRB & 5:20-cv-06069-SRB

## WEBER'S NON-CONFIDENTIAL PRINCIPAL BRIEF

Daniel E. Yonan
Donald R. Banowit
William H. Milliken
Kristina Caggiano Kelly
Richard A. Crudo
**STERNE KESSLER GOLDSTEIN & FOX PLLC**
1100 New York Avenue NW
Washington, DC 20005
(202) 371-2600

*Counsel for Defendants-Appellants*

Dated: April 21, 2023

# EXEMPLARY PATENT CLAIMS AT ISSUE

Three of Provisur's patents are at issue in this appeal: U.S. Patent

Nos. 10,639,812, 10,625,436, and 7,065,936. The following claims are exemplary

(with terms at issue emphasized).

**'812 patent claim 1:**

**1.**   A food article slicing machine comprising:

a) a slicing station comprising a knife blade and a knife blade drive driving the blade along a cutting path in a cutting plane;

b) a food article loading apparatus;

c) *a food article feed apparatus disposed over said food article loading apparatus*,

d) said food article feed apparatus having a conveyor assembly with independently driven endless conveyor belts,

e) wherein each of the conveyor belts is connected to a food article gripper for moving a food article along a food article feed path,

f) the conveyor assembly is an upper conveyor assembly,

g) a food article stop gate disposed upstream of the slicing station forms a portion of the food article feed path,

h) wherein the food article loading apparatus includes a lift tray assembly moveable between a staging position and an elevated position, said elevated position being a position wherein the food articles disposed within the lift tray assembly are in the food article feed path,

i) the food articles are supported in position along the food article feed path by at least the food article stop gate when the lift tray assembly is moved from its elevated position,

j) wherein the food article stop gate also serves as a door for the removal of food article end portions.

**'436 patent claim 9:**

**9.** A food article slicing machine, comprising:

a slicing station comprising a knife blade and a knife blade drive driving the blade along a cutting path in a cutting plane;

a food article loading apparatus including a lift tray assembly moveable between a staging position and an elevated position, the elevated position being a position where food articles disposed within the lift tray assembly are in a food article feed path;

*a food article feed apparatus disposed over said food article loading apparatus* and having a conveyor assembly with independently driven endless conveyor belts,

wherein each of the conveyor belts is used in cooperation with an independently driven and controlled food article gripper for moving a food article along the food article feed path, and

wherein the conveyor assembly is an upper conveyor assembly; and

a food article stop gate disposed upstream of the slicing station that forms a portion of the food article feed path,

wherein the food articles are supported in position along the food article feed path by at least the food article stop gate when the lift tray assembly is moved when in its elevated position, the food articles passing over the food article stop gate when the food articles move along the food article feed path, and

wherein the food article stop gate also serves as a door for the removal of food article end portions.

**'936 patent claim 14:**

10.    An apparatus for filling food product drafts into pockets formed into an elongated web of film, said pockets having open tops and arranged in rows that are displaced along a longitudinal direction and having at least a first row and a longitudinally displaced second row and movable with said web along said longitudinal direction, comprising:

a fill station and a mechanism for moving said pockets longitudinally into said fill station; and

a shuttle conveyor having an endless belt conveying surface, said shuttle conveyor comprises a device to retract and to extend said conveying surface longitudinally, said conveying surface arranged above said fill station and having an end longitudinally movable to a first position arranged to deposit food product drafts into said pockets of said first row by said conveying surface, and while said web remains stationary, said device retracts or extends said conveying surface to longitudinally reposition said end to a second position arranged to deposit food product drafts carried on said conveying surface into said pockets of said second row.

14.    The apparatus according to claim 10, wherein said shuttle conveyor is configured to fill plural rows of pockets while said web is stationary in said fill station, and *said shuttle conveyor is configured to retract from an extended position to a retracted position to fill a new first row of a group of empty pockets while said web advances* to locate a succeeding plural row of pockets in said fill station.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1438, -1476 |
| **Short Case Caption** | Provisur Technologies, Inc. v. Weber, Inc. |
| **Filing Party/Entity** | WEBER, INC., TEXTOR, INC., WEBER MASCHINENBAU GMBH BREIDENBACH, TEXTOR MASCHINENBAU GMBH, WEBER MASCHINENBAU GMBH NEUBRANDENBURG |

> **Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/21/2023

Signature: /s/ William H. Milliken

Name: William H. Milliken

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Weber, Inc. | | Weber Maschinenbau GmbH Neubrandenburg |
| Weber Maschinenbau GmbH Neubrandenburg | | |
| Textor, Inc. | | |
| Weber Maschinenbau GmbH Breidenbach | | |
| Textor Maschinenbau GmbH | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable          ☑ Additional pages attached

| | | |
|---|---|---|
| Michael M. Tamburini<br>Levy Craig Law Firm | Paul A. Overbee<br>Levy Craig Law Firm | Jason S. Leiker<br>Levy Craig Law Firm |
| Deirdre M. Wells<br>Sterne, Kessler, Goldstein & Fox P.L.L.C. | Daniel S. Block<br>Sterne, Kessler, Goldstein & Fox P.L.L.C. | Jonathan Tuminaro<br>Sterne, Kessler, Goldstein & Fox P.L.L.C. |
| Kyle E. Conklin<br>Sterne, Kessler, Goldstein & Fox P.L.L.C. | Brooke McLain<br>Sterne, Kessler, Goldstein & Fox P.L.L.C. | See Appendix A |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| Weber, Inc. v. Provisur Technologies, Inc.<br>2022-1751, 2022-1813 | | |
| Provisur Technologies, Inc. v. Weber, Inc. et al,<br>Case No. 5:21-cv-06113 (W.D. Mo.) | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# Appendix A

**4.Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected toappear in this court for the entities. Do not include those who have alreadyentered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

| Attorney Name | Firm |
|---|---|
| Paige Cloud | Sterne, Kessler, Goldstein & Fox P.L.L.C. |
| Steven Pappas | Sterne, Kessler, Goldstein & Fox P.L.L.C. |
| Tyler J. Dutton | Sterne, Kessler, Goldstein & Fox P.L.L.C. |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................................. viii

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT ........................................................................4

STATEMENT OF THE ISSUES.............................................................................4

STATEMENT OF THE CASE.................................................................................5

    A.    Weber's food-processing lines ...................................................................5

        1.    The Weber slicers and their laterally-offset
            ball-screw actuator ...................................................................6

        2.    The Weber SmartLoader and its retract-to-fill
            conveyor .......................................................................................9

    B.    Provisur's asserted patents ......................................................................11

        1.    The '812 and '436 patents' laterally-aligned slicer .................12

        2.    The '936 patent's advance-to-fill conveyor.............................15

    C.    The present lawsuit...................................................................................19

        1.    Infringement.............................................................................19

            a.    '812 and '436 patents: Provisur ignores
                lateral alignment at trial. ...............................................19

            b.    '936 patent: Provisur submits no evidence of the
                SmartLoader's conveyor advancing-to-fill....................20

        2.    Willfulness ...............................................................................22

            a.    Provisur calls a patent lawyer to testify about
                Weber's intent.................................................................22

            b.    Provisur relies on a single, irrelevant document
                as the centerpiece of its case..........................................24

            c.    Provisur argues to the jury about Weber's
                alleged litigation misconduct.........................................25

        3.    Damages...................................................................................26

        4.    The jury's verdict ....................................................................29

     5.    Post-trial proceedings.................................................29

SUMMARY OF THE ARGUMENT ....................................................30

STANDARDS OF REVIEW ...............................................................33

ARGUMENT ......................................................................................34

I.    The district court should have granted JMOL of non-infringement. ............34

    A.    The undisputed evidence shows that the accused slicers do
           not infringe the '812 and '436 patents. ...............................34

          1.    The district court's construction of "disposed over"
                 requires "lateral alignment" of the feed apparatus and
                 loading apparatus. ....................................................35

          2.    The feed apparatus in the accused slicers is indisputably
                 not laterally aligned with the loading apparatus. ......................38

          3.    The district court's refusal to instruct the jury about the
                 lateral-alignment requirement allowed Provisur to ignore it....40

    B.    The undisputed evidence shows that Weber's SmartLoader
           does not infringe claim 14 of the '936 patent. ...................43

          1.    Claim 14 requires an advance-to-fill conveyor.........................44

          2.    The accused SmartLoader is undisputedly a
                 retract-to-fill conveyor. ...........................................45

                a.    The SmartLoader does not advance to fill......................45

                b.    The SmartLoader cannot be reprogrammed to
                      advance to fill. ................................................46

           3.    The district court's refusal to provide the jury its full
                   construction allowed Provisur to mislead the jury. .................53

II.    The district court should have granted JMOL of no willfulness...................54

    A.    Provisur's evidence was legally insufficient to support
           the verdict. .......................................................54

          1.    The district court erred in admitting White's testimony...........55

                a.    White's testimony that Weber failed to obtain
                      an opinion of counsel violated 35 U.S.C. § 298..............55

|   | b. | White's remaining testimony was inadmissible under Daubert. | 57 |
|   | 2. | The patent matrix was relevant only to knowledge of the patents—not knowledge of infringement | 58 |
|   | 3. | Provisur's allegations of discovery misconduct were baseless and irrelevant to willfulness | 59 |
| B. |   | At minimum, the district court's errors require a new trial. | 61 |
| III. |   | Weber is entitled to a new trial on damages. | 61 |
| A. |   | The district court misapplied this Court's precedent concerning the entire market value rule. | 62 |
|   | 1. | The district court erred in denying Weber's Daubert motion to exclude Provisur's damages theory. | 64 |
|   | 2. | The district court's jury instructions misstated the law. | 67 |
| B. |   | The jury's damages award lacks substantial evidence. | 69 |
| CONCLUSION AND RELIEF SOUGHT | | | 75 |

* * *

**CONFIDENTIAL MATERIAL OMITTED**

The district court's order found at Appx1-10 of the addendum to this non-confidential version of Defendants-Appellants' Principal Brief was entered under seal and is therefore subject to the district court's protective order. The contents of that order have therefore been redacted from the nonconfidential version. Defendants-Appellants' Principal Brief itself contains no confidential information and so the confidential and non-confidential versions of the brief itself are identical.

# TABLE OF AUTHORITIES

## Cases

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*,
501 F.3d 1307 (Fed. Cir. 2007) .................................................47, 51

*Alyus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017) ........................................................45

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) ........................................................39

*Ayoub v. Spencer*,
550 F.2d 164 (3d Cir. 1977) .............................................................52

*BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch.*
*Organisation*,
28 F.4th 1247 (Fed. Cir. 2022) .........................................................59

*Bowers v. Baystate Techs., Inc.*,
320 F.3d 1317 (Fed. Cir. 2003) ...................................................40, 46

*Brown v. Royalty*,
535 F.2d 1024 (8th Cir. 1976) ..........................................................52

*CommScope Techs. LLC v. Dali Wireless Inc.*,
10 F.4th 1289 (Fed. Cir. 2021) ...................................................35, 51

*Cordis Corp. v. Boston Sci. Corp.*,
658 F.3d 1347 (Fed. Cir. 2011) ...................................................41, 54

*Creative Internet Advert. Corp. v. Yahoo!, Inc.*,
476 F. App'x 724 (Fed. Cir. 2011) ...................................................43

*Dominion Energy, Inc. v. Alstom Grid LLC*,
725 F. App'x 980 (Fed. Cir. 2018) ...................................................41

*Draper v. Airco, Inc.*,
580 F.2d 91 (3d Cir. 1978) ...............................................................52

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004) ........................................................51

*Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*,
    946 F.3d 1367 (Fed. Cir. 2020) .......................................................... 60

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) .......................................................... 69

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
    575 F.3d 1312 (Fed. Cir. 2009) .................................................... 42, 54

*Exmark Mf'g Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
    879 F.3d 1332 (Fed. Cir. 2018) .......................................................... 34

*Hallmark Cards, Inc. v. Murley*,
    703 F.3d 456 (8th Cir. 2013) ............................................................. 59

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    579 U.S. 93 (2016) (Breyer, J., concurring) ...................................... 56

*INVT SPE LLC v. ITC*,
    46 F.4th 1361 (Fed. Cir. 2022) .......................................................... 47

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ....................................................... 63, 73

*Lincoln Nat'l Life Ins. Co. v. Transamerica Life Ins. Co.*,
    609 F.3d 1364 (Fed. Cir. 2010) .......................................................... 33

*McPheeters v. Black & Veatch Corp.*,
    427 F.3d 1095 (8th Cir. 2005) ............................................................ 51

*Moba, B.V. v. Diamond Automation, Inc.*,
    325 F.3d 1306 (Fed. Cir. 2003) .................................................... 42, 54

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331 (Fed. Cir. 2006) .......................................................... 34

*Penford Corp. v. Nat'l Union Fire Ins. Co.*,
    662 F.3d 497 (8th Cir. 2011) ............................................................. 33

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    904 F.3d 965 (Fed. Cir. 2018) ................................................... *passim*

*Provisur Techs., Inc. v. Weber, Inc.*,
   2022 WL 17688071 (Fed. Cir. Dec. 15, 2022)................................16, 18, 19, 45

*RightCHOICE Managed Care, Inc. v. Hospital Partners, Inc.*,
   2021 WL 4258747 (W.D. Mo. Sept. 17, 2021) ..................................................52

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
   930 F.3d 1295 (Fed. Cir. 2019) ..................................................................55, 56

*Sulzer Textil A.G. v. Picanol N.V.*,
   358 F.3d 1356 (Fed. Cir. 2004) ........................................................................34

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
   247 F.3d 1316 (Fed. Cir. 2001) ........................................................................47

*Texas Digital Sys., Inc. v. Telegenix, Inc.*,
   308 F.3d 1193 (Fed. Cir. 2002) ..................................................................43, 54

*The Johns Hopkins Univ. v. Datascope Corp.*,
   543 F.3d 1342 (Fed. Cir. 2008) ........................................................................50

*Tokai Corp. v. Easton Enters., Inc.*,
   632 F.3d 1358 (Fed. Cir. 2011) ........................................................................60

*Trading Techs. Int'l, Inc. v. IBG LLC*,
   2020 WL 12309206 (N.D. Ill. Oct. 21, 2020) ..................................................58

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ............................................................64, 67, 70

*Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*,
   308 F.3d 1167 (Fed. Cir. 2002) ........................................................................53

*United States v. Rouse*,
   111 F.3d 561 (8th Cir. 1997) ............................................................................58

*VirnetX, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014) ......................................................63, 66, 71, 72

*Waner v. Ford Motor Co.*,
   331 F.3d 851 (Fed. Cir. 2003) ..........................................................................33

*Weber, Inc. v. Provisur Techs., Inc.*,
  Nos. 22-1751, 22-1813 (Fed. Cir. filed May 4, 2022)..........................................14

**Statutes**

28 U.S.C. § 1295(a) .................................................................................................4

28 U.S.C. § 1331........................................................................................................4

28 U.S.C. § 1338........................................................................................................4

35 U.S.C. § 284........................................................................................................62

35 U.S.C. § 298..................................................................................................*passim*

**Other Authorities**

H.R. Rep. No. 112-98 ............................................................................................55

# STATEMENT OF RELATED CASES

No other appeal in or from the same civil action was previously before this or any other appellate Court. Certain patents asserted in this case, however, were the subject of IPR decisions that this Court has reviewed on appeal:

- In *Provisur Technologies, Inc. v. Weber, Inc.*, No. 21-1851, 2022 WL 17688071 (Fed. Cir. Dec. 15, 2022), this Court addressed Board decisions regarding U.S. Patent No. 7,065,936 (at issue in this appeal) and related U.S. Patent No. 7,533,513 (asserted below but not at issue in this appeal).

- In *Provisur Technologies, Inc. v. Weber, Inc.*, 50 F.4th 117 (Fed. Cir. 2022), this Court addressed Board decisions regarding U.S. Patent No. 6,997,089 (asserted below but not at issue in this appeal).

- In *Provisur Technologies, Inc. v. Weber, Inc.*, No. 21-1883, 2022 WL 3131838 (Fed. Cir. Aug. 5, 2022), this Court summarily affirmed the Board's determination that all claims of U.S. Patent No. 9,399,531 (asserted below but not at issue in this appeal) are unpatentable.

- *Provisur Technologies, Inc. v. Weber, Inc.*, No. 21-1853, 2021 WL 4811421 (Fed. Cir. Jul. 13, 2021), involved a Board decision concerning U.S. Patent No. 6,320,141 (asserted below but not at issue in this appeal). Provisur voluntarily dismissed that appeal.

Additionally, the following pending cases may directly affect or be directly affected by the Court's decision in this appeal:

- *Weber, Inc. v. Provisur Technologies, Inc.*, Nos. 22-1751, 22-1813 (Fed. Cir. filed May 4, 2022), involves Board decisions concerning U.S. Patent Nos. 10,639,812 and 10,625,436 (at issue in this appeal).

- *Provisur Technologies, Inc. v. Weber, Inc.*, No. 5:21-cv-06113 (W.D. Mo. filed Sept. 21, 2021), involves Provisur's U.S. Patent No. 8,408,109.

# INTRODUCTION

Provisur's asserted patents concern components of industrial food-processing lines that prepare packages of sliced food, like meats and cheeses. Two patents cover slicers—machines that slice the food—and the third covers a loading machine that places the sliced food into packages.

This case has a long procedural history and this appeal presents several issues, but let one point be clear at the outset: the functionality Provisur accused of infringement long predates its patents. Slicing and packaging food has a long history, so the prior art in this field is crowded. Thus, to obtain these patents and keep them alive in IPRs, Provisur had to narrow its claims to cover very specific implementations of slicing and loading machines. Those implementations are simply not present in the accused Weber products.

That is not surprising. Much of the art Provisur confronted related to Weber's own prior-art machines—machines that, so far as the patents here are concerned, are materially identical to the machines Provisur now accuses of infringement. Specifically, Provisur distinguished its slicer patents from a prior-art Weber slicer by narrowing the claims to cover a specific configuration of certain components (the "loading apparatus" and the "feed apparatus"). But the prior-art slicers and accused slicers here are identical in all relevant respects. Accordingly, if the prior-art slicers do not have the required configuration, the accused ones do

not either. And Provisur successfully defended the asserted claim of its loading-machine patent by arguing that, unlike prior-art machines that deposit food into packages by *retracting* a conveyor, the claim requires depositing food into packages by *advancing* a conveyor. Weber's accused machines—like the prior art but unlike the asserted claim—fill by retracting. In short, Provisur accused of infringement the very subject matter it distinguished from its claims when arguing validity.

Because Provisur's infringement arguments were extraordinarily weak—after all, the same thing cannot both infringe and not invalidate—Provisur barely discussed infringement at trial. Instead, Provisur introduced irrelevant and prejudicial evidence designed to falsely portray Weber as a bad actor. Provisur's first "expert" witness was a lawyer who testified that Weber's infringement (about which the jury had thus far heard no evidence) was willful. The lawyer contended the jury could infer willfulness because Weber did not obtain a "freedom to operate" opinion. That was a blatant violation of 35 U.S.C. § 298, which provides that "t[h]e failure of an infringer to obtain the advice of counsel…may not be used to prove that the accused infringer willfully infringed." And Provisur falsely told the jury that the *reason* it had no evidence of infringement was because Weber concealed it—ambushing Weber with a baseless spoliation argument Provisur had never raised before. To make matters worse, Provisur's closing improperly urged

the jury to "send a message" to Weber and punish it for its alleged spoliation by "award[ing] us our full damages." Appx42615(2129:7-18).

Provisur's tactics, unfortunately, worked. The jury found willful infringement and awarded Provisur approximately $10 million in damages. That number constituted a reasonable royalty based on the entire market value of Weber's entire food-processing *lines* (not merely the discrete accused machines within those lines), which cost millions of dollars and contain thousands of components having nothing to do with Provisur's patents. To obtain damages based on the whole food-processing line, the law requires Provisur to prove that the patented features alone drive demand for the *entire line*.

Provisur did not do so. Given the narrowness of Provisur's patents, Provisur *could not* do so. Indeed, Provisur's loading-machine patent claims a functionality (filling food packages by advancing a conveyor) that, undisputedly, *no Weber customer has ever used*. Provisur's damages theory thus relied on the facially absurd premise that a customer would buy a multi-million dollar food-processing line solely to obtain a useless feature.

This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. The court entered final judgment on October 28, 2022, Appx68, and denied Weber's post-trial motions on January 9, 2023, Appx69-72. Weber timely appealed on January 19, 2023. Dkt. 1. This Court has jurisdiction under 28 U.S.C. § 1295(a).

## STATEMENT OF THE ISSUES

1.  Whether Weber is entitled to JMOL of non-infringement, where:

(a)  the '812 and '436 patents' claims require certain components of a food slicer to be laterally aligned, whereas the corresponding components in the accused slicers are laterally offset, just as in the Weber prior art Provisur distinguished during IPRs; and

(b)  the '936 patent's claim 14 requires a conveyor that *advances* to fill packages with food, whereas the accused Weber conveyor *retracts* to fill, just as in the prior art Provisur distinguished during an IPR.

2.  Whether Weber is entitled to JMOL of no willfulness, where Provisur's evidence consisted of (i) a patent lawyer's testimony that Weber should have obtained an opinion of counsel; (ii) a Weber document that showed only knowledge of the patents (not knowledge of infringement); and (iii) baseless and prejudicial allegations of discovery misconduct.

3.    Whether Weber is entitled to a new trial on damages, where Provisur obtained damages on Weber's entire food-processing line but failed to adduce any evidence that its patented features solely drove demand for the line.

## STATEMENT OF THE CASE

### A.    Weber's food-processing lines

Weber designs, manufactures, and sells industrial food-processing machinery, including slicers and food-packaging machines. Weber pioneered the equipment at issue here and sold it to customers long before Provisur obtained the asserted patents. Appx41590(1104:7-1104:18); Appx41597-41598(1111:8-1112:10); Appx41601-41602(1115:16-1116:25).

As shown in the figure below, a food-processing line typically includes multiple pieces of machinery, each containing thousands of components that prepare, slice, and package food items. Appx40947(461:13-24); Appx41639(1153:9-17).



Appx93110 (excerpted). Preparation machinery (orange) prepares bulk food product for slicing. Appx40977(491:3-18). A slicer (blue) slices the food. Appx40977(491:3-18). Automation machines (green)—such as machines that weigh or grade food slices—prepare slices for packaging. Appx40976-

40978(490:23-492:8); Appx41029(543:11-16); Appx41953(1467:12-18). A packaging machine (yellow) packages the slices, and end-of-line machines (red) process the packaged food product. Appx41750-41751(1264:4-1265:19); Appx41953-41954(1467:11-1468:15).

Each machine within a line is independently priced and can be sold separately:



The machines accused of infringement here are discrete components of a food-processing line: (1) Weber's 905, 906, 908, and S6 slicers; and (2) Weber's SmartLoader.

### 1. The Weber slicers and their laterally-offset ball-screw actuator

The accused slicers slice large quantities of food at great speeds. They are later-generation models of a prior-art slicer (the 904 slicer) that Weber has sold

since 2005—years before Provisur's patents were filed. Appx41591(1105:4-8).

Indeed, Provisur initially accused the 904 slicer of infringement, Appx51009-

51019, before dropping it from the case.



Weber 904 Slicer (Prior Art 2005)

Weber 905 Slicer (Prior Art 2009) (Accused)

Weber 906 Slicer (Accused)

Weber S6 Slicer (Accused)

The accused 905 slicer (itself prior art to Provisur's patents) is a wider version of

the 904 slicer that can slice more product at a time. Appx41591(1105:9-16).[1] The

basic design and functionality of the 906 slicer models the 904 slicer, but the

---

[1] Provisur was able to accuse the prior art of infringement because the district court arbitrarily limited Weber to introducing three exhibits per asserted prior-art product, thereby effectively precluding Weber from using prior-art products in its invalidity case. Appx40251-40254; Appx40295-40297. Weber believes that determination was erroneous but has not appealed it in order to streamline the issues before the Court.

housing is more open, allowing for easier cleaning and thus better hygiene. Appx41587(1101:16-20). The S6 slicer added functionality to allow for slicing different types of food product at the same time. Appx41029-41030(543:3-544:5). None of these innovations has anything to do with Provisur's slicer patents.

All these slicers have an overhead conveyor system (or "food article feed apparatus") (yellow below) with product holders (or "grippers") (green) that grasp food articles and drive them along a feed path (red arrow) toward a blade as the articles are supported underneath by a product conveyor (or "food article loading apparatus" / "lift tray") (blue). Appx41969-41971(1483:10-1485:12).



**Weber S6 Slicer**
(Perspective View)

Critically for purposes of this appeal, the drive mechanism responsible for driving the grippers is a ball-screw actuator (red box below) that is laterally offset from the lift tray when viewed from above:



Appx93156 (re-annotated and rotated). In other words, when the machine is viewed from above, the ball-screw actuator—part of the feed apparatus—does not fall within the footprint of the lift tray. It is instead off to the side.

### 2. The Weber SmartLoader and its retract-to-fill conveyor

Weber's accused SmartLoader is a machine that deposits stacks of food slices (referred to as "drafts") into packages after the food has been sliced. Relevant here is the SmartLoader's "shuttle conveyor" highlighted below:

## Weber SmartLoader



Shuttle Conveyor

A shuttle conveyor has a rotating endless belt (blue) that moves food items along the conveyor. Additionally, the conveyor itself moves back-and-forth (blue arrow). Appx42047-42048(1561:13-23).

As shown below, once food product is sliced, the drafts are deposited onto the shuttle conveyor. The shuttle conveyor then advances toward a row of open packages (left photo). Once the drafts are positioned directly over empty rows of packages, the conveyor quickly retracts (middle photo) to pull the floor out from under the drafts, causing them to fall straight down into their corresponding packages positioned below (like a magician yanking a tablecloth from under a table setting). Appx41601(1115:16-21); Appx42047-42048(1561:13-1562:19). Finally, once the shuttle conveyor is fully retracted (right photo), the process can repeat using new rows of empty packages.

Weber Smartloader (Accused)



Appx66993(0:38-0:41, 0:52-1:00) (annotated).

Weber WCS Loader (Prior Art 2001)



Appx67852(1:37-1:54) (annotated); *see* Appx41607(1121:4-13);

Appx41613(1127:4-14).

As evident from the description above, the SmartLoader's shuttle conveyor

"retracts-to-fill"—i.e., it fills packages by retracting. This retract-to-fill mechanism

(sometimes referred to in the industry as a "flying carpet" mechanism) is standard

in the art and has been used in Weber and other prior-art machines—like the

Weber WCS Loader depicted above—since at least 2001. Appx4105(1119:13-20);

Appx41607(1121:4-13).

### B.     Provisur's asserted patents

Provisur's patents issued years after Weber's prior-art products (on which

the accused products are based) hit the market. Three of Provisur's nine originally

asserted patents are at issue: (1) the '812 and '436 patents, which cover a specific embodiment of a slicer, and (2) the '936 patent, which covers a loading machine.

### 1. The '812 and '436 patents' laterally-aligned slicer

a. Provisur's '812 and '436 patents are directed to a slicer, such as the one shown in Figure 1B below:



Fig. 1B

Appx145(Fig. 1B) (annotated).[2] The slicer contains a "food article loading apparatus" (blue) with a "lift tray assembly" 220 into which food is placed. Appx164-168(2:52-54, 4:33-43, 9:28-34). The tray pivots upward, and then the "grippers" (green) of the overhead "food article feed apparatus" (yellow) guide the

---

[2] The patents share a specification. This brief cites the '812 patent.

food forward for slicing. Appx164-167(2:55-60, 4:33-43, 5:31-35, 5:58-61, 6:31-34, 7:3-5, 9:13-24).

At issue here is the claims' disposed-over limitation, which defines the spatial orientation of the feed apparatus (yellow) relative to the loading apparatus (blue). For example, claim 1 of the '812 patent recites "[a] food article slicing machine comprising...a food article feed apparatus *disposed over* said food article loading apparatus." Appx169(11:17-18) (emphasis added).

**b.** The phrase "disposed over" has a very specific meaning as a result of Provisur's arguments in parallel IPR proceedings. Namely, it requires that, when the apparatus is viewed from above, the *entire feed apparatus*—including its drive mechanism—lie within the footprint of the loading apparatus's lift tray. The parties have referred to this as the lateral-alignment requirement.

In the IPRs, Weber challenged the patents using manuals for Weber's 904 slicer. To evade that art, Provisur urged a narrow construction of the disposed-over limitation requiring the entire feed apparatus to be laterally aligned with the loading apparatus. Appx61737-61739. Provisur contended that Weber's prior-art combination did not satisfy this construction because the 904 slicer's feed apparatus has a ball-screw actuator that is "*to the side of*"—i.e., laterally offset from—the lift tray. Appx61739-61740 (emphasis added).

The Board agreed. It construed "disposed over" to require that the "feed apparatus…[be] *vertically and laterally* aligned with the lift tray assembly of [the] food article loading apparatus." Appx59309 (reference numerals omitted, emphasis added); *see* Appx59307-59315. The Board specified that "laterally aligned" means that, "when the feed apparatus and loading apparatus are viewed from above, there is no offset between the overhead conveyor assembly of [the] feed apparatus and the lift tray assembly of the loading apparatus." Appx59309 (reference numeral omitted). And the Board found that Weber's prior-art combination did not satisfy this lateral-alignment requirement because "the ball screw actuator (part of the feed apparatus)…is not 'positioned above and in vertical and lateral alignment with' the product conveyor (part of the loading apparatus), but is instead laterally offset when the slicer is viewed from above." Appx59357. The Board upheld the claims of the '812 and '436 patents on that basis.[3]

**c.** The district court in this case adopted the Board's construction of "disposed over," holding that it "does not mean merely 'above'" but requires "that the food article feed apparatus and its conveyor belts and grippers are positioned above and in vertical and lateral alignment with the food article loading apparatus

---

[3] Weber appealed. *Weber, Inc. v. Provisur Techs., Inc.*, Nos. 22-1751, 22-1813 (Fed. Cir. filed May 4, 2022). While Weber believes the Board's construction is too narrow, it does not dispute the construction for purposes of this case. Provisur should be held to the construction it successfully urged to the Board.

and its lift tray assembly." Appx64381. That construction excludes slicers (such as the 904 slicer in the IPRs) that have laterally-offset drive mechanisms.

### 2. The '936 patent's advance-to-fill conveyor

**a.** Provisur's '936 patent describes a "fill and packaging apparatus" for loading sliced food into packages, as shown below:



Appx102-104(Figs. 1, 3) (annotated); Appx100(Abstract). After food is sliced, rows of drafts A (beige) move from slicer 20 (blue) to shuttle conveyor 52 (green), which deposits the drafts into rows of stationary packages (or "pockets") 62a-62d (orange) formed from web of film 63. Appx106(3:65-4:4). Once filled, the web

advances forward by a separate conveyor, making way for a new set of empty pockets. Appx106(4:5-6). At issue here is how the shuttle conveyor fills pockets. The patent describes two alternative ways to do this: a retract-to-fill embodiment and an advance-to-fill embodiment.

In the retract-to-fill embodiment, the shuttle conveyor begins in an extended position and fills the pockets farthest from the slicer (62a). It then retracts toward the slicer to successively fill pockets until the shuttle conveyor is fully retracted and the pockets closest to the slicer (62d) are filled. Appx105(2:50-55); Appx107(5:13-23). Then, while a new set of empty pockets is put into place, the shuttle conveyor advances back to its starting position so the process can repeat itself. Appx105(2:55-58); Appx107(5:33-38).



This is the retract-to-fill method that Weber's SmartLoader uses. *Supra* Section A.2. The '936 patent claims covering this embodiment (claims 1-4, 6-13, and 15-20) were found invalid over the prior art. Appx23691-23776; *Provisur Techs., Inc. v. Weber, Inc.*, 2022 WL 17688071 (Fed. Cir. Dec. 15, 2022).

The "advance-to-fill" embodiment, by contrast, fills in the opposite direction. The shuttle conveyor begins in its retracted position and first fills the pockets closest to the slicer (62d). It then advances away from the slicer to successively fill pockets until the shuttle conveyor is fully extended and the pockets farthest from the slicer (62a) are filled. Appx105(2:59-64); Appx107(5:39-44). Then, while a new set of empty pockets is put into place, the shuttle conveyor retracts back to its starting position so the process can repeat itself. Appx105(2:64-67); Appx107(5:44-47).



Claim 14—the only claim asserted at trial—is limited to this advance-to-fill embodiment. The claim is reproduced below (with the advance-to-fill requirement emphasized and the claim's dependency from claim 10 omitted for readability):

An apparatus for filling food product drafts into pockets…comprising:

….

a shuttle conveyor having an endless belt conveying surface, said shuttle conveyor comprises a device to retract and to extend said conveying surface longitudinally, said conveying surface arranged above said fill station and having an end longitudinally

movable to a first position arranged to deposit food product drafts into said pockets of said first row by said conveying surface, and while said web remains stationary, said device retracts or extends said conveying surface to longitudinally reposition said end to a second position arranged to deposit food product drafts carried on said conveying surface into said pockets of said second row.

wherein said shuttle conveyor is configured to fill plural rows of pockets while said web is stationary in said fill station, and *said shuttle conveyor is configured to retract from an extended position to a retracted position to fill a new first row of a group of empty pockets while said web advances* to locate a succeeding plural row of pockets in said fill station.

Appx107-108(6:32-7:14, 7:39-45) (emphasis added). The claim is confusingly worded, but all agree it is limited to the advance-to-fill embodiment.[4]

**b.** In fact, the advance-to-fill requirement is what allowed claim 14 to survive Weber's IPR. In the IPR, Weber challenged the '936 patent using references disclosing retract-to-fill machines—i.e., machines that fill by retracting a conveyor toward the slicer, thereby "removing the ground from under the feet" of the drafts. Appx666-677. Provisur argued that Weber's retract-to-fill prior art did not disclose the advance-to-fill embodiment. Appx24752-24754. The Board agreed

---

[4] When read in isolation, the claim's reference to the conveyor "retract[ing]" could be incorrectly interpreted to cover the retract-to-fill embodiment. But the claim requires that the conveyor retract "*while [the] web advances*" to reveal new, empty pockets—i.e., *after* the conveyor has finished filling the previous set of pockets. By specifying that the conveyor *retracts after* filling, the claim requires that the conveyor *advance while filling*. *See* Appx107(5:39-47); *Provisur*, 2022 WL 17688071, at *5 (claim 14 "involve[s] depositing drafts starting from a retracted position of the conveyer [*sic*] and then moving to an extended position").

- 18 -

and upheld the advance-to-fill claims (including claim 14) on that basis. Appx23737-23739; Appx23771. This Court affirmed. *Provisur*, 2022 WL 17688071, at *5.

**c.** The district court adopted the Board's interpretation of claim 14 limiting it to the advance-to-fill embodiment. Appx30862. "This means that the shuttle conveyor must start in a retracted position, and then advance[] as it fills each new row of employ packages"—a construction "consistent with the PTAB's findings and with Plaintiff's arguments before the PTAB." *Id.* Claim 14 thus undisputedly does not cover retract-to-fill machines.

## C. The present lawsuit

This appeal concerns three issues: infringement, willfulness, and damages.

### 1. Infringement

Provisur's infringement arguments throughout the litigation ignored the narrow scope of the disposed-over limitation ('812 and '436 patents) and the advance-to-fill requirement ('936 patent) that Provisur had relied on to avoid prior art. And, although, the district court adopted these narrow constructions, it failed to enforce or instruct the jury about them.

#### a. '812 and '436 patents: Provisur ignores lateral alignment at trial.

The district court agreed with the Board's construction—successfully urged by Provisur—that the disposed-over limitation requires lateral alignment of the

ball-screw actuator. *Supra* Section B.1.c. But, although the district court's jury instruction stated that "disposed over" means "above and in vertical and lateral alignment with," it did not explain what "lateral alignment" means (i.e., no offset when viewed from above). Appx28. Weber requested that the court modify its instruction to supply that essential information, Appx40335, but the court refused, Appx40333.

Accordingly, at trial, Provisur argued that the accused slicers satisfy the disposed-over limitation by ignoring that the ball-screw actuator that drives the grippers is laterally offset from the lift tray (just like in the prior-art 904 slicer). Appx41275-41276(789:24-790:4). Provisur's expert said nothing about the alignment of the accused slicers' ball-screw actuator. Rather, Provisur's counsel argued to the jury that the entire drive mechanism could be ignored. Appx41277-41278(791:20-792:11); Appx42090-42091(1604:11-1605:9).

### b. '936 patent: Provisur submits no evidence of the SmartLoader's conveyor advancing-to-fill.

The district court also agreed with the Board's interpretation of claim 14 of the '936 patent requiring a shuttle conveyor that advances to fill. *Supra* Section B.2.c. But the district court's proposed jury instruction stated only that the claim "require[s] an advancing conveyor," Appx29, without specifying that the conveyor must advance *to fill*. Weber requested that the court modify its instruction to match

the construction it actually adopted—that is, to specify that the conveyor must advance *while filling*, Appx40335—but the court again refused, Appx40333.

The evidence showed that the SmartLoader cannot operate as an advance-to-fill conveyor. *E.g.*, Appx41011(525:9-17); Appx41758-41759(1272:22-1273:14); Appx41891-41893(1405:19-1407:17); Appx42045-42048(1559:11-14, 1560:9-18, 1561:19-1562:19). And Provisur's infringement expert Keith Vorst admitted at trial that he had no such evidence. Appx41443(957:21-25). Instead, he claimed it was possible to *reprogram* the SmartLoader to operate as an advance-to-fill conveyor by inputting certain parameters into the machine's interface. Appx41396-41397(910:4-13, 910:24-911:2); Appx41404-41405(918:21-919:7). But Vorst did not identify any such parameters and did not input them during his inspection of the SmartLoader. Weber's source-code expert, by contrast—in testimony unrebutted by Provisur's source-code expert—testified that there *are no* parameters that could make the SmartLoader advance to fill. Appx41895-41896(1409:13-1410:5); Appx41904-41907(1418:4-1421:1); Appx41901(1415:11-25). And Weber's mechanical expert testified that it is physically impossible for the machine to operate this way. Appx42050(1564:9-25).

Provisur, taking advantage of the court's incomplete jury instruction, showed the jury videos of the SmartLoader conveyor advancing *after* filling (i.e., while resetting) and argued that the videos established that the SmartLoader is an

"advancing conveyor." Appx42121-42123(1635:6-1637:5). Provisur and Vorst also asserted—for the first time and to the jury—that the reason they had no proof of the SmartLoader advancing to fill is because Weber impeded Vorst's access to the machine during his inspection. Appx41259-41260(773:24-774:8); Appx41404(918:1-12); Appx41441-41443(955:7-957:16); Appx41834(1348:16-20); Appx42124-42125(1638:23-1639:5); Appx42542(2056:20-22).

### 2. Willfulness

Lacking legally relevant evidence of willful infringement, Provisur spent much time at trial trying to portray Weber as a bad actor. It did so by relying on irrelevant and highly prejudicial evidence and testimony.

### a. Provisur calls a patent lawyer to testify about Weber's intent.

During expert discovery, Provisur submitted a report on willfulness from lawyer John White. Appx9023-9025(¶¶5-12); Appx9126(19:2-20:2). White asserted that, because Weber did not present evidence that it sought and followed advice of counsel on the asserted patents, Weber willfully infringed. Appx9059(¶¶110-118).

Weber moved to exclude White's testimony. Appx8989-9007. The district court granted that motion in part. Appx1-10. The court concluded that White's "opinions on industry standards and practices to avoid infringement" were admissible. Appx6. The court held, however, that "advice of counsel is 'legally

irrelevant' under [35 U.S.C.] § 298" and precluded White from "offer[ing] testimony regarding Defendants' alleged failure to obtain the advice of counsel." Appx8 (quoting *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1309 (Fed. Cir. 2019)).

At trial, however, White sought to do just that. Weber objected, citing § 298. Appx40798(312:10-17). Provisur responded that White's testimony was admissible so long as he did not use the word "attorney":

> He's talking about third-party opinions…. [H]e doesn't say attorneys, he doesn't say patent agents…he doesn't say wonkenshiels (phonetic) or whatever these folks are over in Germany. He just says, You go find somebody who's qualified to tell you whether you're okay or not.

Appx40798(312:18-24). The court allowed the testimony. Appx40799(313:1-2).

White then purported to "speak as an expert on industry practice and standards for avoiding patent infringement." Appx41084(598:19-20); Appx41085(599:22-24). He told the jury that those standards included activities like a "landscape search," a "background search," a "freedom-to-operate analysis"—all steps that White said Weber should have taken to avoid infringement. Appx41139-41142(653:20-656:6); Appx41103(617:18-21). These were the types of services White offered "in the firm that [he] used to operate" (a law firm). Appx41140(654:4-7).

**b.  Provisur relies on a single, irrelevant document as the centerpiece of its case.**

Provisur's willfulness case centered on a Weber spreadsheet (the "patent matrix") listing certain Provisur U.S. and foreign patents and applications along with "ratings" assigned by Weber officers and employees. Appx91084-91086; Appx92793-92821; Appx30766-30789. The matrix was generated by PATOffice, an industry-standard computer program that Weber's German headquarters uses to monitor patents of potential interest to its business. Appx41616(1130:17-25); Appx41138-41139(652:8-654:7). To stay abreast of developments in the industry, Weber personnel can view patents or applications potentially related to Weber's business, assign them a "rating" (between 1 and 3), and leave comments. Appx41617-41618(1131:7-1132:16). Before this litigation began, Weber personnel had assigned ratings to—among many other patents and applications—the patents-in-suit and related patent applications. During discovery, over Weber's privilege objection, the district court ordered Weber to generate the spreadsheet in question. *See* Appx8970-8971; Appx31384-31389.

The ratings on the matrix do not reflect any assessment relating to potential infringement. As Weber's CEO testified, patents were rated "1" if they were irrelevant to Weber's business (no relation to food processing); "2" "if there was some interest" (like food processing other than slicing); and "3" if they "had a lot to do with the market in which we are active" (slicing). Appx41617(1131:10-14).

Accordingly, a "slicer patent" would get a "3" rating "even if it was different from what Weber does," meaning "a three didn't indicate any risk of infringement." Appx41618-41619(1132:12-1133:1).

Nevertheless, Provisur's counsel told the jury the patent matrix was "the most important document in the case," Appx40524(38:10), and used it throughout trial as purported evidence of intent to infringe, *e.g.*, Appx40913-40923(427:18-437:21); Appx42538-42539(2052:5-2053:20); Appx42553(2067:20-24); Appx42565(2079:1-6).

### c. Provisur argues to the jury about Weber's alleged litigation misconduct.

Though it had never previously raised these issues with the district court, Provisur repeatedly told the jury that Weber and its attorneys engaged in discovery misconduct and insinuated that the jury could base its decision on that rather than on evidence of infringement. For example, Provisur questioned witnesses about the fact that Weber supplemented interrogatory responses regarding the date it first learned of the asserted patents. *See* Appx40886-40929(400:6-443:9); Appx41106-41110(620:3-624:9); Appx41115-41119(629:17-633:14); Appx41126-41130(640:18-644:22). Weber's initial responses stated that Weber was aware of the patents "at least as of service of the complaint." Appx91525-91526; Appx91548-91549. Weber later supplemented these responses to identify an earlier date of knowledge based on further investigation. Appx91536-91542; Appx91569-

91573. Provisur suggested to the jury that this supplementation meant Weber was "not telling you [the jury] the truth." Appx42539-42540(2053:21-2054:7).

Provisur's counsel and witnesses also suggested that Weber impeded Provisur's ability to inspect the accused machines. Again, Provisur had never raised any issue about its investigation to the district court during discovery. Appx40139-40140; Appx40224-40228. But at trial, Provisur's infringement expert—over multiple objections from Weber—said Weber personnel did not allow him sufficient "access" to unspecified administrative settings for the machines. Appx41259-41260(773:24-774:2); Appx41404(918:1-12). Provisur's counsel also told the jury that Weber changed the SmartLoader source code to conceal its infringement (ignoring undisputed testimony that the change was unrelated to this case and unrelated to the machine's inability to advance to fill). Appx42545-42546(2059:18-2060:2). And Provisur's counsel asked the jury "to make inferences" based on Weber's alleged discovery misconduct and "send a message to those in Germany" by finding infringement and awarding damages. Appx42563(2077:16-22); Appx42615(2129:7-18). Indeed, this was the focus of the entire closing. Appx42536-42567(2050-2081); Appx42608-42615(2122-2129).

### 3. Damages

Provisur's damages theory was a reasonable royalty. But Provisur based its damages demand on the value of Weber's entire food-processing lines. Because

this theory relied on the entire market value rule, Provisur needed evidence that the patented features alone drive demand for Weber's entire food-processing line. Provisur purported to rely on its technical expert Vorst for this evidence.

a.      Vorst readily admitted that the patented features were not the sole drivers of demand and that many other features also drove demand for the accused products and overall lines. Appx41449-41450(963:24-964:2); Appx41457(971:17-20). He also did not quantify the relative value contribution of the alleged inventions versus the other components of the machines. Appx41446-41448(960:12-962:10). Vorst relied solely on a conclusory technical assessment of Weber's machines—not any market research, surveys, or customer demand data—to argue that the patented features drove some unspecified amount of demand for Weber's products. Appx33711(190:9-192:17); Appx33730-33733(265:21-279:6); Appx33759-33760(383:8-389:12).

Weber moved to exclude Vorst's opinion, arguing his methodology was unreliable. Appx33175-33193. Weber also moved to exclude Provisur's damages expert, Julie Davis, since she relied on Vorst's opinion that the entire market value rule applies. Appx31672-31695. The district court denied Weber's *Daubert* motions without explanation. Appx39124(3:12-16); Appx39126(5:14-24); Appx39128(7:3-16); Appx11.

**b.** At trial, Vorst testified that the patented features allegedly contained in Weber's food-processing lines "substantially created the value" of some "components." Appx41310(824:8-25); Appx41405(919:12-21). He did not specify which components. Nor did he provide economic evidence of market demand or evidence of how Weber's customers viewed the patented features or their alleged benefits. Appx41448-41489(962:2-963:23). Instead, he said the patented features were "super cool." Appx41312(826:3-19); Appx41333(847:1-25); Appx41378(892:15-16); Appx41405(919:12-21); Appx41408-41409(922:21-923:24). He dismissed all other components of the lines as "conventional." Appx41318(832:13-16); Appx41409(923:10-24); Appx41446(960:17-25). He also did not address testimony from Provisur's own witnesses that customers did not care about the patented features. *E.g.*, Appx33460-33461(37:3-38:16); Appx40822(336:6-15).

Vorst additionally testified that Weber's machines had "faster speed, better accuracy," "higher yield," and a "smaller footprint." Appx41314(828:7-14). But he did not explain how those advantages related to the asserted patents. And Vorst conceded that Weber's lines have features "besides the patented features that influence customers' purchasing decisions." Appx41448(962:2-3). He made no attempt to apportion the value of the patented and unpatented features of the accused machines or the entire food-processing lines.

**c.** Davis, for her part, did not offer an independent opinion that the predicate for application of the entire market value rule was satisfied—she "rel[ied] upon Dr. Vorst for that." Appx41554(1068:19-21). And she offered no opinion about what damages would be appropriate should the rule *not* apply. Appx41564(1078:9-14).

Davis's ultimate damages calculation was multiple times Weber's profit on the accused products. Appx42338-42340(1852:6-1854:6). For example, she concluded that Weber would pay over $250,000—33% of the cost of the entire food-processing line—in royalties on a ~$200,000 SmartLoader to license an advance-to-fill capability (a capability that, as explained above, *supra* Section A.2, the machine does not have). Appx41525(1039:6-8); Appx41560(1074:12-22).

### 4. The jury's verdict

The jury found that the accused slicers infringe the '812 and '436 patents and that the SmartLoader infringes the '936 patent. Appx61. The jury further found Weber's infringement willful and awarded Provisur the full damages it sought for those patents: about $3 million for the '936 patent and about $3.75 million each for the '812 and '436 patents. Appx62-63.

### 5. Post-trial proceedings

Weber moved for JMOL of non-infringement and no willfulness and for a new trial on infringement, willfulness, and damages. Appx40133-40175;

Appx40217-40263. The court denied Weber's motions without substantive analysis. Appx69-72.

Provisur, for its part, moved for enhancement of damages. Appx39430-39432. The district court granted that motion and doubled the jury's damages award. Appx73-86.

This appeal followed.

## SUMMARY OF THE ARGUMENT

**I.** The evidence does not support the jury's infringement verdict.

**A.** Weber's slicers do not infringe. The '812 and '436 patent claims require the slicer's feed apparatus to be "disposed over" the loading apparatus. During IPRs, Provisur successfully argued that this limitation requires lateral alignment, and that Weber's prior-art 904 slicer does not satisfy the lateral-alignment requirement because the feed apparatus's drive mechanism is laterally offset from the loading apparatus's lift tray. The feed apparatus of the accused slicers likewise has a laterally-offset drive mechanism. Accordingly, those slicers, too, are not covered by the claims.

The district court's failure to specify which components must be laterally aligned allowed Provisur to ignore the alignment requirement at trial altogether. Provisur cannot have it both ways: it cannot say to the Board that Weber's prior-art slicers do not satisfy the disposed-over limitation because they lack lateral

alignment, and then argue to the jury that *materially identical* slicers satisfy the requirement because lateral alignment does not matter. The same configuration cannot simultaneously infringe and not invalidate.

**B.**     Weber's SmartLoader does not infringe. Claim 14 of the '936 patent requires a conveyor that *advances* to deposit food into packages. Provisur relied on this advance-to-fill feature during IPR to distinguish prior-art machines that *retract* to fill. The SmartLoader *is a retract-to-fill machine*. And no one—no customer and not even Provisur's expert—has ever configured the SmartLoader to advance to fill. Indeed, the sole evidence of record showed that such a configuration is impossible. Provisur's baseless speculation that the SmartLoader could theoretically advance to fill if one were to input unspecified parameters into the machine's interface is not substantial evidence.

Further, the district court's failure to specify that the conveyor must advance *while* filling allowed Provisur to argue that the SmartLoader infringes merely because its conveyor advances *after* filling. That is wrong. The claim requires the conveyor advance while filling. The SmartLoader does the opposite.

**II.**     The jury's finding of willfulness should be set aside.

Provisur's willfulness case rested on (1) testimony from lawyer White, (2) the patent matrix, and (3) ambushing Weber with claims of discovery abuse to the jury. This is legally insufficient to support the jury's willfulness finding.

The district court should have excluded White's testimony. White's opinion that Weber failed to obtain a "third party" opinion that the patents were invalid or not infringed was inadmissible under 35 U.S.C. § 298. A patentee cannot circumvent § 298 simply by avoiding the word "lawyer." The remainder of White's testimony consisted of a one-sided factual narrative designed to imply a conclusion about Weber's intent. Such "expert" testimony is by definition unhelpful and unreliable.

The patent matrix was relevant only to an undisputed issue—knowledge of the patents. The ratings on the matrix undisputedly do not indicate any belief or knowledge of potential infringement. And the law is clear that knowledge of the patents is not evidence of intentional infringement. Finally, Provisur's baseless allegations of litigation misconduct to the jury were false, irrelevant, improper, and prejudicial.

**III.** The jury's damages verdict should be set aside.

**A.** The district court misunderstood this Court's precedent on the entire market value rule. That rule is a narrow exception to the rule that the royalty base must constitute the smallest saleable patent-practicing unit. The exception applies only if the patentee proves the patented features *alone* drive demand for the entire product used as the royalty base.

The district court erroneously interpreted the law to permit invocation of the entire market value rule merely if the patented features create some unspecified value. That error infected the jury instructions and allowed Provisur to tell the jury the entire market value rule applies even though the patented features undisputedly do not solely drive demand for the entire food-processing line and even though many other features influence customer purchasing decisions.

**B.**    Even if Provisur's entire-market-value-rule theory were admissible, the evidence the jury heard was legally insufficient to support that theory. Weber's food-processing lines undisputedly contain many machines and have many features besides the allegedly patented ones that drive consumer purchases. The entire market value rule was thus foreclosed.

## STANDARDS OF REVIEW

This Court reviews a denial of JMOL under regional-circuit law. *Lincoln Nat'l Life Ins. Co. v. Transamerica Life Ins. Co.*, 609 F.3d 1364, 1367-68 (Fed. Cir. 2010). In the Eighth Circuit, JMOL decisions are reviewed de novo, using the same standard the trial court applied. *Penford Corp. v. Nat'l Union Fire Ins. Co.*, 662 F.3d 497, 503 (8th Cir. 2011). Under that standard, JMOL is appropriate "if the jury's factual findings are not supported by substantial evidence." *Waner v. Ford Motor Co.*, 331 F.3d 851, 855 (Fed. Cir. 2003).

This Court reviews jury instructions on claim construction de novo. *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1337 (Fed. Cir. 2006). A verdict will be set aside if the movant establishes that the instructions were legally erroneous and prejudicial. *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004). "In reviewing jury instructions, the full trial record and the jury instructions in their entirety must be examined." *Id.*

When reviewing damages, this Court applies regional-circuit law "to procedural issues and Federal Circuit law to substantive and procedural issues pertaining to patent law." *Exmark Mf'g Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1347 (Fed. Cir. 2018). In this Court and the Eighth Circuit, a denial of a motion for a new trial on damages is reviewed for abuse of discretion. *Id.* So, too, are evidentiary rulings, including those related to admissibility of expert testimony. *Id.* An error of law is by definition an abuse of discretion. *Id.*

## ARGUMENT

## I. The district court should have granted JMOL of non-infringement.

### A. The undisputed evidence shows that the accused slicers do not infringe the '812 and '436 patents.

The accused slicers do not satisfy the '812 and '436 patents' disposed-over limitation under the district court's construction requiring lateral alignment. Provisur relied on that construction during IPRs to avoid Weber's prior art. And,

because the accused slicers are materially identical to the slicers Provisur distinguished, they cannot infringe as a matter of law.

Provisur was able to argue infringement *only* by exploiting the district court's refusal to instruct the jury about what lateral alignment means, thereby sidestepping the alignment requirement altogether. This resulted in a legal impossibility: a configuration found not to invalidate was found to infringe. That result cannot stand. *See CommScope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1294 (Fed. Cir. 2021) ("That which infringes, if later, would anticipate, if earlier.").

1. **The district court's construction of "disposed over" requires "lateral alignment" of the feed apparatus and loading apparatus.**

The district court construed the disposed-over limitation to require that the entire feed apparatus, including the mechanism that drives the slicer's grippers, be positioned above *and* in "*lateral alignment*" with the loading apparatus's lift tray. Appx64381. That was the very construction Provisur successfully urged in the IPRs to overcome Weber's prior-art 904 slicer.



EX1001, FIG. 1B (ANNOTATED)          DEMONSTRATIVE SCHEMATIC

Appx59311; Appx59314 (Board's reproductions). Specifically, Provisur argued

that the entire feed apparatus, including the mechanism that drives the grippers

(orange in the image above), must lie within the footprint of the lift tray (blue).

As shown below, Provisur argued that Weber's prior-art combination

(depicted in the right image below) did not satisfy Provisur's construction (left

image) because the feed apparatus's drive mechanism (red) is laterally offset

from—i.e., lies *outside* the footprint of—the lift tray (blue rectangles).

Appx61737-61739; Appx61739-61740.



Appx59311; Appx59314; Appx59352.

The Board agreed, construing "disposed over" to require that the entire feed apparatus, including its drive mechanism (e.g., a conveyor belt or a ball-screw actuator), be positioned in "lateral alignment" with the loading apparatus's lift tray—meaning that "when the feed apparatus and loading apparatus are viewed from above, there is no offset between the overhead conveyor assembly of feed apparatus and the lift tray assembly of the loading apparatus." Appx59309 (reference numeral omitted).

The Board's construction necessarily excludes slicers like the 904 slicer whose drive mechanism is laterally offset. The Board was explicit on this point: it found that the 904 slicer's "ball screw actuator (part of the feed apparatus) for the product holder…is not 'positioned above and in vertical and lateral alignment with' the product conveyor (part of the loading apparatus), but is instead laterally

offset when the slicer is viewed from above" and thus does not satisfy the claims. Appx59357. By adopting the Board's construction, the district court necessarily excluded the 904 slicer as well. Appx64381.

### 2. The feed apparatus in the accused slicers is indisputably not laterally aligned with the loading apparatus.

It is undisputed that the accused slicers' drive mechanism (a ball-screw actuator) is laterally offset from the loading apparatus, *just as in the prior-art 904 slicer*.

To demonstrate this, Weber's expert Charles Reinholtz relied at trial on a CAD drawing showing a top view of the accused S6 slicer.

**Weber S6 Slicer** (Top View)



Appx93156 (re-annotated and rotated). The feed apparatus's "ball screw that drives the grippers" (outlined by a red box in the reproduction below) is "substantially off to the side" of the slicer's accused loading apparatus (blue), and is thus "not in…lateral alignment with the lift tray" of the loading apparatus. Appx41999-

42001(1513:2-1515:8) (ball-screw actuator "clearly extends outside of" the loading apparatus's footprint). Provisur's own expert Vorst admitted earlier in the litigation that the drive mechanism in the accused slicers is laterally offset. Appx59473(105:22-106:19).



Appx93156 (re-annotated and rotated); Appx59352 (re-annotated).

Such offset precludes infringement under the district court's construction of "disposed over." This makes sense: the accused slicers are materially identical in relevant part to the 904 slicer Provisur successfully distinguished from its claims during the IPRs. If the lateral offset of the slicer's drive mechanism caused the 904 slicer to fall outside the scope of the claims, the same lateral offset of the same components in the materially identical accused slicers requires the same conclusion. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343,

1351 (Fed. Cir. 2001) ("A patent may not, like a 'nose of wax,' be twisted one way to avoid [invalidity] and another way to find infringement."); *see Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317, 1334 (Fed. Cir. 2003) (reversing denial of JMOL of non-infringement where accused product was similar to prior art distinguished during reexamination).

### 3. The district court's refusal to instruct the jury about the lateral-alignment requirement allowed Provisur to ignore it.

Lacking any evidence of infringement under the district court's lateral-alignment requirement, Provisur ignored the requirement altogether by exploiting the court's refusal to instruct the jury about which components (i.e., the drive mechanism and the lift tray) must be aligned. The district court's refusal constitutes legal error.

The court's preliminary jury instructions stated that "disposed over" means "positioned above and in vertical and lateral alignment with." Appx40314. But the court—over Weber's objection, Appx40335—omitted the Board's important clarification that "lateral alignment" means there must be "no offset between the overhead conveyor assembly of feed apparatus and the lift tray assembly of the loading apparatus" when viewed from above. Appx40340; Appx59309.

The district court's omission proved to be highly prejudicial because it allowed Provisur to simply ignore the lateral-alignment requirement at trial. For example, Vorst asserted that the accused slicers satisfy the limitation merely

because they have certain components (product guides) that are "above" the product conveyor (the accused lift tray), without regard to lateral alignment of the slicers' ball-screw actuator. Appx93692. He did not consider the lateral alignment of that component at all. Appx41998-41999(1512:9-1513:16); Appx42086(1600:4-21); *see* Appx41275-41276 (789:24-790:4). Similarly, during cross-examination of Weber's expert, Provisur's counsel drew a box around the accused slicers' ball-screw actuator and stated that it was okay to "cross that one out" because its lateral alignment did not matter. Appx42090-42091(1604:11-1605:9); *see* Appx42091-42092(1605:20-1606:4); Appx42127(1641:7-19). These statements are based on an incorrect understanding of the disposed-over limitation and thus are not probative of infringement. *See Cordis Corp. v. Boston Sci. Corp.*, 658 F.3d 1347, 1357 (Fed. Cir. 2011). And yet, the jury must have placed dispositive weight on the testimony to find infringement.[5]

---

[5] Provisur seemed to believe it could prove infringement simply by saying it was not pointing to the ball-screw actuator as part of the claimed feed apparatus. But the IPR proceedings demonstrate that the drive mechanism *is* part of the feed apparatus. In distinguishing the prior-art 904 slicer from the claims, the Board explained that "the *ball screw actuator (part of the feed apparatus)* for the product holder (food article gripper)…is…*laterally offset* when the slicer is viewed from above." Appx59357 (emphases added). Provisur cannot avoid that fact by simply asserting it is not so. *Dominion Energy, Inc. v. Alstom Grid LLC*, 725 F. App'x 980, 986 (Fed. Cir. 2018) ("[J]ust saying that something is so does not make it true….").

The Court's decision in *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306 (Fed. Cir. 2003), is instructive. There, the district court construed a key claim term to require three distinct steps, but the jury instructions did not specify if the steps had to be performed sequentially. *Id.* at 1313. The jury returned a non-infringement verdict, and in denying the patentee's JMOL motion, the court reasoned that "the jury reasonably could have determined" that sequential performance of the steps is required. *Id.* This Court reversed, finding that the district court erred by not enforcing its construction, which did not require sequential performance of claim steps. *Id.* The Court further found that the only way the jury could have returned a non-infringement verdict is by improperly importing a sequential-performance limitation into the claims. *Id.* at 1314.

Similar reasoning applies here. The *only* way the jury could have found infringement is to accept Provisur's argument that the claims do not require lateral alignment of the entire feed apparatus, including the ball-screw actuator. The district court should never have allowed the jury to make such a determination. Rather, it should have enforced its construction requiring such alignment—a construction under which no reasonable juror could find infringement. *Id.*; *see Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) (reversing denial of JMOL of non-infringement where patentee made "misleading statement to the jury" that "directly contradict[ed] the district court's earlier

construction"); *Creative Internet Advert. Corp. v. Yahoo!, Inc.*, 476 F. App'x 724, 728-29, 731-33 (Fed. Cir. 2011) (reversing denial of JMOL of non-infringement where the district court left "a critical question of claim construction to the jury," thereby allowing the patentee "to invite the jury to find infringement on a theory that is contrary to the proper construction of the asserted claim") (citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360-62 (Fed. Cir. 2008)).

At the very least, the district court's erroneous instruction necessitates a new trial. *See Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1216 (Fed. Cir. 2002) (granting new trial where defendant "warned the district court concerning the court's failure to properly construe" a key claim term in its jury instruction and proposed an instruction "that would have corrected the flaws").

## B. The undisputed evidence shows that Weber's SmartLoader does not infringe claim 14 of the '936 patent.

The SmartLoader does not satisfy claim 14's advance-to-fill requirement. It is undisputed that the SmartLoader is a *retract*-to-fill conveyor, exactly as disclosed in the prior art Provisur successfully distinguished in the IPR.

Provisur's expert conceded he had no evidence of the accused SmartLoader being used as an advance-to-fill conveyor. Rather, he speculated it could theoretically be reprogrammed to do so. But Provisur proffered no evidence to support such speculation. Instead—exploiting the district court's refusal to instruct

the jury about what an "advancing conveyor" means—Provisur ignored the advance-to-fill requirement and presented the jury with improper and prejudicial arguments about alleged discovery misconduct.

### 1. Claim 14 requires an advance-to-fill conveyor.

All agree that claim 14 requires that the conveyor "advance to fill"—i.e., it must begin in a retracted position and then advance away from the slicer to sequentially fill packages. *E.g.*, Appx30862. Provisur touted this feature during the IPR. There, Provisur argued that Weber's prior art did not satisfy the claim because the references "deposit food items using a *retracting* conveyor" rather than an "*advancing* conveyor." Appx24752-24754 (emphases added).



The Board agreed, Appx23737-23739; Appx23771, and this Court affirmed, *Provisur*, 2022 WL 17688071, at *5.

The district court correctly adopted the Board's construction, ruling that claim 14 requires "an 'advancing conveyor' and not a withdrawing conveyor." Appx30862; *see Alyus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1361-63 (Fed. Cir. 2017) (patentee's unambiguous statements distinguishing prior art during IPR give rise to prosecution disclaimer). Under that construction, it is insufficient that the conveyor advances forward at some time during operation (e.g., to reset after it has retracted to fill). Rather, "the shuttle conveyor must start in a retracted position, and then advance[] *as it fills each new row of emp[t]y packages*." Appx30862 (emphasis added). That is, the conveyor must advance *during filling*.

### 2. The accused SmartLoader is undisputedly a retract-to-fill conveyor.

#### a. The SmartLoader does not advance to fill.

The SmartLoader is a *retracting* conveyor, not an advancing one. The evidence is unanimous on this point.

Weber's expert Reinholtz explained that the SmartLoader fills packages with food by "pulling the rug out from under the food and letting it drop down," which is the hallmark of "a retracting conveyor." Appx42045-42046(1559:12-14, 1560:9-18); Appx42047-42048(1561:19-1562:19); Appx41891-41893(1405:19-1407:17). A Weber employee similarly testified that the "SmartLoader pulls back"—i.e.,

retracts—to "drop[] [food] into the package[s]," Appx41011(525:9-17), while another testified that he had never seen the SmartLoader operate in any other manner, Appx41758-41759(1272:22-1273:14). These witnesses' testimony was corroborated by videos presented by both sides showing the SmartLoader retracting to fill. Appx66993; Appx87661; Appx87666; Appx93768. The sales documentation relied upon by Provisur, moreover, refers to SmartLoader as a "*retract* conveyor[.]" Appx89412; Appx41403(917:11-15).

Provisur's own expert Vorst admitted there was no evidence that any customer has ever used the SmartLoader as an advance-to-fill conveyor. Appx41443(957:21-25); *see* Appx41763(1277:15-17). He also admitted that he never observed the SmartLoader so operating, either personally or in any of Weber's product literature. Appx41441-41443(955:7-12, 957:8-11).

In short, the SmartLoader operates exactly the same way as the prior art Provisur distinguished during the IPR: it removes "the ground from under the feet of the food items when depositing them by moving the conveyor in the withdrawing direction." Appx23738; Appx42056(1570:9-12). Accordingly, no reasonable jury could have found infringement. *See Bowers*, 320 F.3d at 1334.

> **b.** **The SmartLoader cannot be reprogrammed to advance to fill.**

**i.** Rather than presenting evidence that the SmartLoader is an advance-to-fill conveyor, Vorst testified that the machine could theoretically be

reprogrammed to advance to fill if one were to input certain unspecified parameters into the machine's interface. Appx41396-41397(910:4-14, 910:24-911:2); Appx41404-41405(918:21-919:7); Appx42048-42050(1562:20-1564:2).

As an initial matter, this infringement theory fails as a matter of law. "[T]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001). Claim 14 recites a conveyor "configured to" advance to fill. Appx107-108. The SmartLoader is not so configured. It thus does not infringe, regardless of whether the machine could be reprogrammed to fill by advancing.

In any event, Provisur presented no evidence supporting the notion that the SmartLoader can be reprogrammed to advance to fill. Vorst pointed to no "specific instances" where the SmartLoader has been so programmed. *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007). Nor did he provide "evidence or undisputed knowledge" of such reprogramming. *INVT SPE LLC v. ITC*, 46 F.4th 1361, 1376, 1380 (Fed. Cir. 2022) (even where claims are drawn to mere capability, infringement requires "evidence or undisputed knowledge of an instance that the accused product performs the claimed function").

Instead, he relied solely on a demonstrative animation hypothesizing what the SmartLoader *might* look like if reprogrammed. Appx93783; Appx41385(899:3-

7); Appx41396-41398(910:4-912:6); Appx41400(914:3-10); Appx41404-41405(918:21-919:7). But that demonstrative is not evidence and does not cite any evidence. Appx41441-41443(955:7-18, 957:8-11). Vorst did not take any photographs or video of the machine advancing to fill. Appx42051(1565:7-21). He admitted that the only videos Provisur presented to the jury showed the SmartLoader *retracting* while filling. *See* Appx87661; Appx93768; Appx87666; Appx41438-41439(952:23-953:14); Appx41440-41441(954:14-955:12); Appx42122-42123(1636:18-1637:12); Appx42133(1647:8-16). And, while Vorst purported to base his animation on unspecified Weber manuals, Appx41404-41405(918:21-919:3), no such manuals were introduced into evidence or referenced in the animation.

Vorst also did not say which parameters could be used to reprogram the machine in the manner he suggested. Weber's source-code expert, Ricardo Valerdi, on the other hand, confirmed there are *no* such parameters. Appx41901(1415:11-25); *see* Appx41895-41896(1409:13-1410:5); Appx41904-41907(1418:4-1421:1); Appx42050(1564:9-19). Provisur's source-code expert did not testify otherwise, so Valerdi's testimony was unrebutted. Appx41229(743:12-14); Appx42051(1565:1-6). And Reinholtz tried "to cause the machine to operate as an advancing

conveyor" by inputting parameters into the machine's interface as Vorst suggested but was unable to do so. Appx42050-42052(1564:20-22, 1565:22-1566:12).[6]

The evidence also showed that, even if it were possible to reprogram the SmartLoader to operate as an advance-to-fill conveyor (it is not), the machine could not operate that way without defying the laws of physics. This is because the SmartLoader's conveyor belt responsible for dropping food drafts into packages is horizontal, not angled downward as in the '936 patent's figures. *Compare, e.g.*, Appx66993(0:38-0:41, 0:52-1:00), *and* Appx68129, *with* Appx104(Fig. 3).

---

[6] Provisur responded to Valerdi's unrebutted testimony with false accusations of evidence spoliation. Provisur's counsel presented Valerdi with a Weber interrogatory response indicating that Weber changed the SmartLoader's source code before Valerdi reviewed it. Appx41933-41935(1447:19-1449:11). Counsel then implied during closing that the change rendered Valerdi's opinions unreliable. Appx42545-42546(2059:20-2060:2); Appx42554(2068:9-12). Counsel said he "felt terrible for Valerdi" because Valerdi "had no idea what [Weber] had given him," Appx42555-42556(2069:5-2070:2); Appx42612(2126:12-14), and accused Weber of "mak[ing] things up." Appx42615 (2129:7-13); Appx42545-42546(2059:18-2060:5).

The implication that the source-code change had any relation to an advance-to-fill feature was indisputably false. Provisur's own source-code expert admitted the change had nothing to do with the SmartLoader's (in)ability to fill packages by advancing. Instead, the "change in code relate[d] to a change in how the inlay (infeed) conveyer [*sic*] synchronizes with the packaging machine." Appx23200(¶39); *accord* Appx8430(98:21-99:19).



Accordingly, if the conveyor were to advance forward with its belt moving in the same direction (left image), the food would fly off the conveyor rather than fall into the pocket below (right image). Appx42052-42055(1566:13-1569:1). Vorst's demonstrative, which animated food stopping in midair and falling straight down, was akin to "Wile E. Coyote going off the cliff and then running in the air backwards to stop himself." Appx42053-42055(1567:2-1569:1); Appx93783; *see* Appx41612-41613(1126:17-1127:23). Vorst's testimony on this score is thus entitled to no weight. *See The Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1348 (Fed. Cir. 2008) (rejecting patentee's expert's infringement testimony based on animation as "incredible" and "impossible" given that it conflicted with simple geometry).

Given its lack of foundation in admissible evidence—and its conflict with all the other evidence of record—Vorst's speculation that the SmartLoader *could* be reprogrammed to advance to fill if unspecified parameters were changed in an

unspecified way is not substantial evidence that the SmartLoader infringes. *See CommScope*, 10 F.4th at 1297 (Fed. Cir. 2021) (reversing denial of JMOL of non-infringement where, "[n]ot only was there a lack of evidence to show that the accused product met the proper construction of the claims, there is unrebutted evidence showing the opposite"); *ACCO*, 501 F.3d at 1313 (reversing induced infringement judgment where patentee's expert had "no evidence of actual users having operated the [accused product] in an infringing manner"); *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) ("expert's unsupported conclusion on the ultimate issue of infringement is insufficient" to meet patentee's burden of proof).

    **ii.**    Vorst falsely asserted that the reason he had no evidence of infringement was because Weber improperly concealed it. For example, Vorst testified he was unable to show "an actual video of SmartLoader advancing to fill" because Weber employees "would not let [him] do it" and "locked [him] out" of certain configuration settings. Appx41441(955:7-18); Appx41443(957:8-11). During closing, Provisur's counsel told the jury that Weber "wouldn't even let [Vorst] try to reprogram the SmartLoader." Appx42542(2056:20-22).

    These baseless contentions of discovery misconduct were highly prejudicial and should never have been presented to the jury. *See McPheeters v. Black & Veatch Corp.*, 427 F.3d 1095, 1101-02 (8th Cir. 2005) (affirming trial court's

refusal "to inject [a] discovery dispute into the trial" by admitting video deposition regarding sufficiency of interrogatory response); *RightCHOICE Managed Care, Inc. v. Hospital Partners, Inc.*, 2021 WL 4258747, at *1 (W.D. Mo. Sept. 17, 2021) ("[e]vidence and testimony regarding pre-trial discovery disputes" are irrelevant, prejudicial, and inadmissible). Provisur's counsel compounded the prejudice by improperly supplying the jury with his own testimony during closing, stating that Provisur could not obtain clear video of Weber machines "because when we inspected it…[t]here was a big piece of plexiglass on it." Appx42552(2066:22-25). *But see Ayoub v. Spencer*, 550 F.2d 164, 170 (3d Cir. 1977) (counsel's reference in closing to "extraneous matter" unsupported by record evidence was "reversible error"); *Brown v. Royalty*, 535 F.2d 1024, 1028 (8th Cir. 1976) (similar).

Regardless, Provisur's contentions were baseless. Across fifteen deficiency letters, four discovery dispute conferences, five hearings, and three depositions, not once did Provisur say Vorst was not permitted to conduct the inspection he needed. This ambush was highly prejudicial: rather than hearing evidence that Weber infringed, the jury heard false assertions that Weber prevented Provisur from obtaining such evidence. *See Draper v. Airco, Inc.*, 580 F.2d 91, 96 (3d Cir. 1978) (granting new trial where "plaintiff's counsel implied [during closing] that the defendants and their attorneys had deliberately withheld requested documents"); *cf.*

*Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1183 (Fed. Cir. 2002) ("[i]mproper comments" by counsel "run the risk of infecting the entire trial").

> **3.** **The district court's refusal to provide the jury its full construction allowed Provisur to mislead the jury.**

As with the lateral-alignment requirement in the '812 and '436 patents, the district court failed to enforce the advance-to-fill requirement at trial. The district court's jury instructions omitted critical parts of the construction:

| Claim Construction | Jury Instruction |
|---|---|
| "Claim 14 requires an 'advancing conveyor' and not a withdrawing conveyor. *This means that the shuttle conveyor must start in a retracted position, and then advances as it fills each new row of emp[t]y packages*." <br><br> Appx30862 (emphasis added) | "[C]laim 14 is construed as requiring an advancing conveyor." <br><br> Appx29 |

As a result, the jury heard only that claim 14 requires a conveyor to "advance," not "advance-*to-fill*," which gutted the most important part of the construction. Weber warned the court that its departure from its claim construction would cause mischief because, without the added clarification, "a withdrawing conveyor that also advances at some point could be argued to meet the claim—a proposition [the district court] explicitly rejected in its summary judgment order." Appx40335.

And, indeed, this is what happened. Provisur exploited the court's vague instruction to disregard the advance-to-fill requirement altogether. For example,

Provisur showed the jury videos of the SmartLoader's conveyor advancing *after* it completed its retract-to-fill operation and was advancing back to its starting position to reset. Appx87666; Appx93768; Appx42122-42123(1636:18-1637:12); Appx42133(1647:11-19); Appx41751(1265:7-10). But advance-*after*-fill is *not* advance-*to*-fill. Claim 14 requires the latter, and so Provisur's misleading statements on this score are not probative of infringement. *Exergen*, 575 F.3d at 1321; *Cordis*, 658 F.3d at 1357.

Once again, the district court's refusal to modify its jury instruction to reflect the actual construction it adopted is prejudicial legal error that impermissibly allowed Provisur and the jury to disregard the construction and reach a legally insupportable verdict. *See Moba*, 325 F.3d at 1314. No reasonable juror could find infringement under the correct construction, and so reversal of the district court's denial of JMOL is warranted. At the very least, Weber is entitled to a new trial. *Texas Digital*, 308 F.3d at 1216.

## II. The district court should have granted JMOL of no willfulness.

### A. Provisur's evidence was legally insufficient to support the verdict.

Weber was entitled to JMOL of no willfulness. Provisur's willfulness case centered on (1) lawyer White's testimony that Weber should have obtained a "third party" opinion on Provisur's patents; (2) the patent matrix's ratings of Provisur's patents; and (3) evidence designed to make Weber look like a bad actor. Item (1)

was inadmissible, and items (2) and (3) were legally insufficient to support a finding of willful infringement.

### 1. The district court erred in admitting White's testimony.

#### a. White's testimony that Weber failed to obtain an opinion of counsel violated 35 U.S.C. § 298.

Section 298 provides that "[t]he failure of an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent." The provision was "designed to protect attorney-client privilege and to reduce pressure on accused infringers to obtain opinions of counsel for litigation purposes." H.R. Rep. No. 112-98, at 53. Thus, an accused infringer's "decision not to seek an advice-of-counsel defense is legally irrelevant." *SRI*, 930 F.3d at 1309.

White's testimony flagrantly violated § 298. In the guise of testifying about "industry practice and standards for avoiding patent infringement," Appx41084(598:19-20), White suggested the jury could find Weber's conduct willful because Weber did not "consult a third party to evaluate" the risk associated with Provisur's patents, Appx41139-41140(653:18-655:12). White (a lawyer) explained that such evaluations were "the kind of thing" he did "in the firm that [he] used to operate" (a law firm). Appx41140(654:4-5). Specifically, he offered "services" (legal services) "to people who said, Hey, here's a patent. We'd like to

get further information about it." Appx41140(654:5-7). These "services" included a "landscape search," a "background search," a "freedom to operate analysis," or a validity analysis, or investigation whether "there's an off-patent solution." Appx41139-41141(653:23-655:28); *see* Appx77.

The district court's admission of this testimony was error. A party cannot circumvent § 298 by simply substituting "third party" for "lawyer." The services White testified Weber failed to employ—patent landscape searches, FTO analyses, patent validity analyses, and so on—are *legal* services. No one other than a lawyer is qualified to provide them. Indeed, Provisur's opposition to Weber's *Daubert* motion against White conceded this point. Provisur did not argue that the "third parties" White was referring to were not lawyers; instead, Provisur *admitted* that White "consider[ed]…whether Defendants sought advice of counsel" and argued this consideration was "permissible" notwithstanding § 298. Appx26685. Only after the district court rejected that argument did Provisur pretend that White's references to "third parties" did not mean lawyers after all.

In short, White testified that Weber willfully infringed because it failed to present opinion-of-counsel evidence. The admission of that testimony violated § 298. *SRI*, 930 F.3d at 1309; *see Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 112 (2016) (Breyer, J., concurring) ("Congress has…left it to the potential

infringer to decide whether to consult counsel—without the threat of treble damages influencing that decision.").

> **b.    White's remaining testimony was inadmissible under *Daubert*.**

The remainder of White's testimony consisted of a selective factual narrative designed to imply a conclusion about Weber's mental state. This testimony was improper as a matter of law.

White walked through the patent matrix in laborious detail, pointing out that Weber personnel rated the asserted patents a "3." Appx41127(641:7-16); Appx41130-41137(644:23-651:23). But White never explained what the ratings meant. He candidly admitted he did not understand much of the spreadsheet. Appx41115(629:1-6). White also commented that some of the Weber personnel who rated the patents in PATOffice testified not remembering having seen them before—thereby intimating (baselessly) that Weber's witnesses had testified untruthfully. Appx41146-41154(660:12-668:23). And he testified that Weber's interrogatory responses concerning the date of Weber's first knowledge of the patents changed over time. Appx41106-41107(620:9-621:9); Appx41115-41119(629:17-633:12); Appx41126-41127(640:15-641:6); Appx41129-41130(643:17-644:22); Appx41136(650:12-18).

This testimony was likewise inadmissible. White was not offering an expert opinion here (which even Provisur's counsel admitted, Appx41107(621:8-9)).

Instead, he simply served as a conduit for Provisur to introduce evidence that, in its view, supported a finding of willfulness. That "is not the stuff of expertise." *Trading Techs. Int'l, Inc. v. IBG LLC*, 2020 WL 12309206, at \*2 (N.D. Ill. Oct. 21, 2020). "Determining what a party intended is a classic jury function," and White's "training as a lawyer does not give him any special skill in deciphering [Weber's] collective intent." *Id.* (excluding testimony from patent attorney that accused infringer had a good-faith belief that the asserted patents were invalid or not infringed); *see United States v. Rouse*, 111 F.3d 561, 571 (8th Cir. 1997) (expert's testimony regarding witness credibility was properly excluded because "assessing the reliability or credibility of [witnesses] is the exclusive function of the jury").

### 2. The patent matrix was relevant only to knowledge of the patents—not knowledge of infringement.

It is undisputed that the patent matrix—the crown jewel of Provisur's willfulness case—was irrelevant to infringement. Weber's CEO so testified, Appx41618-41619(1132:12-1133:1), and Provisur introduced no contrary evidence. Even the district court acknowledged that the ratings did not suggest knowledge of infringement. Appx26610(29:21-23). This, however, did not stop Provisur's counsel from repeatedly and falsely implying in closing that the document evidenced Weber's knowledge that it infringed. *See* Appx42538-42539(2052:5-2053:20); Appx42553(2067:20-24).

The patent matrix was relevant *only* insofar as it showed Weber knew of the patents as of the dates they were rated. But that was undisputed—Weber admitted during discovery it was aware of the patents during the entire damages window. Appx31387-31388. Accordingly, the patent matrix does not move the needle on willfulness at all and cannot constitute substantial evidence of willfulness. *See BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Organisation*, 28 F.4th 1247, 1274 (Fed. Cir. 2022) (affirming JMOL of no willfulness where patentee presented evidence only that defendant was "aware and kept track of [the asserted] patents" because "knowledge of the asserted patent and evidence of infringement" is "necessary, but not sufficient, for a finding of willfulness").

### 3. Provisur's allegations of discovery misconduct were baseless and irrelevant to willfulness.

Provisur's repeated suggestions to the jury that Weber engaged in discovery misconduct were legally irrelevant and baseless. *Supra* Section I.B.2.b. Especially improper was Provisur's request during closing for the jury "to make inferences" based on Weber's alleged misconduct. That amounts to an adverse-inference instruction based on spoliation. *Only* the court can provide such an instruction, and *only* as a sanction when the court finds spoliation. *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 461-62 (8th Cir. 2013) (court must make explicit findings of bad faith and prejudice before giving spoliation instruction). There was no such finding here.

To the extent any of Provisur's arguments were relevant at all (most were not), they went solely to whether Weber's "conduct was 'egregious behavior' or 'worthy of punishment.'" *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020). Those issues are relevant to enhanced damages—not willfulness vel non—and "are therefore not appropriate for jury consideration." *Id.* Provisur's counsel explicitly framed its jury arguments in terms of egregiousness. Appx40528(42:19); Appx42564-42566(2078:23-2080:6) ("This is the most egregious case of patent infringement you can possibly imagine"), and urged the jury to punish Weber for its "bad behavior," Appx42565(2079:5-6). That was improper. The jury's job was to decide whether Weber deliberately infringed; egregiousness was for the judge. *Eko*, 946 F.3d at 1378.

Provisur also implied to the jury that Weber copied Provisur's patents. Appx40518(32:23); Appx40530(44:21-22). However, when asked for "any evidence of actual copying," White admitted there was none. Appx41161(675:16-19). Instead, he said "there's allegations of infringement. Infringement is sort of copying." *Id.* It is not. "Copying requires evidence of efforts to replicate a specific product." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1370 (Fed. Cir. 2011). Infringement, standing alone, is "not probative of copying." *Id.*[7]

---

[7] The district court repeated this error when granting enhanced damages. Appx76-77 (stating Weber "intentionally copied Plaintiff's patented ideas").

In short, Provisur's arguments about discovery misconduct were not only improper; they were irrelevant to willfulness and thus insufficient to support the verdict. Because Provisur failed to introduce *any* admissible evidence showing that Weber deliberately infringed Provisur's patents, the court should have granted JMOL of no willfulness.

## B. At minimum, the district court's errors require a new trial.

At the very least, Weber is entitled to a new trial on willfulness. The admission of White's testimony and Provisur's counsel's improper comments were enormously prejudicial to Weber. The prejudice could hardly be more salient: during closing, Provisur's counsel invited the jury to draw inferences legally prohibited by § 298, stating that "they [Weber] don't go out and get a freedom-to-operate opinion. They don't go out and do further analysis. They do nothing…. It's pretty dishonest conduct." Appx42613(2127:9-18). Accordingly, if the Court does not order JMOL, Weber is at least entitled to a new trial.

## III. Weber is entitled to a new trial on damages.

Provisur's damages theory was predicated on a legally improper use of the entire market value rule. Specifically, Provisur used Weber's entire food-processing line—which comprises thousands of components having nothing to do with Provisur's patents—as a royalty base instead of the few discrete products *actually* accused of infringement.



Appx93110 (excerpted and annotated); Appx70439; Appx84076; Appx89392.
That damages theory should never have gone to the jury, and the verdict cannot
stand.

### A. The district court misapplied this Court's precedent concerning the entire market value rule.

Under 35 U.S.C. § 284, a successful patent-infringement plaintiff is entitled
to "damages adequate to compensate for the infringement." "[T]he value to be
determined is only the value that the infringing features contribute to the value of
an accused product." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l,
Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018). This principle gives rise to the rule of
apportionment: the patentee "must in every case give evidence tending to separate
or apportion the defendant's profits and the patentee's damages between the
patented features and the unpatented features." *Id.*

When a patentee accuses a multi-component product of infringement and seeks reasonable-royalty damages, "the royalty base should not be larger than the smallest salable unit embodying the patented invention." *Id.* That is because "use of the entire market value of a multi-component product that includes a patented component…'cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.'" *Id.* (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011)). Moreover, even if "a damages theory relies on the smallest salable unit as the basis for calculating the royalty, the patentee must estimate what portion of that smallest salable unit is attributable to the patented technology when the smallest salable unit itself contains several non-infringing features." *Id.*

The entire market value rule is a "narrow exception" to the rule restricting the royalty base to, at most, the smallest salable unit embodying the invention. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). Specifically, the patentee may use the entire market value of the accused product as the royalty base only if "the feature patented constitutes *the* basis for consumer demand." *Power Integrations*, 904 F.3d at 978 (emphasis added). If the accused product has "other valuable features" that "cause consumers to purchase the product," the entire market value rule is inappropriate. *Id.* at 979; *see VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014).

This Court has frequently emphasized the "demanding" nature of the entire-market-value-rule exception. *Power Integrations*, 904 F.3d at 977-78. Specifically, application of the rule is appropriate only if the patentee proves that the "patented feature is the sole driver of customer demand or substantially creates the value of the component parts." *Id.* at 979 (collecting cases). If there is "evidence that [the] accused product has other valuable features beyond the patented feature, the patent holder must establish that these features do not cause consumers to purchase the product." *Id.* That is, the patentee must "show[] that the patented feature *alone* motivates customers to purchase the infringing product in the first place." *Id.* (emphasis added). Critically, application of the rule is *not* appropriate merely based on proof that "the patented feature is viewed as essential, that a product would not be commercially viable without the patented feature, or that consumers would not purchase the product without the patented feature." *Id.*

> 1. **The district court erred in denying Weber's *Daubert* motion to exclude Provisur's damages theory.**

Vorst's entire-market-value-rule theory was legally unsound and should have been excluded at the *Daubert* phase. The jury should never have heard about the value of Weber's entire food-processing lines. Vacatur of the damages award is warranted for this reason alone. *See Uniloc*, 632 F.3d at 1319-21.

Vorst's expert report conclusorily stated that the SmartLoader and the accused slicers "dr[ove]" the customer to purchase the food processing line."

Appx33604-33605(¶¶89-91); Appx33623(¶¶126-128). Vorst based this opinion solely on his subjective assessment of the accused products. Appx33759-33761(383:8-389:12); Appx33711(190:9-192:17); Appx33730-33733(265:21-279:6). He did not rely on any customer surveys, third-party analysis of customer purchasing decisions, market analysis, customer interviews, or testimonials. Appx33692(114:7-116:11); Appx 33711(190:9-192:22). Vorst simply said the accused products were "cool" and a "game changer" that would "help impact [] sales and push people over to one product or another." Appx33711(190:22-192:17); Appx33732(275:15-20) (SmartLoader); Appx33772(433:6-434:3) (slicers).

This analysis should have been excluded for three related reasons.

*First*, Vorst's report did not even purport to state that the *patented features* drove demand for Weber's lines; instead, he stated that the *accused products* (the SmartLoader and the slicers) drove purchases. Those products undisputedly contain non-patented features. For example, Provisur witnesses testified about the benefits of the SmartLoader's inline loading capability. Appx40728-40730(242:6-244:22); Appx41312(826:3-7); Appx41315(829:21-25); Appx41406-41407(920:15-921:5). Inline loading undisputedly is in the prior art. Appx42148(1662:4-21); Appx42496(2010:6-9). The Weber slicers, for their part, include as "critical component[s]" custom-made Weber blades. Appx40818-

- 65 -

40820(332:24-334:6); *see* Appx41589(1103:11-19). Provisur thus failed "to apportion the royalty down to a reasonable estimate of the value of its claimed technology, or else establish that its patented technology drove demand for the entire product." *VirnetX*, 767 F.3d at 1329.

*Second*, even if Vorst *had* properly focused on the patented features, his opinions would still be irrelevant. His assertion that the accused functionalities are generally important, such that they "push people over to one product or another," is exactly the sort of thing this Court has held does *not* justify invocation of the entire-market-value-rule. *See Power Integrations*, 904 F.3d at 979 ("it is not enough to merely show that the patented feature is viewed as valuable, important, or even essential to the use of the infringing product").

*Third*, Vorst admitted that Weber's food-processing lines include many other components besides the accused products—portioning conveyor, interleavers, check weighers, rockers, robots, and transport conveyor, for example—that also drive demand. *See* Appx33694(121:6-9, 123:21-124:5); Appx33697(135:8-14). Indeed, Vorst dismissed the idea that customers might purchase a food-processing line solely to obtain the patented features—the factual predicate for application of the entire market value rule—as "silly." Appx33698(137:7-20).

Other Provisur witnesses testified similarly. Provisur's CEO admitted that the allegedly inventive feature of the '436 and '812 patents "would not have been…a salient feature that a customer would be interested in." Appx33188(37:6-22); Appx40822(336:6-15). He and others also admitted that food-processing lines have other important features that cause customers to purchase them, including blades, hygiene, yield, and size. Appx33463(297:1-7); Appx34044(190:5-5, 192:9-16); Appx40688-40689(202:14-203:5). And damages expert Davis admitted that a slicer's footprint, throat size, and blade are important factors in purchasing decisions but are not related to the asserted patents. Appx32196-32199(125:14-126:13, 127:13-134:1, 138:7-139:10).

Provisur thus had no evidence that "the patented feature was the sole driver of consumer demand, i.e., that it alone motivated consumers to buy the accused products." *Power Integrations*, 904 F.3d at 980. The district court should have never allowed Provisur's entire-market-value-rule theory to go to the jury. *See Uniloc*, 632 F.3d at 1320-21 (testimony about the entire market value of the accused products is inadmissible unless the patentee can "prove that the patent-related feature is *the* basis for customer demand") (emphasis added).

### 2. The district court's jury instructions misstated the law.

The district court's error at the *Daubert* stage was particularly prejudicial in light of its erroneous jury instruction on apportionment. Weber's proposed

instruction tracked the Federal Circuit Bar Association model jury instructions. Appx50277-50278. The district court largely rejected it and instead crafted an instruction stating that, "[i]n determining a damages base, you may use the value of an entire multi-component product if the patented feature is either (1) the sole driver of customer demand, or (2) substantially creates the value of the component parts." Appx42401-42405(1915:12-1919:15); Appx50227-50228. The district court also refused Weber's request to specify that "a royalty compensating the patent holder for damages must reflect the value attributable to the infringing features of the product, and no more." Appx50227-50228.

The instruction given was erroneous. *First*, framing the legal test as two enumerated options separated by a disjunctive "or" implies that a patentee may invoke the entire market value rule simply by showing that the patented feature "substantially creates value" without showing that it solely drives demand for the product used as the royalty base. That is wrong. The patented feature must "account[] for almost all of the value of the product as a whole," *Power Integrations*, 904 F.3d at 978—which means showing that the patented feature "alone motivate[s] consumers to buy the accused products," *id.* at 979-80. Put differently, "sole driver of consumer demand" and "substantially creates the value of the component parts" are two ways of saying the same thing. The district court's

instruction wrongly suggested that "substantially creates the value of the component parts" is an alternate (and easier-to-satisfy) trigger for the rule.

*Second*, the court erred in deleting the instruction that a royalty "must reflect the value attributable to the infringing features of the product, and no more." Appx42405(1919:14-15). That requirement comes verbatim from this Court's caselaw. *E.g.*, *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). Deleting it allowed Provisur to ask the jury to excuse its failure to separate the value attributable to the infringing and non-infringing features in the accused products. Appx42615(2129:17-18).

## B.    The jury's damages award lacks substantial evidence.

Even setting aside the district court's legal errors—which are reason enough to vacate the damages award—the evidence Provisur ultimately adduced was insufficient as a matter of law to support the award.

Vorst performed no market analysis. Appx41448(962:5-20). He surveyed no customers, spoke to no salespeople, and did no pricing comparisons. His opinions were entirely a subjective assessment, allegedly based on his technical experience, that the patented features were "super cool," while everything else in the lines was "conventional." Appx41318(832:13-16); Appx41333(847:12-16) (VarioSlicer); Appx41378(892:13-19) (SmartLoader). As to the SmartLoader, for example, Vorst said, "[i]f it wasn't super cool, I don't think it would say 'smart' on the front."

Appx41408-41409(922:25-923:1). And, while Vorst referred to "advantages" of the Weber products—including speed, accuracy, hygiene, footprint, and inline loading capability, *see* Appx41312(826:3); Appx41314(828:7-14); Appx41330-41332(844:9-846:22)—he never said those advantages were related to anything in Provisur's patents.[8] They are quite obviously not. Appx41965-41966(1479:23-1480:05); Appx42046-42047(1560:19-1561:8); *see Uniloc*, 632 F.3d at 1317 (patentee must "carefully tie proof of damages to the claimed invention's footprint in the marketplace").

Even setting aside the conclusory nature of these assertions, they are legally insufficient to invoke the entire market value rule. Vorst admitted "[t]here are things besides the patented features that influence customers' purchasing decisions," Appx41448(962:2-4), and that the patented features "did not solely drive demand" of any of the accused food-processing lines, Appx41449-41450(963:24-964:2); Appx41457(971:14-20). Ample trial evidence corroborated this point: as explained above, features like yield, throughput, giveaway, hygiene, throat width—none of which have anything to do with Provisur's purported inventions—are important to customers. Appx40994-40998(508:1-512:2);

---

[8] Nor could Vorst have credibility done so. For example, inline loading, the advantages of which Vorst emphasized repeatedly, Appx41312(826:3); Appx41315(829:21-25); Appx41406-41407(920:15-921:5), was in the prior art. Appx42148(1662:4-21); Appx42496(2010:6-9).

Appx41021-41024(535:13-538:219). And other machines within food-processing lines besides the accused products—for example, Pick Robots, check-weighers, interleavers—drive demand. Appx41021-41024(535:13-538:219); Appx41029-41030(543:3-544:11); Appx41954(1468:11-22). Indeed, the evidence showed that no Weber customer has ever purchased a food-processing line because it contained a SmartLoader or because it contained the configuration of components allegedly claimed in the '812 and '436 patents. Appx41012-41013(526:25-527:2); Appx41022(536:19-23); Appx41024(538:17-19); Appx41030(544:10-12).

Nor can Davis's testimony support Provisur's reliance on the entire market value rule. She simply relied on Vorst. Appx41554-41556(1068:19-1070:25). Davis's only independent observation was that it was "appropriate to use the sale of the entire food-processing line" for the royalty base because "that's the way…Weber and Provisur sell these products." Appx41527(1041:18-19). As an initial matter, that is false. Each machine is separately priced, even when it is sold as part of a line. Appx40982(496:17-19).

More importantly, however, this Court's precedent is clear that, even if the patented feature is sold as a part of a larger product, the law still "requires patentees to apportion the royalty down to a reasonable estimate of the value of the claimed technology, or else establish that its patented technology drove demand for the entire product." *VirnetX*, 767 F.3d at 1329. "There is no necessity-based

exception to the entire market value rule." *Id*. (rejecting patentee's argument that it could use the cost of an Apple software upgrade as the royalty base for a patent on FaceTime because Apple did "not actually charge separately for FaceTime on [its] devices"). The law does not permit Provisur to use the entire line as a royalty base simply because that is how the products are sometimes sold.[9]

*Power Integrations* demonstrates that the verdict here is legally insupportable. The patent there covered a switching regulator with a "frequency reduction feature" that made power-supply controller chips more efficient. 904 F.3d at 978. The patentee presented—and the jury accepted—a damages calculation that relied on the entire market value rule. *Id.* at 970. The evidence showed that the "patented frequency reduction feature was essential to many customers," that "some customers asked for the [patented] feature, that products with the [patented] feature outsold other products, and that technical marketing materials promoted the [patented] feature." *Id.* at 978. But there was also evidence that the accused chips had "other valuable features," like "jittering." *Id.* at 979. And the patentee presented "no proof that these features, including jittering, did not affect consumer demand." *Id.* Without such proof, the patentee "did not meet

---

[9] Despite the clarity of the law on this point, Provisur's counsel repeatedly implied that the jury could base a damages award on the value of the Weber lines because the "products are sold as lines." Appx42346-42350(1860:2-1864:18).

its burden to show that the patented feature was the sole driver of consumer demand, i.e., that it alone motivated consumers to buy the accused products." *Id.* at 979-80. The evidence was therefore "insufficient as a matter of law to invoke" the entire market value rule. *Id.* at 980. This Court accordingly vacated the damages award and remanded for a new trial.

The same conclusion is appropriate here. At *best*, Provisur presented evidence that the patented features were "cool" and may have contributed *some* value to Weber's lines. That is legally insufficient. Provisur did not even try to show "that the patented feature was the sole driver of consumer demand, i.e., that it alone motivated consumers to buy the accused products," or that other aspects of the accused lines (for example, Weber's custom blades) did not influence purchasing decisions. *Id.* at 979-80; *see LaserDynamics*, 694 F.3d at 68 (setting aside damages verdict based on the entire market value of accused laptops because, while there was evidence that "customers would not want" a laptop without the patented features, there was no "proof that any one of those features *alone* drives the market for laptop computers") (emphasis added).

This case illustrates the wisdom of this Court's strict constraints on use of the entire market value rule. Davis's calculated royalty per unit for the '936 patent (over $250,000) amounted to 4.5 times the profit Weber makes on a SmartLoader. Appx42338-42339(1852:6-1853:5). And her calculated royalty per unit for the

'436 and '812 patents (about $470,000) amounted to three times the profit Weber makes on a slicer. Appx42339-42340(1853:17-1854:6). In other words, Davis concluded Weber would have been willing to pay a multiple of its profit margin on the accused machines to license the patents. That is not a reasonable conclusion.

Davis's damages calculation for the '936 patent leads to a particularly absurd result. Even assuming the SmartLoader could somehow be reconfigured to fill food packages by advancing, as required by claim 14, it is undisputed that *no customer has ever used the SmartLoader this way.* So Davis concluded, and the jury agreed, that Weber would have given up nearly five times its profits on the SmartLoader to license a patent on a feature no one uses.

That is an unsupported—and insupportable—damages calculation. The jury's award should be set aside.

## CONCLUSION AND RELIEF SOUGHT

This Court should reverse the district court's denial of JMOL of non-infringement. Alternatively, the Court should vacate that ruling, reverse or vacate the court's denial of JMOL of no willfulness, vacate the jury's damages award, and remand for a new trial.

Dated: April 21, 2023

Respectfully submitted,

*/s/ William H. Milliken*
Daniel E. Yonan
Donald R. Banowit
William H. Milliken
Kristina Caggiano Kelly
Richard A. Crudo
STERNE KESSLER GOLDSTEIN &
     FOX PLLC
1100 New York Avenue, NW
Washington, DC 20005
(202) 371-2600

*Counsel for Defendants-Appellants*

# ADDENDUM

# TABLE OF CONTENTS

| Date Filed | # | Docket Text | Appx |
|---|---|---|---|
| 07/13/2022 | 341 | ORDER granting in part and denying in part 285 Defendants' Motion to Excludethe Improper Expert Opinions of White and McGuire. Signed on 7/13/2022 by District Judge Stephen R. Bough. **Confidential Material Omitted.** | Appx1-10 |
| 09/30/2022 | 441 | ORDER granting in part and denying in part 408 Sealed Motion.; granting in part and denying in part 419 Sealed Motion.; denying 379 Sealed Motion.; denying 380 Sealed Motion.; denying 383 Sealed Motion. Signed on 9/30/2022 by District Judge Stephen R. Bough. | Appx11-13 |
| 10/28/2022 | 485 | JURY INSTRUCTIONS GIVEN | Appx14-59 |
| 10/28/2022 | 489 | JURY VERDICT. | Appx60-67 |
| 10/28/2022 | 490 | CLERK'S JUDGMENT. | Appx68 |
| 01/09/2023 | 537 | ORDER denying 501 motion for judgment as a matter of law; denying 503 motion for new trial. Signed on 1/9/2023 by District Judge Stephen R. Bough. | Appx69-72 |
| 01/09/2023 | 538 | It is hereby ORDERED that Plaintiff's Motion for Willful Infringement Enhanced Damages (Doc. #497) is GRANTED. Plaintiff is awarded enhanced damages of double the jury's verdict on the '436, '812, and '936 patents. | Appx73-86 |
| 01/09/2023 | 539 | ORDER granting in part and denying in part 499 Motion for Supplemental Damages, Pre- and Post-Judgment Interest, and an Ongoing Royalty. Signed on 1/9/2023 by District Judge Stephen R. Bough. | Appx87-98 |
| 02/22/2019 | 1-3 | Exhibit C - U.S. Patent No. 7,065,936 | Appx99-109 |
| 05/06/2020 | 1-1 | Exhibit A – U.S. Patent No. 10,625,436 | Appx110-139 |
| 05/06/2020 | 1-2 | Exhibit B – U.S. Patent No. 10,639,812 | Appx133-169 |



Appx1















CONFIDENTIAL MATERIAL OMITTED





IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| PROVISUR TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-CV-06021-SRB |
| | ) | |
| WEBER, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

On September 30, 2022, the Court presided over a pretrial conference with the parties. For the reasons stated on the record, it is hereby **ORDERED** that:

(1) Defendants' Motion to Exclude the Expert Opinions of Ms. Julie L. Davis (Doc. #379) is **DENIED**;

(2) Plaintiff's Motion to Exclude Opinion of Vincent A. Thomas (Doc. #380) is **DENIED**;

(3) Defendants' Motion to Exclude the Improper Expert Opinions of Dr. Keith Vorst (Doc. #383) is **DENIED**;

(4) Defendants' Motion in Limine (Doc. #408) is **GRANTED IN PART** and **DENIED IN PART**.

Defendants' motion is **GRANTED** on the following topics:

Motion to Exclude Reference to Discovery Disputes, Motions, or Court Orders;

Motion to Preclude Provisur Attorneys or Witnesses From Arguing that the PTAB Found the Asserted Patent Claims to be Valid; and

Motion to Preclude Provisur From Seeking Damages on Sales of the weSLICE 9500.

Defendants' motion is **DENIED** on the following topics:

Motion to Exclude Evidence of Weber's "Pillage and Protect" Marketing Plan;

Appx11

Motion to Exclude Evidence of Weber's Competitive Intelligence Gathering;

Motion to Exclude Evidence of Knowledge of the Asserted and Other Provisur Patents;

Motion to Exclude Certain Arguments Under the Doctrine of Equivalents;

Motion to Exclude Untimely New Theories or Evidence of Infringement;

Motion to Exclude Evidence of Design Changes and Argument that Such Changes Suggest a Belief of Infringement;

Motion to Preclude Provisur from Seeking Additional Damages under a Provisional Rights Theory.

Finally, Defendants' Motion to Exclude Evidence of European Patents and Proceedings is **GRANTED IN PART** and **DENIED IN PART** as follows. The motion is denied insofar as evidence of the European patents and evidence of the parties' patent litigation in Germany will be admitted. The motion is otherwise granted.

(5) Plaintiff's Motion in Limine (Doc. #419) is **GRANTED IN PART** and **DENIED IN PART**.

Plaintiff's motion is **GRANTED** on the following topics:

Bar Defendants from Presenting Testimony, Argument, and Evidence at Trial on Any Subject Where Defendants Invoked Privilege to Prevent Discovery;

Bar Defendants from Presenting Any Advice of Counsel Defense to Willful Infringement;

Bar Defendants from Presenting Testimony, Argument, and Evidence Regarding Unrelated Employment Litigation Between Scott Scriven and His Former Employer Robert Reiser & Company;

Bar Defendants from Using Cumulative and Confusing Product Documentation from Defendants' Unsuccessful IPRs;

Bar Defendants from Presenting Undisclosed Expert Testimony regarding Priority Dates and Invalidity on § 101 and § 112 Non-Prior Art Grounds;

Bar Defendants from Presenting Testimony, Argument, and Evidence Relating to Validity and Infringement of Unasserted Claims;

Bar Defendants from Presenting Defendants' Fact Witness Testimony Regarding Provisur's Patent Claims, Infringement, or Invalidity; and

2

Bar Matthias Leistner from Testifying.

Plaintiff's motion is **DENIED** on the following topics:

Bar Defendants from Presenting Testimony, Argument, and Evidence Regarding a Decade-Old Listeria Outbreak at Facilities of Third-Party Maple Leaf, Inc.;

Bar Defendants from Presenting Testimony, Argument, and Evidence Regarding Non-Parties CCI Industries, Inc., Henry Crown and Company, and their Associated Companies;

Bar Defendants from Presenting Testimony, Argument, and Evidence Regarding Patent Invalidity Evidence that Relies on More Than Defendants' Court-Ordered List of References;

Bar Defendants from Presenting Testimony, Argument, and Evidence Regarding the Expiration of the '089 and '936 Patents;

Bar Defendants from Presenting Testimony, Argument, and Evidence that Provisur Does Not Practice the Asserted Patents. However, the attorneys and witnesses shall not use the terms "patent troll" or "pirate" at trial; and

Bar All Attorneys from Referring to Themselves as "Patent" Counsel and or "Patent" Law Firms.

The parties may consult the transcript for further details and/or clarification.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: September 30, 2022

3

Members of the Jury Panel, we are about to begin the process of selecting which of you will be the jury that tries this case. In that process you will be asked questions by me or by the attorneys or by both that touch on your qualifications to sit as jurors in this case. You will be placed under oath or asked to affirm that you will truthfully and completely answer these questions put to you.

During this jury selection process and during the trial, it is important that all the information you receive about the case comes from the courtroom. So, from now on until you are discharged from the case you may not discuss this case with anyone and that includes the other potential jurors, except during deliberations if you are selected as a juror. However, you may tell your family, close friends, and other people about your participation in this trial, but only so they will know when you are required to be in court. If you do that, please warn them not to ask you about this case or try to tell you anything they know or think they know about it, or discuss this case in your presence.

Also, just as importantly, you must not communicate any information at all about the case to anyone by any means, directly or indirectly, in face-to-face conversation or by any digital media.

If you discuss the case with someone other than the other jurors during deliberations, you may be influenced in your verdict by the opinions of people other than the other jurors. That would not be fair to the parties and it would result in a verdict that is not based entirely on the evidence in court and the law the court gives you.

It is very important that you abide by these rules. Failure to follow these instructions, and indeed any instructions the court gives you during the trial could result in the case having to be

retried. And failure to follow these and the court's other instructions could result in you being held in contempt of court and punished accordingly.

Those of you who are selected to try this case will receive similar instructions as we go through the trial.

# INSTRUCTION NO. 2

During this recess, and every other recess, do not discuss this case among yourselves or with anyone else, including your family and friends. Do not allow anyone to discuss the case with you or within your hearing. "Do not discuss" also means do not e-mail, send text messages, blog or engage in any other form of written, oral or electronic communication, as I instructed you earlier.

You must decide this case only from the evidence received by the court here in the courtroom and the instructions on the law that I give you.

Do not read any newspaper or other written account, watch any televised account or streamed video account, or listen to any streamed internet or radio program on the subject of this trial.

Do not conduct any Internet research or consult with any other sources about this case, the people involved in the case, its general subject matter, or the law.

You must keep your mind open and free of outside information. Only in this way will you be able to decide the case fairly, based solely on the evidence received in court and my instructions on the law. If you decide this case on anything else, you will have done an injustice. It is very important that you follow these instructions.

I might not repeat these things to you before every recess, but keep them in mind until you are discharged.

**INSTRUCTION NO. 3**

Members of the Jury: I am now going to give you some instructions about this case and about your duties as jurors. At the end of the trial I will give you more instructions. I may also give you instructions during the trial. All instructions - those I give you now and those I give you later - whether they are in writing or given to you orally – are equally important and you must follow them all.

You must leave your cell phone, PDA, smart phone, iPhone, tablet computer, and any other wireless communication devices in the jury room during the trial and may only use them during breaks. However, you are not allowed to have those devices in the jury room during your deliberations. You may give them to the Courtroom Deputy for safekeeping just before you start to deliberate. They will be returned to you when your deliberations are complete.

This case is what is known as a patent infringement case in which the Plaintiff contends that the Defendants infringed four of Plaintiff's patents. The Plaintiff is Provisur Technologies, Inc. ("Provisur" or "Plaintiff"). There are five defendants in this case: Weber Maschinenbau GmbH Breidenbach, Weber Maschinenbau GmbH Neubrandenburg, Weber, Inc., Textor Maschinenbau GmbH, and Textor, Inc. (collectively, "Weber" or "Defendants").

In this case, Provisur contends that Weber willfully infringed four Provisur patents relating to technology used in industrial food slicing products and components. Provisur seeks monetary damages.

Weber denies that it infringed, or willfully infringed, any of Provisur's patents, contends that the patents are invalid, and contends Weber owes no damages.

It will be your duty to decide from the evidence whether Provisur is entitled to a verdict against Weber.

Your duty is to decide what the facts are from the evidence. You are allowed to consider the evidence in the light of your own observations and experiences. After you have decided what the facts are, you will have to apply those facts to the law that I give you in these and in my other instructions. That is how you will reach your verdict. Only you will decide what the facts are. However, you must follow my instructions, whether you agree with them or not. You have taken an oath to follow the law that I give you in my instructions.

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness says, or only part of it, or none of it.

In deciding what testimony to believe, consider the witnesses' intelligence, their opportunity to have seen or heard the things they testify about, their memories, any reasons they might have to testify a certain way, how they act while testifying, whether they said something different at another time, whether their testimony is generally reasonable, and how consistent their testimony is with other evidence that you believe.

Do not let sympathy, or your own likes or dislikes, influence you. The law requires you to come to a just verdict based only on the evidence, your common sense, and the law that I give you in my instructions, and nothing else.

Nothing I say or do during this trial is meant to suggest what I think of the evidence or I think your verdict should be.

# INSTRUCTION NO. 4

When I use the word "evidence," I mean the testimony of witnesses, documents, and other things I receive as exhibits, facts that I tell you the parties have agreed are true, and any other facts that I tell you to accept as true.

Some things are not evidence. I will tell you now what is not evidence:

1. Lawyers' statements, arguments, questions, and comments are not evidence.

2. Documents or other things that might be in court or talked about, but that I do not receive as exhibits are not evidence.

3. Objections are not evidence. Lawyers have a right – and sometimes a duty – to object when they believe something should not be a part of the trial. Do not be influenced one way or the other by objections. If I sustain a lawyer's objection to a question or an exhibit, that means the law does not allow you to consider that information. When that happens, you have to ignore the question or the exhibit, and you must not try to guess what the information might have been.

4. Testimony and exhibits that I strike from the record, or tell you to disregard, are not evidence, and you must not consider them.

5. Anything you see or hear about this case outside the courtroom is not evidence, and you must not consider it unless I specifically tell you otherwise.

Also, I might tell you that you can consider a piece of evidence for one purpose only, and not for any other purpose. If that happens, I will tell you what purpose you can consider the evidence for and what you are not allowed to consider it for. You need to pay close attention when I give an instruction about evidence that you can consider for only certain purposes, because you might not have that instruction in writing later in the jury room.

Some of you may have heard the terms "direct evidence" and "circumstantial evidence." You should not be concerned with those terms, since the law makes no distinction between the weight to be given to direct and circumstantial evidence.

## INSTRUCTION NO. 5

During the trial, I will sometimes need to talk privately with the lawyers. I may talk with them here at the bench while you are in the courtroom, or I may call a recess and let you leave the courtroom while I talk with the lawyers. Either way, please understand that while you are waiting, we are working. We have these conferences to make sure that the trial is proceeding according to the law and to avoid confusion or mistakes. We will do what we can to limit the number of these conferences and to keep them as short as possible.

## INSTRUCTION NO. 6

At the end of the trial, you will have to make your decision based on what you recall of the evidence. You will not have a written copy of the testimony to refer to. Because of this, you must pay close attention to the testimony and other evidence as it is presented here in the courtroom.

If you wish, however, you may take notes to help you remember what witnesses say. If you do take notes, do not show them to anyone until you and your fellow jurors go to the jury room to decide the case after you have heard and seen all of the evidence. And do not let taking notes distract you from paying close attention to the evidence as it is presented. The Courtroom Deputy will provide each of you with a pad of paper and a pen or pencil. At each recess, leave them in your seat.

When you leave at night, your notes will be locked up and will not be read by anyone. When the trial is over your notes will be destroyed. They will not be read by anyone other than you.

# INSTRUCTION NO. 7

Jurors, to make sure this trial is fair to all parties, you must follow these rules:

*First*, do not talk or communicate among yourselves about this case, or about anyone involved with it, until the end of the trial when you go to the jury room to consider your verdict.

*Second*, do not talk with anyone else about this case, or about anyone involved with it, until the trial has ended and you have been discharged as jurors.

*Third*, when you are outside the courtroom, do not let anyone tell you anything about the case, or about anyone involved with it until the trial has ended and your verdict has been accepted by me. If someone tries to talk to you about the case during the trial, please report it to the Courtroom Deputy.

*Fourth*, during the trial, do not talk with or speak to any of the parties, lawyers, or witnesses in this case – not even to pass the time of day. It is important not only that you do justice in this case, but also that you act accordingly. If a person from one side of the lawsuit sees you talking to a person from the other side – even if it is just about the weather – that might raise a suspicion about your fairness. So, when the lawyers, parties and witnesses do not speak to you in the halls, on the elevator or the like, please understand that they are not being rude. They know they are not supposed to talk to you while the trial is going on, and they are just following the rules.

*Fifth*, you may need to tell your family, close friends, and other people that you are a part of this trial. You can tell them when you have to be in court. But you must warn them not to ask you about this case, tell you anything they know or think they know about this case, or talk about this case in front of you. Remember: You must not communicate with anyone in any manner about anything or anyone, including the court, related to this case.

You must not tell anyone anything about the jury's deliberations in this case until after I accept your verdict or until I give you specific permission to do so. If you talk about the case with someone besides the other jurors during deliberations, it looks as if you might already have decided the case or that you might be influenced in your verdict by their opinions. That would not be fair to the parties, and it might result in the verdict being thrown out and the case having to be tried over again.

During the trial, while you are in the courthouse and after you leave for the day, do not give any information to anyone, by any means, about this case.

*Sixth*, do not do any research or investigate the case facts or the law-- on the Internet, in libraries, newspapers, dictionaries or otherwise. Do not visit or view any place discussed in this case, and do not use the Internet or other means to search for or view any place discussed in the testimony.

*Seventh*, do not read or otherwise receive any information, including any news stories or Internet articles or blogs that are about the case, or about anyone involved with it. Do not listen to any radio or television reports, or digital streaming, about the case or about anyone involved with it. I do not know whether there will be news reports about this case, but if there are, you might accidentally find yourself reading or listening to something about the case. If you want, you can have someone collect information or clip out any stories and set them aside to give to you after the trial is over. I assure you, that by the time you have heard all the evidence in this case, you will know what you need to return a just verdict.

The parties have a right to have you decide their case based only on evidence admitted here in court. If you research, investigate, or experiment on your own, or get information from other sources, your verdict might be influenced by inaccurate, incomplete, or misleading

information. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through cross-examination. All of the parties are entitled to a fair trial before an impartial jury, and you have to conduct yourselves in a way that assures the integrity of the trial process. If you decide a case based on information not admitted in court, you will deny the parties a fair trial. You will deny them justice. Remember, you have taken an oath to follow the rules, and you must do so.

*Eighth*, do not make up your mind during the trial about what your verdict should be. Keep an open mind until after you and your fellow jurors have discussed all the evidence.

## INSTRUCTION NO. 8

The trial will proceed in the following manner. First, the plaintiff's lawyer may make an opening statement. Next, the defendants' lawyer may make an opening statement. An opening statement is not evidence, but it is a summary of the evidence the lawyers expect you will see and hear during the trial.

There are two standards of proof that you will apply to the evidence, depending on the issue you are deciding. On some issues, you must decide whether certain facts have been proven by a preponderance of the evidence. A preponderance of the evidence means that the fact that is to be proven is more likely true than not, that is, that the evidence in favor of that fact being true is sufficient to tip the scale, even if slightly, in its favor. On other issues that I will identify for you, you must use a higher standard and decide whether the fact has been proven by clear and convincing evidence, that is, that you have been left with a clear conviction that the fact has been proven.

These standards are different from what you may have heard about in criminal proceedings where a fact must be proven beyond a reasonable doubt. On a scale of these various standards of proof, as you move from preponderance of the evidence, where the proof need only be sufficient to tip the scale in favor of the party proving the fact, to beyond a reasonable doubt, where the fact must be proven to a very high degree of certainty, you may think of clear and convincing evidence as being between the two standards.

After the opening statements, Provisur will present its evidence in support of its contention that the claims of the Asserted Patents have been infringed by Weber and that the infringement has been willful. To prove infringement of any claim, Provisur must persuade you that it is more likely than not that Weber has infringed that claim. To persuade you that any infringement was willful, Provisur must also prove that it is more likely than not that the infringement was willful.

Weber will then present its evidence that the claims of the Asserted Patents are invalid. To prove invalidity of any claim, Weber must persuade you by clear and convincing evidence that the claim is invalid. In addition to presenting its evidence of invalidity, Weber will put on evidence responding to Provisur's evidence of infringement and willfulness.

Provisur may then put on additional evidence responding to Weber's evidence that the claims of the Asserted Patents are invalid, and to offer any additional evidence of infringement and willfulness. This is referred to as "rebuttal" evidence. Provisur's "rebuttal" evidence may respond to any evidence offered by Weber.

Finally, Weber may have the option to put on its "rebuttal" evidence to support its contentions as to the validity of the claims of the Asserted Patent by responding to any evidence offered by Provisur on that issue.

After you have seen and heard all of the evidence from both sides, the lawyers will make closing arguments that summarize and interpret the evidence. Just as with opening statements, closing arguments are not evidence. Before the closing arguments, I will instruct you further on the law. After the lawyers' arguments and after the court's instructions you will go to the jury room to deliberate and decide on your verdict.

# INSTRUCTION NO. 7

I have already determined the meaning of the claims of the Asserted Patents. Specifically, I have made the following determinations:

*First*, for the '436 and '812 patents, the phrase "food article grippers" has been construed by the Court to mean "a device that closes and opens to seize and release an end of the food product."

*Second*, for the '436 and '812 patents, the phrase "upper conveyor assembly" has been construed by the Court to mean an "overhead conveyor system positioned over the food article loading apparatus."

*Third*, for the '436 and '812 patents, the phrase "food article stop gate" has been construed by the Court to mean a "single movable structure that provides the three positions: (1) gate, (2) bridge, and (3) door."

*Fourth*, for the '436 and '812 patents, the phrase "disposed over" has been construed by the Court to mean "positioned above and in vertical and lateral alignment with."

*Fifth*, for the '089 patent, the phrase "top slice" has been construed by the Court to mean "the topmost already cut slice."

*Sixth*, for the '089 patent, the phrase "input into said memory section a two-dimensional pixel field corresponding to an image captured of a surface area of a top slice of said stack of slices located on said conveyor" has been construed by the Court to mean "input into said memory section a two-dimensional pixel field corresponding to an image captured of a surface area of a topmost already cut slice of said stack of slices located on said conveyor."

*Seventh*, for the '936 patent, the phrase "a first row and a longitudinally displaced second row" has been construed by the Court to mean "a first row and a lengthwise second row."

*Eighth*, for the '936 patent, the phrase "food product drafts" has been construed by the Court to mean "sliced foods or sliced food product."

*Ninth*, for the '936 patent, "claim 14 is construed as requiring an advancing conveyor."

For any and all claim terms for which I have not provided you with a definition, you should apply the ordinary meaning of that term in the field of the patent.

## INSTRUCTION NO. 10

Members of the jury, the instructions I gave at the beginning of the trial and during the trial are still in effect. Now I am going to give you additional instructions.

You have to follow all of my instructions – the ones I gave you earlier, as well as those I give you now. Do not single out some instructions and ignore others, because they are all important. This is true even though I am not going to repeat some of the instructions I gave you at the beginning of the trial.

You will have copies of all of the instructions in the jury room. Remember, you have to follow all instructions, no matter when I give them, whether or not you have written copies.

# INSTRUCTION NO. __11__

Certain summaries and charts may be admitted in evidence. You may use those summaries and charts as evidence, even though the underlying documents and records are not available for your review.

# INSTRUCTION NO. 12

Certain charts and summaries were shown to you in order to help explain the facts disclosed by the books, records, or other underlying evidence in the case. Those charts or summaries are used for convenience. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts shown by the evidence in the case, you should disregard these charts and summaries and decide the facts from the books, records or other underlying evidence.

# INSTRUCTION NO. 13

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness said, or only part of it, or none of it.

You are instructed that you are the sole judges of the credibility of the witnesses and of the weight and value to be given to their testimony. In determining such credibility and weight you will take into consideration the character of the witness, his or her demeanor on the stand, his or her interest, if any, in the result of the trial, his or her relation to or feeling toward the parties to the trial, the probability or improbability of his or her statements as well as all the other facts and circumstances given in evidence.

You may also consider a witness's intelligence; the opportunity the witness had to see or hear the things testified about; a witness's memory, knowledge, education, and experience; any reasons a witness might have for testifying a certain way; how a witness acted while testifying; whether a witness said something different at another time; whether a witness's testimony sounded reasonable; and whether or to what extent a witness's testimony is consistent with other evidence you believe.

In deciding whether to believe a witness, remember that people sometimes hear or see things differently and sometimes forget things. You will have to decide whether a contradiction is an innocent misrecollection, or a lapse of memory, or an intentional falsehood. That may depend on whether it has to do with an important fact or only a small detail.

## INSTRUCTION NO. 14

Testimony was presented to you in the form of a deposition. A deposition is the recorded answers a witness made under oath to questions asked by lawyers before trial. The deposition testimony to be offered was electronically video recorded and that recording was played for you. You should consider the deposition testimony, and judge its credibility, as you would that of any witness who testifies here in person.

## INSTRUCTION NO. 15

You heard testimony from expert witnesses who testified to opinions and the reasons for the opinions. This opinion testimony is allowed because of the education or experience of this witness.

You should judge this opinion testimony just as you would any other testimony. You may accept it or reject it and give it the weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all other evidence in this case.

## INSTRUCTION NO. 16

I have not intended to suggest what I think your verdicts should be by any of my rulings or comments during the trial.

# INSTRUCTION NO. 17

Evidence was presented to you in the form of answers of one of the parties to written interrogatories submitted by the other side. These answers were given in writing and under oath before the trial in response to questions that were submitted under established court procedures. You should consider the answers, insofar as possible, in the same way as if they were made from the witness stand.

A party who has responded to an interrogatory has a duty to supplement or correct its response in a timely manner if the party learns that in some material respect the response is incomplete or incorrect.

## INSTRUCTION NO. 18

As you have heard from the parties, Provisur contends that Weber has infringed four of Provisur's patents, specifically claims 9, 10, 11, 12, and 16 of U.S. Patent No. 10,625,436; claims 1, 7 and 8 of U.S. Patent No. 10,639,812; claim 12 of U.S. Patent No. 6,997,089; and, claim 14 of U.S. Patent No. 7,065,936. Provisur contends that Weber's infringement of these four patents was willful, and that Provisur is entitled to damages.

Provisur contends that the following Weber products meet the limitations, literally or equivalently, of the asserted claims of the '436 and '812 patents: Weber's S6, 905, 906, and 908 products made, used, offered for sale, sold, or imported into the United States, since April 11, 2019.

Provisur contends that the following Weber products meet the limitations, literally or equivalently, of the asserted claim of the '089 patent: Any Weber high speed slicing apparatus, combined with any quality grading device (such as a COW).

Provisur contends that the following Weber products meet the limitations, literally or equivalently of the asserted claim of the '936 patent: Weber/Textor SmartLoader.

I will now provide you with detailed instructions.

## INSTRUCTION NO. 19

In order to show patent infringement, Provisur bears the burden of proof by a preponderance of the evidence, that is, that it is more likely than not that patent infringement has been proven.

# INSTRUCTION NO. 20

There are two types of patent infringement relevant to this case. Provisur contends that Weber directly infringes its patents, first, by literal patent infringement and, second, by doctrine of equivalents patent infringement. I will now explain each of these types of infringement in more detail.

## INSTRUCTION NO. 21

As I stated, the first type of patent infringement is known as literal infringement. For literal infringement, Provisur must prove that Weber made, used, sold, offered for sale within, or imported into the United States a product that meets all of the requirements of a claim and did so without the permission of Provisur during the time the Asserted Patents were in force. You must compare the product with each and every one of the requirements of a claim to determine whether all of the requirements of that claim are met.

Provisur is not required to prove that Weber intended to infringe or had actual knowledge of the patent.

# INSTRUCTION NO. 22

The second type of patent infringement is known as the doctrine of equivalents. Under the doctrine of equivalents, an accused product infringes the asserted claims if the accused product contains elements that literally meet or are equivalent to each and every element of the claim. You may find that an element or step is equivalent to an element of a claim that is not met literally if a person having ordinary skill in the field of technology of the patent would have considered the differences between them to be "insubstantial" or would have found that the structure or action performs substantially the same function and works in substantially the same way to achieve substantially the same result as the element of the claim.

In considering patent infringement under the doctrine of equivalents, you may also consider whether people of ordinary skill in the art believed that the structure of the accused product and the requirement recited in the patent claim were interchangeable at the time of the alleged patent infringement. The proper time for evaluating equivalency—and thus knowledge of interchangeability between requirements—is the time of infringement, not the time the patent was issued. Thus, the inventor need not have foreseen, and the patent need not describe, all potential equivalents to the invention covered by the claims. Also, changes in technique or improvements made possible by technology developed after the patent application is filed may still be equivalent for the purposes of the doctrine of equivalents.

# INSTRUCTION NO. 23

If you find that Weber has infringed, you must consider whether the patent infringement was willful. In order to establish willful patent infringement, Provisur must show, by a preponderance of the evidence, that Weber knew or should have known of, and intentionally infringed, one or more of Provisur's patents.

To determine whether Weber acted willfully, consider all facts and assess Weber's knowledge at the time of the challenged conduct. Facts that may be considered include, but are not limited, to:

*First,* whether Weber acted consistently with the standards of behavior for its industry;

*Second,* whether Weber intentionally copied a product of Provisur's that is covered by the asserted patent claims;

*Third,* whether Weber reasonably believed it did not infringe or that the patent was invalid;

*Fourth,* whether Weber made a good-faith effort to avoid infringing the any of patents, for example, whether Weber attempted to design around the asserted patents; and

*Fifth,* whether Weber tried to cover up its patent infringement.

You may not assume that merely because Weber did not obtain a legal opinion about whether it infringed the Asserted Patents that the opinion would have been unfavorable. The absence of a legal opinion may not be used by you to find that Weber acted willfully.

# INSTRUCTION NO. 24

I will now instruct you about the measure of damages. If you find that Weber infringed any valid claim of Provisur's patents, then Provisur is entitled to damages, and you must consider what amount of damages to award Provisur. Provisur must prove damages by a preponderance of evidence. The measure of damages Provisur seeks is a reasonable royalty.

# INSTRUCTION NO. 25

In determining a damages base, you may use the value of an entire multi-component product if the patented feature is either (1) the sole driver of customer demand, or (2) substantially creates the value of the component parts.

If the claimed patented features are not the sole driver of customer demand for the accused infringing product, or substantially creates the value of the component parts, then you must perform what is called apportionment. When damages are apportioned, the amount you find as damages should be based on the value attributable to the patented invention, as distinct from unpatented features of the accused product or other factors such as marketing or advertising, or Provisur's size or market position.

# INSTRUCTION NO. 26

The damages you may award Provisur shall be in the form of a reasonable royalty. A reasonable royalty is the amount that Weber would have agreed to pay Provisur in exchange for the right to use Provisur's patents. In considering this hypothetical negotiation, you must assume that both parties believed the patent was valid and infringed, and that both parties were reasonable in their negotiations and willing to enter into an agreement.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the patent infringement began. Some of the kinds of factors that you may consider, known as the *Georgia-Pacific* factors, in making your determination are:

Factor no. 1 – The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

Factor no. 2 – The rates paid by the licensee for the use of other patents comparable to the patent in suit.

Factor no. 3 – The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

Factor no. 4 – The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

Factor no. 5 – The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

Factor no. 6 – The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

Factor no. 7 – The duration of the patent and the term of the license.

Factor no. 8 – The established profitability of the product made under the patent; its commercial success; and its current popularity.

Factor no. 9 – The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

Factor no. 10 – The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

Factor no. 11 – The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

Factor no. 12 – The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

Factor no. 13 – The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

Factor no. 14 – The opinion testimony of qualified experts.

Factor no. 15 – The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the patent infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a

particular article embodying the patented invention— would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. You may also consider any other factors which in your mind would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people.

**INSTRUCTION NO. 27**

I will now instruct you on the rules you must follow in deciding whether or not Weber has proven that the asserted claims of the Asserted Patents are invalid. The law presumes each claim of the asserted patents to be valid. To prove that any claim of a patent is invalid, Weber must persuade you by clear and convincing evidence, that is, you must be left with a clear conviction that the claim is invalid. Clear and convincing is a higher burden of proof than preponderance of the evidence standard.

# INSTRUCTION NO. 28

In order for someone to be entitled to a patent, the invention must actually be "new" and not obvious over what came before, which is referred to as the prior art. Weber contends that the following is prior art to the '089 patent:

1. U.S. Patent No. 3,846,958 to Divan ("Divan")

2. Cognex In-Sight 2000 ("Cognex")

3. U.S. Patent No. 5,267,168 to Antonissen ("Antonissen")

You must determine whether the above references are prior art that can be considered in determining whether claim 12 of the '089 patent is anticipated or obvious. There are different types of prior art, and I will instruct you on the relevant types that you need to consider.

Weber contends that each of the above-listed references is prior art because each was known to or used by others in the United States or patented or described in a printed publication anywhere in the world before the date of invention, June 25, 2002. An invention is known when the information about it was reasonably accessible to the public on that date.

Weber contends that the following is prior art to the '936 patent:

1. U.S. Patent No. 7,021,450 to Jones ("Jones")

2. Weber WCS Machine

You must determine whether the above references are prior art that can be considered in determining whether claim 14 of the '936 patent is anticipated or obvious. There are different types of prior art, and I will instruct you on the relevant types that you need to consider.

Weber contends that Jones is prior art because it was known to or used by others in the United States or patented or described in a printed publication anywhere in the world before the date of invention, Dec. 18, 2002. An invention is known when the information about it was reasonably accessible to the public on that date.

Weber contends that the Weber WCS Machine is prior art because it was publicly used, sold, or offered for sale in the United States more than one year before Dec. 18, 2002, which is the effective filing date of the application for the '936 patent. An invention was publicly used when it was either accessible to the public or commercially exploited. An invention was sold or offered for sale when it was offered commercially and what was offered was ready to be patented, i.e., it was reduced to practice or it had been described such that a person having ordinary skill in the field of the technology could have made and used the claimed invention, even if it was not yet reduced to practice or publicly disclosed.

Weber contends that each of the following is prior art to the '436 and '812 patents:

1. Weber 904 Slicing Machine

2. Weber 905 Slicing Machine

3. PowerMax4000 Slicing Machine

You must determine whether above references are prior art that can be considered in determining whether claims 9, 10, 11, 12, and 16 of the '436 patent and claims 1, 7, and 8 of the '812 patent are anticipated or obvious. There are different types of prior art, and I will instruct you on the relevant types that you need to consider.

Weber contends that the Weber 904 Slicing Machine, Weber 905 Slicing Machine, and PowerMax4000 Slicing Machine are prior art because each was publicly used, sold, or offered for sale in the United States more than one year before the effective filing date of the application for the '436 patent or more than one year before the effective filing date of the application for the '812 patent. An invention was publicly used when it was either accessible to the public or commercially exploited. An invention was sold or offered for sale when it was offered commercially and what was offered was ready to be patented, i.e., it was reduced to practice or it had been described such that a

person having ordinary skill in the field of the technology could have made and used the claimed invention, even if it was not yet reduced to practice or publicly disclosed.

# INSTRUCTION NO. 29

In order for someone to be entitled to a patent, the invention must actually be "new." Weber contends that claims 9, 10, 11, 12, and 16 of the '436 patent and claims 1, 7, and 8 of the '812 patent are invalid because the claimed invention is anticipated by the Weber 904 Slicing Machine. Weber must convince you of this by clear and convincing evidence, i.e., that the evidence highly probably demonstrates that the claims are invalid.

Anticipation must be determined on a claim-by-claim basis. Weber must prove by clear and convincing evidence that all of the requirements of a claim are present in a single piece of prior art. To anticipate the invention, the prior art does not have to use the same words as the claim, but all of the requirements of the claim must have been disclosed and arranged as in the claim. The claim requirements may either be disclosed expressly or inherently—that is, necessarily implied—such that a person having ordinary skill in the art in the technology of the invention, looking at that one reference, could make and use the claimed invention.

If a dependent claim is anticipated by the prior art, then the claims from which it depends are necessarily anticipated as well.

# INSTRUCTION NO. 30

Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of technology of the patent at the time the invention was made.

Weber may establish that a patent claim is invalid by proving, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of industrial meat slicing machines. In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field of the invention that someone would have had at the time the invention was made, the scope and content of the prior art, any differences between the prior art and the claimed invention, and, if present, so-called objective evidence or secondary considerations, which I will describe shortly. Do not use hindsight; consider only what was known at the time the invention was made.

Keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art. In considering whether a claimed invention is obvious, you should consider whether, at the time the invention was made, there was a reason that would have prompted a person having ordinary skill in the field of the invention to combine the known elements in the prior art in a way the claimed invention does, taking into account such factors as (1) whether the claimed invention was merely the predictable result of using prior art elements according to their known function(s); (2) whether the claimed invention provides an obvious solution to a known problem in the relevant field; (3) whether the prior art teaches or suggests the desirability of combining elements claimed in the invention; (4) whether the prior art teaches away from combining elements in the claimed invention; (5) whether it would have been obvious to try the combinations of elements, such as when there is a design incentive or market pressure to solve a problem and there are a finite number of identified,

predictable solutions. To find it rendered the claimed invention obvious, you must find that the prior art provided a reasonable expectation of success. Obvious to try is not sufficient in unpredictable technologies.

In determining whether the claimed invention is obvious, you should take into account any objective evidence (sometimes called "secondary considerations") that may shed light on whether or not the claimed invention is obvious, such as:

a. Whether the claimed invention was commercially successful as a result of the merits of the claimed invention (rather than the result of design needs or market-pressure advertising or similar activities);

b. Whether the claimed invention satisfied a long-felt need;

c. Whether others had tried and failed to make the claimed invention;

d. Whether others invented the claimed invention at roughly the same time;

e. Whether others copied the claimed invention;

f. Whether there were changes or related technologies or market needs contemporaneous with the claimed invention;

g. Whether the claimed invention achieved unexpected results;

h. Whether others in the field praised the claimed invention;

i. Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the claimed invention;

j. Whether others sought or obtained rights to the patent from the patent holder; and

k. Whether the inventor proceeded contrary to accepted wisdom in the field.

In determining whether the claimed invention was obvious, consider each claim separately, but understand that if a dependent claim is obvious, then the claims from which it depends are necessarily obvious as well.

# INSTRUCTION NO. 3|

In deciding what the level of ordinary skill in the field of the invention in the Asserted Patents is, you should consider all the evidence introduced at trial, including but not limited to: (1) the levels of education and experience of the inventor and other persons actively working in the field; (2) the types of problems encountered in the field; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; and (5) the sophistication of the technology.

# INSTRUCTION NO. 32

Weber contends that all of the asserted claims of the '089 patent are invalid as being directed to patent ineligible subject matter. You must decide if the elements in each of these claims, taken individually or as a combination, involve well-understood, routine, and conventional activity previously engaged in by researchers in the field, or well-understood, routine, and conventional activities or components previously known to the industry as of June 25, 2002. Whether a particular technology was well-understood, routine, and conventional goes beyond what was simply known in the prior art. The mere fact that something was disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional. At the same time, a lack of invalidating prior art does not mean that the elements of a claim are not well-understood, routine, and conventional. The specification of the Asserted Patents may also be such evidence where it admits that a part of a claim was well-understood, routine, and conventional.

# INSTRUCTION NO. 33

There are rules you must follow when you go to the jury room to deliberate and return with your verdict.

*First*, you will select a foreperson. That person will preside over your discussions and speak for you here in court.

*Second*, it is your duty, as jurors, to discuss this case with one another in the jury room. You should try to reach agreement, if you can do this without going against what you believe to be true because all jurors have to agree on the verdict.

Each of you must come to your own decision, but only after you have considered all the evidence, discussed the evidence fully with your fellow jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your mind if the discussion persuades you that you should. But, do not come to a decision just because other jurors think it is right, or just to reach a verdict. Remember you are not for or against any party. You are judges – judges of the facts. Your only job is to study the evidence and decide what is true.

*Third*, during your deliberations, including during any recess taken during deliberations, you must not, directly or indirectly, communicate with or provide any information to anyone by any means or by any medium, about anything relating to this case, until I accept your verdict and discharge you from further service in this case.

*Fourth*, as stated in my instructions at the beginning of the trial, you may not in any manner seek out or receive any information about the case from any source other than the evidence received by the court and the law of the case I have provided to you.

You are only permitted to discuss the case with your fellow jurors during deliberations because they have seen and heard the same evidence you have. In our judicial system, it is

important that you are not influenced by anything or anyone outside of this courtroom. Otherwise, your decision may be based on information known only by you and not your fellow jurors or the parties in the case. This would unfairly and adversely impact the judicial process.

*Fifth*, if you need to communicate with me during your deliberations, send me a note signed by one or more of you. Give the note to the Courtroom Deputy and I will answer you as soon as I can, either in writing or here in court. While you are deliberating, do not tell anyone - including me - how many jurors are voting for any side.

*Sixth*, nothing I have said or done was meant to suggest what I think your verdict should be. The verdict is entirely up to you.

*Finally*, the verdict form is your written decision in this case. You will take these forms to the jury room, and when you have all agreed on the verdicts, your foreperson will fill in the forms, sign and date them, and tell the Courtroom Deputy that you are ready to return to the courtroom.

## VERDICT FORM

When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout the form. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

We, the jury, unanimously agree to the answers to the following questions and return them under the instructions of this court as our verdict in this case.

## I.  INFRINGEMENT

**Question 1a:** Has Provisur Technologies, Inc. ("Provisur") proven, by a preponderance of the evidence, that Weber, Inc., Textor, Inc., Weber Maschinenbau GmbH Breidenbach, Weber Maschinenbau GmbH Neubrandenburg, and Textor Maschinenbau GmbH ("Weber") have infringed the following claim of the '089 patent?

|  | YES (for Provisur) | NO (for Weber) |
|---|---|---|
| Claim 12 |  | ✓ |

**Question 1b:** Has Provisur proven, by a preponderance of the evidence, that Weber has infringed the following claim of the '936 patent?

|  | YES (for Provisur) | NO (for Weber) |
|---|---|---|
| Claim 14 | ✓ |  |

**Question 1c:** Has Provisur proven, by a preponderance of the evidence, that Weber has infringed the following claims of the '436 patent?

|  | YES (for Provisur) | NO (for Weber) |
|---|---|---|
| Claim 9 | ✓ |  |
| Claim 10 | ✓ |  |
| Claim 11 | ✓ |  |
| Claim 12 | ✓ |  |
| Claim 16 | ✓ |  |

**Question 1d:** Has Provisur proven, by a preponderance of the evidence, that Weber has infringed the following claims of the '812 patent?

|  | YES (for Provisur) | NO (for Weber) |
|---|---|---|
| Claim 1 | ✓ |  |
| Claim 7 | ✓ |  |
| Claim 8 | ✓ |  |

## II. WILLFUL INFRINGEMENT

If you answer 'YES' for any patent claim in **Section I**, you should answer the following questions about those patent claims:

**Question 2a:** Has Provisur proven, by a preponderance of the evidence, that Weber willfully infringed a claim of the '089 patent?

| Yes (for Provisur) | No (for Weber) |
|---|---|
| | ✓ |

**Question 2b:** Has Provisur proven, by a preponderance of the evidence, that Weber willfully infringed a claim of the '936 patent?

| Yes (for Provisur) | No (for Weber) |
|---|---|
| ✓ | |

**Question 2c:** Has Provisur proven, by a preponderance of the evidence, that Weber willfully infringed a claim of the '436 patent?

| Yes (for Provisur) | No (for Weber) |
|---|---|
| ✓ | |

**Question 2d:** Has Provisur proven, by a preponderance of the evidence, that Weber willfully infringed a claim of the '812 patent?

| Yes (for Provisur) | No (for Weber) |
|---|---|
| ✓ | |

## III.   DAMAGES

If you answer 'YES' for any patent claim in **Section I**, you should answer the following questions about those patent claims:

**Question 3a:** For the '089 patent, we find damages in the amount of:

$ _____ 0 _____

**Question 3b:** For the '936 patent, we find damages in the amount of:

$ 3,013,068

**Question 3c:** For the '436 patent, we find damages in the amount of:

$ 3,747,046.50

**Question 3d:** For the '812 patent, we find damages in the amount of:

$ 3,747,046.50

## IV. INVALIDITY

**Question 4:** Has Weber proven, by clear and convincing evidence, that the following claim of the '089 patent would have been invalid as obvious under 35 U.S.C. § 103 to a person of ordinary skill in the art on June 25, 2002?

|  | YES (for Weber) | NO (for Provisur) |
|---|---|---|
| Claim 12 |  | ✓ |

If you answered NO (for Provisur), you need not fill in anything below; however, if you answered YES (for Weber) for the claim above, please list the combination of references that show that the respective claim would have been obvious to a person of ordinary skill in the art:

_____

_____

**Question 5:** Has Weber proven, by clear and convincing evidence, from the perspective of a person of ordinary skill in the art, the following claim of the '089 patent is invalid under 35 U.S.C. § 101 as not directed to patent eligible subject matter?

|  | YES (for Weber) | NO (for Provisur) |
|---|---|---|
| Claim 12 |  | ✓ |

**Question 6:** Has Weber proven, by clear and convincing evidence, that the following claim of the '936 patent would been invalid as obvious under 35 U.S.C. § 103 to a person of ordinary skill in the art on December 18, 2002?

| | YES (for Weber) | NO (for Provisur) |
|---|---|---|
| Claim 14 | | ✓ |

If you answered NO (for Provisur), you need not fill in anything below; however, if you answered YES (for Weber) for the claim above, please list the combination of references that show that the respective claim would have been obvious to a person of ordinary skill in the art:

_____

_____

**Question 7:** Has Weber proven, by clear and convincing evidence, that the following claims of the '436 patent would have been invalid as anticipated under 35 U.S.C. § 102?

| | YES (for Weber) | NO (for Provisur) |
|---|---|---|
| Claim 9 | | ✓ |
| Claim 10 | | ✓ |
| Claim 11 | | ✓ |
| Claim 12 | | ✓ |
| Claim 16 | | ✓ |

If you answered NO (for Provisur), you need not fill in anything below; however, if you answered YES (for Weber) for any claims above, please list the combination of references that show that the respective claim would have been obvious to a person of ordinary skill in the art:

_____

_____

**Question 8:** Has Weber proven, by clear and convincing, that the following claims of the '436 patent would been invalid as obvious under 35 U.S.C. § 103 as obvious to a person of ordinary skill in the art on May 1, 2010?

|            | YES (for Weber) | NO (for Provisur) |
|------------|-----------------|-------------------|
| Claim 9    |                 | ✓                 |
| Claim 10   |                 | ✓                 |
| Claim 11   |                 | ✓                 |
| Claim 12   |                 | ✓                 |
| Claim 16   |                 | ✓                 |

If you answered NO (for Provisur), you need not fill in anything below; however, if you answered YES (for Weber) for any claims above, please list the combination of references that show that the respective claim would have been obvious to a person of ordinary skill in the art:

_____

_____

**Question 9:** Has Weber proven, by clear and convincing evidence, that the following claims of the '812 patent would have been invalid as anticipated under 35 U.S.C. § 102?

|          | YES (for Weber) | NO (for Provisur) |
|----------|-----------------|-------------------|
| Claim 1  |                 | ✓                 |
| Claim 7  |                 | ✓                 |
| Claim 8  |                 | ✓                 |

If you answered NO (for Provisur), you need not fill in anything below; however, if you answered YES (for Weber) for any claims above, please list the combination of references that show that the respective claim would have been obvious to a person of ordinary skill in the art:

**Question 10:** Has Weber proven, by clear and convincing evidence, that the following claims of the '812 patent would been invalid as obvious under 35 U.S.C. § 103 as obvious to a person of ordinary skill in the art on May 1, 2010?

|  | YES (for Weber) | NO (for Provisur) |
|---|---|---|
| Claim 1 |  | ✓ |
| Claim 7 |  | ✓ |
| Claim 8 |  | ✓ |

If you answered NO (for Provisur), you need not fill in anything below; however, if you answered YES (for Weber) for any claims above, please list the combination of references that show that the respective claim would have been obvious to a person of ordinary skill in the art:

Note: All jurors who agree to the above findings must sign below.

| | |
|---|---|
| *Thomas Gull* | *Talley McDaniel* |
| *Nora Hildreth* | *Willi Voll* |
| *B. S* | |
| *Dan Sm* | |
| *Marlene Mc Clellan* | |
| *Codi Boyer* | |

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**ST. JOSEPH DIVISION**

## JUDGMENT IN A CIVIL CASE

| | | |
|---|---|---|
| PROVISUR TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 19-cv-06021-SRB |
| v. | ) | |
| | ) | |
| WEBER, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

  **X** **Jury Verdict**.   This action came before the Court for a trial by jury.   The issues have been tried and the jury has rendered its verdict.

  **Decision by Court.**   This action came before the Court.   The issues have been determined and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** pursuant to the verdict returned on October 28, 2022 that the jury finds:

In favor of Plaintiff Provisur Technologies, Inc. in the amount of; $3,013,068 for the '936 patent, $3,747,046.50 for the '436 patent, and $3,747,046.50 for the '812 patent.

October 28, 2022                               Paige Wymore-Wynn
Date                                       Clerk of Court

                                           /s/ Tracey L. Richard
                                         (by) Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## ST. JOSEPH DIVISION

PROVISUR TECHNOLOGIES, INC.,      )
            )
         Plaintiff,          )
            )
       v.                  )        Case No. 19-cv-06021-SRB
            )
WEBER, INC., et al.,          )
            )
         Defendants.       )

## ORDER

Before the Court are Defendant Weber, Inc., Textor Inc., Weber Maschinenbau GmbH Breidenbach, Textor Maschinenbau GmbH, and Weber Maschinenbau GmbH Neubrandenburg's ("Defendants") (1) Rule 50(b) Motion for Judgment as a Matter of Law (Doc. #501); and (2) Rule 59 Motion for a New Trial (Doc. #503).[1]  Plaintiff Provisur Technologies, Inc. ("Plaintiff") has filed briefs in opposition to both motions.  Upon review, Defendants' motions are DENIED.

The facts of this case have been exhaustively discussed in the Court's prior Orders and in the parties' briefs.  They will not be repeated herein.  This Order assumes familiarity with the facts and law applicable to the claims and defenses asserted in this case.

Federal Rule of Civil Procedure 50(b) allows a party that has previously moved for judgment as a matter of law to renew that motion no later than 28 days after the entry of judgment.  Fed. R. Civ. P. 50(b).  When reviewing a motion under Rule 50(b), a court must "affirm the jury's verdict unless, viewing the evidence in the light most favorable to the

---

[1] Defendants are interrelated corporate entities and subsidiaries.  The Court acknowledges the differences between these entities.  However, for purposes of clarity and consistency, this Order collectively refers to Defendants.

prevailing party, . . . a reasonable jury could not have found for that party." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) (citation omitted). The court should "review all of the evidence in the record," and "draw all reasonable inferences in favor of the nonmoving party," without making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "Judgment as a matter of law is proper only when there is a complete absence of probative facts to support the conclusion reached so that no reasonable jury could have found for the nonmoving party." *Foster v. Time Warner Entm't Co.*, 250 F.3d 1189, 1194 (8th Cir. 2001).

In this case, Defendants' Rule 50(b) motion raises numerous arguments. Defendants' primary arguments are as follows: there is no evidence that the SmartLoader can operate as an advancing conveyor as properly construed; Plaintiff's accusations of spoliation and concealing evidence cannot support an infringement verdict as a matter of law; the SmartLoader alone cannot satisfy the web of advancing film limitation as a matter of law; the TS750 and the 908 Slicers do not infringe the '436/'812 patents as a matter of law; the accused 900-Series slicers do not infringe the '436/'812 patents as a matter of law; Defendants do not infringe the '436/'812 patents as a matter of law; and Defendants did not willfully infringe any patent as a matter of law.

Upon review of the record and the parties' arguments, the Court finds that Defendants are not entitled to judgment as a matter of law. For the reasons stated in Plaintiff's opposition brief, in the Court's prior Orders, and by the Court at trial, Defendants' arguments are rejected. A reasonable jury could have found for Plaintiff under the evidence and applicable law. *Foster*, 250 F.3d at 1194. Therefore, Defendants' Rule 50(b) motion for judgment as a matter of law is denied.

Defendants also move for a new trial under Federal Rule of Civil Procedure 59. Rule 59 "confirms the trial court's historic power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict." *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996). "A new trial is appropriate when the first trial, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial, resulted in a miscarriage of justice." *Id.* When ruling on a motion for a new trial, the court has broad discretion. *Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir. 1998). However, a Rule 59 motion serves the "limited function of correcting manifest errors of law or fact or to present newly discovered evidence." *Id.*

In this case, Defendants present numerous arguments in support of their motion for a new trial. Defendants' primary arguments are as follows: Plaintiff misrepresented discovery disputes and European proceedings which misled and prejudiced the jury; Plaintiff misrepresented the law on willful infringement that tainted the jury on willfulness and infringement; the Court wrongly precluded Defendants from offering testimony about its patent monitoring program; the Court erroneously instructed the jury on claim construction; the Court erred by preventing Defendants from introducing evidence in support of their invalidity defenses; Defendants were wrongly prevented from presenting deposition testimony of Plaintiff's employees; and the jury's damages verdict was excessive, against the great weight of the evidence, and based on erroneous jury instructions.

Upon review of the record and the parties' arguments, the Court finds that Defendants are not entitled to a new trial. For the reasons stated in Plaintiff's opposition brief, in the Court's prior Orders, and by the Court at trial, Defendants' arguments are rejected. Therefore, Defendants' motion for a new trial under Rule 59 is denied.

Accordingly, it is hereby ORDERED that:

(1) Defendants' Rule 50(b) Motion for Judgment as a Matter of Law (Doc. #501) is

DENIED; and

(2) Defendants' Rule 59 Motion for a New Trial (Doc. #503) is DENIED.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated:  January 9, 2023

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### ST. JOSEPH DIVISION

PROVISUR TECHNOLOGIES, INC.,      )
                                     )
           Plaintiff,           )
                                       )
      v.                       )        Case No. 19-cv-06021-SRB
                                       )
WEBER, INC., et al.,             )
                                       )
          Defendants.       )

## ORDER

Before the Court is Plaintiff Provisur Technologies, Inc.'s ("Plaintiff" or "Provisur")

Motion for Willful Infringement Enhanced Damages.  (Doc. #497.)  For the reasons set forth

below, the motion is GRANTED.

### I.  FACTUAL BACKGROUND

The Court's prior Orders and the parties' briefs have exhaustively discussed the facts of

this case.  This Order assumes familiarity with the facts and law applicable to all claims and

defenses.  Only those facts and issues necessary to resolve the pending motion are discussed

herein.  The following is a brief factual summary.  Additional facts relevant to the pending

motion are set forth in Section III.

Plaintiff designs, makes, and sells commercial food processing technologies.  Plaintiff

owns four patents that are at issue in this case (the "Patents-at-Issue"):  United States Patent

Nos. 6,997,089 ("the '089 Patent"), 7,065,936 ("the '936 Patent"), 10,625,436 ("the '436

Patent") and 10,639,812 ("the '812 Patent").  Defendants Weber, Inc., Textor Inc., Weber

Maschinenbau GmbH Breidenbach, Textor Maschinenbau GmbH, and Weber Maschinenbau

GmbH Neubrandenburg ("Defendants" or "Weber") design, manufacture, and sell commercial food processing machinery to their customers.[1]

On February 22, 2019, Plaintiff filed this lawsuit against Defendants for patent infringement.[2] Plaintiff alleged that Defendants manufacture and sell commercial slicing machines that infringe the Patents-at-Issue. The machinery at issue generally involves a high-speed industrial slicing and packaging machine comprised of a series of belts, conveyors, scanners, sensors, and packaging parts. Bulk food items—such as loaves or blocks of meat or cheese, referred to generally as food articles or products—are loaded into the slicer, sliced, and transported down the line for additional processing, sorting, weighing, and packaging. The Patents-at-Issue involve different mechanical components that play distinct roles in this overall conveyor and packaging system.

On October 14, 2022, a nine-day jury trial commenced in this case. On October 28, 2022, the jury returned its verdict. The jury found that Defendants infringed all nine asserted claims of the '936, '436, and '812 patents. The jury found that Defendants did not infringe the '089 patent. The jury also found that the Patents-at-Issue were valid and that Defendants willfully infringed the '936, '436, and '812 patents. The jury awarded Plaintiff $3,013,068 for Defendants' infringement of the '936 patent, $3,747,046.50 for Defendants' infringement of the '436 patent, and $3,747,046.50 for Defendants' infringement of the '812 patent. Therefore, the total damages award in favor of Plaintiff was $10,507,161. On October 28, 2022, the Court entered judgment in favor of Plaintiff.

---

[1] Defendants are interrelated corporate entities and subsidiaries. The Court acknowledges the differences between these entities. However, for purposes of clarity and consistency, this Order collectively refers to "Defendants" or "Weber."

[2] Plaintiff filed a subsequent lawsuit against Defendants for patent infringement, Case No. 20-cv-06069-SRB. In an Order dated July 28, 2022, the Court consolidated the two cases and ordered that all future filings should be made in Case No. 19-cv-06021-SRB.

Plaintiff now moves for enhanced damages under 35 U.S.C. § 284.  In particular, Plaintiff "moves the Court to treble the damages found by the jury for Defendants' infringements of [the] '436, '812, and '936 Patents."  (Doc. #497, p. 1.)[3]  Defendants oppose the motion, and the parties' arguments are addressed below.

## II.  LEGAL STANDARD

Under 35 U.S.C. § 284, "the court may increase the damages up to three times the amount found or assessed" for patent infringement.  35 U.S.C. § 284.  "A party seeking enhanced damages under § 284 bears the burden of proof by a preponderance of the evidence." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1339 (Fed. Cir. 2016).  If a jury finds willful infringement, the court "enjoy[s] discretion in deciding whether to award enhanced damages, and in what amount."  *Halo Elec., Inc. v. Pulse Elec., Inc.*, 579 U.S. 93, 104 (2016); *see also Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1377 (Fed. Cir. 2002)  (recognizing that a verdict of willful infringement "authorizes but does not mandate" enhanced damages). "The sort of conduct warranting enhanced damages has been variously described . . . as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed— characteristic of a pirate."  *Halo Elec.*, 579 U.S. at 103-04.

## III.  DISCUSSION

To determine "whether enhanced damages are appropriate, courts should consider the overall circumstances of the case."  *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382 (Fed. Cir. 2017).  The following non-exclusive factors guide the analysis:

> (1) whether the infringer deliberately copied the ideas of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation;

---

[3] Plaintiff states that it "does not seek enhanced damages related to the '089 patent, which the jury found valid but not infringed."  (Doc. #498, p. 24 n.9.)  All page numbers refer to the pagination automatically generated by CM/ECF.

(4) the defendant's size and financial condition; (5) the closeness of the case; (6) the duration of the defendant's misconduct; (7) remedial action by the defendant; (8) the defendant's motivation for harm; and (9) whether the defendant attempted to conceal its misconduct.

*Georgetown Rail Equip. Co. v. Holland LP*, 867 F.3d 1229, 1244-45 n.6 (Fed. Cir. 2017) (quotation marks and alterations omitted) (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992). "An award need not rest on any particular factor, and not all relevant factors need to weigh in favor of an enhanced award." *Stryker Corp. v. Zimmer, Inc.*, Case No. 1:10–CV–1223, 2017 WL 4286412, at *3 (W.D. Mich. July 12, 2017), *aff'd*, 745 F. App'x 167 (Fed. Cir. 2018). These factors and other relevant considerations are discussed below.

### 1. Whether Defendants Intentionally Copied Plaintiff's Patented Ideas

The first factor considers "whether the infringer intentionally copied the ideas of another." *Stryker Corp. v. Intermedics Ortho., Inc.*, 96 F.3d 1409, 1414 (Fed. Cir. 1996). Plaintiff argues the evidence at trial "showed—at a minimum—circumstantial evidence of [Defendants'] copying of [Plaintiff's] patents." (Doc. #498, p. 8.) Defendants claim the evidence shows that they "did not copy [Plaintiff's] patented ideas or designs." (Doc. #524, p. 8.)[4] Upon review of the record and the parties' arguments, the Court finds this factor weighs in favor of enhanced damages.

In particular, the Court finds that Plaintiff presented evidence showing that Defendants:

> monitor[ed] and rat[ed] . . . the asserted patents and later s[old] . . . the same ideas and designs. [Defendants'] chief technology officer, Joerg Schmeiser, told his subordinates that [Defendants] would do '[w]hatever it takes' to compete with [Plaintiff]. He collected detailed notes on the designs of Formax's machines from [Defendants'] employees.

---

[4] Defendants' opposition brief argues that the pending motion "relies on the jury's erroneous willfulness finding and therefore should be mooted by Weber's post-trial motions seeking to correct that error." (Doc. #524, p. 6.) In a companion Order, the Court denied Defendants' motion for a new trial and motion for judgment as a matter of law. The pretrial and trial errors alleged by Defendants are unpersuasive and do not weigh against an award of enhanced damages.

4

(Doc. #498, p. 8) (citations omitted).  In addition, the evidence supports a finding—and the jury found—that Defendants developed products that embodied Plaintiff's patented technology. Consequently, the first factor supports enhanced damages because the evidence shows that Defendants intentionally copied Plaintiff's patented ideas.

### 2. Whether Defendants Had a Good Faith Belief that the Patents-at-Issue Were Invalid or Not Infringed

The second factor considers, in part, whether the infringer "properly investigate[d] the scope of the patents and form[ed] a good-faith belief that the patents were invalid and/or not infringed."  *Arctic Cat Inc. v. Bombardier Rec. Prods., Inc.*, 198 F. Supp. 3d 1343, 1350 (S.D. Fla. 2016).  Plaintiff argues this factor "strongly favors enhancing damages."  (Doc. #498, p. 8.) Plaintiff contends the evidence showed that Defendants "failed to undertake any invalidity or non-infringement investigation, despite its extensive tracking, analysis, and rating of [Plaintiff's] patents." (Doc. #498, p. 8.)  Defendants respond in part that their "purported failure to produce evidence of an investigation does not support enhanced damages" and that Plaintiff failed to carry its burden of showing "intentional and deliberate infringement."  (Doc. #524, p. 11.)

Upon review of the record and the parties' arguments, the Court finds this factor weighs in favor of enhanced damages.  As explained by Plaintiff:

> John White, one of the country's foremost intellectual property management experts, testified how Weber was plainly aware of Provisur's patents but did nothing else.  Weber did not conduct a landscape search, a background search, a state of the art search, or a freedom to operate analysis regarding the patents.  Weber did not attempt to design around, license, or file an IPR of the patents, all of which are standard industry practices to avoid infringement risks . . . [n]ot a single Weber employee testified about any belief of invalidity or non-infringement of the asserted patents.

(Doc. #498, pp. 8-9) (citations omitted).  For these reasons, the second factor supports an award of enhanced damages.

5

### 3. Whether Defendants' Behavior During Litigation Supports Enhanced Damages

The third factor considers whether enhanced damages are warranted based on the infringer's litigation conduct. "Many varieties of [litigation] misconduct can support a district court's finding of enhanced damages." *Metso Minerals, Inc. v. Powerscreen Int'l Distrib. Ltd.*, 833 F. Supp. 2d 333, 339 (E.D.N.Y. 2011). However, "[l]itigation misconduct generally involves unethical or unprofessional conduct by a party or his attorneys during the course of adjudicative proceedings." *Id.* at 338. Such conduct includes, but is not limited to, purchasing the silence of a potential witness, destroying relevant documents, and displaying "a lack of regard for the judicial system." *Id.* at 338-39 (collecting Federal Circuit case law).

Plaintiff argues that Defendants' litigation and trial conduct "weigh[] heavily in favor of enhancing damages." (Doc. #498, p. 10.) Specifically, Plaintiff contends that Defendants: "(1) changed fact witness testimony at trial; (2) violated the Court's evidentiary rulings; (3) refused to timely limit its prior art references for trial as the Court ordered, and (4) hid and obfuscated key evidence throughout the case." (Doc. #498, pp. 10-16.) Defendants respond that "[n]othing about [their] litigation and trial conduct evidences willful infringement." (Doc. #524, p. 11.) Defendants further claim that "if anything, it was Provisur who filled its time at trial with distractions, conjecture, and theater." (Doc. #524, p. 12.)

Upon review, the Court finds the third factor is neutral and does not weigh in favor of enhanced damages. Throughout this case, Plaintiff and Defendants have repeatedly accused each other of wrongdoing. The parties' briefs on factor three is the latest example of this. Among other things, Plaintiff claims that Defendants "lied in their interrogatory responses and withheld the truth during two years of discovery." (Doc. #498, p. 14.) Defendants respond that Plaintiff's

accusation is "baseless and false," and that Plaintiff "deliberately" misled the jury.  (Doc. #524, pp. 13, 15.)

The parties' arguments on this factor raise many of the same or similar disputes that were previously resolved by the Court, either before or during trial.[5]  In addition, Defendants have provided plausible explanations for their discovery and trial conduct.  Viewing the record as a whole, the Court cannot conclude that Defendants' litigation and trial conduct supports enhanced damages.  Consequently, this factor is neutral.

### 4. Whether Defendants' Size and Financial Condition Supports Enhanced Damages

The fourth factor considers the infringer's size and financial condition.  If the infringer is a large company, an enhancement may be warranted "to deter infringing conduct."  *Stryker Corp.*, 2017 WL 4286412, at *5.  Plaintiff argues that enhancement is necessary "to serve the intended deterrent function" because Defendants' annual revenue "in a single, global pandemic year" was "approximately $100 million."  (Doc. #498, p. 17.)  Plaintiff also argues that damages should be enhanced because Defendants failed to use their financial resources to develop a non-infringing alternative.

Defendants respond that this factor "is given weight only *against* enhancement or to inform the amount."  (Doc. #524, p. 18) (emphasis in original).  Defendants further contend that "[t]o the extent size matters at all, Weber is actually smaller than Provisur."  (Doc. #524, p. 18.)  According to Defendants, this difference in size "is likely one of the reasons Provisur is trying to bully Weber with multiple successive lawsuits and other litigation costs."  (Doc. #524, p. 18.)

---

[5] By way of one example, the Court denied Plaintiff's motion for sanctions which alleged discovery misconduct by Defendants.  (Doc. #358.)

Upon review, the Court finds this factor weighs in favor of Plaintiff. Factor four "is often given weight against enhancement in situations where, for instance, the other . . . factors strongly support enhancement but the infringer is in such perilous financial condition that an award of enhanced damages might put it out of business." *See Idenix Pharm. LLC v. Gilead Sciences, Inc.*, 271 F. Supp. 3d 694, 701 (D. Del. 2017). But that general rule is not applicable here. Weber is a large company with significant revenue. Defendants' opposition brief "never claims an inability to pay" enhanced damages, or that enhanced damages "could be equivalent to an organizational death sentence." (Doc. #534, p. 11); *Idenix Pharm. LLC*, 271 F. Supp. 3d at 701 (citations omitted). Finally, Defendants did not use their substantial resources, financial or otherwise, to develop a non-infringing alternative. Under these circumstances, and "[t]o deter infringing conduct," the Court finds that Defendants' size and financial condition supports enhanced damages. *Stryker Corp.*, 2017 WL 4286412, at *5 (focusing only on the size of the infringer without discussing the relative size of the parties).

**5. Whether this Case Involved Close Issues**

Plaintiff contends the fifth factor weighs in favor of enhanced damages because this case did not involve close issues. Plaintiff argues that the jury and the United States Patent and Trademark Office rejected Defendants' validity arguments on each asserted claim of the '936, '436, and '812 patents. Plaintiff also emphasizes that the jury found infringement on all asserted claims of the '936, '436, and '812 patents, and "fully adopted the damages calculated" by Plaintiff's expert. (Doc. #498, p. 20.)

Defendants believe the issues were close, and that they should have obtained a complete victory. Specifically, Defendants argue they "did not prevail on validity at trial because the Court gutted [their] prior-art defenses on the eve of opening statements." (Doc. #524, p. 19.)

8

Defendants believe that "Provisur only prevailed on infringement, validity, and damages for the SmartLoader and slicers based on the numerous prejudicial errors discussed in Weber's post-trial motions. It was not because the evidence actually favored Provisur." (Doc. #524, p. 19.)[6]

Overall, the Court finds this case did not involve close issues. Although Defendants obtained a verdict of non-infringement on the '089 patent, the remaining issues were not close. The jury rejected all of Defendants' validity arguments, found infringement of the '936, '436, and '812 patents, and awarded Plaintiff the full amount of damages on those patents. The jury also needed less than four hours to reach their verdicts. *See Jiaxing Super Lighting Elec. Appliance Co. v. CH Lighting Tech Co., Ltd.*, 6:20-cv-00018-ADA, 2022 WL 3371630, at *6 (W.D. Tex. Aug. 16, 2022) (recognizing that "courts have enhanced damages based in part on the length of the jury's deliberations and the asymmetry of the outcome.").

Based on the entire record, the Court finds this case did not involve close issues on validity, infringement, or damages. Consequently, the fifth factor supports enhanced damages.

### 6. Whether the Duration of Defendants' Misconduct Supports Enhanced Damages

"The sixth factor looks at the duration of the infringer's misconduct or the duration of infringement when the defendant had knowledge of the patent." *Canon, Inc. v. Color Imaging, Inc.*, 292 F. Supp. 3d 1357, 1366-67 (N.D. Ga. 2018). Plaintiff argues the duration of Defendants' infringement weighs in favor of enhanced damages. Defendants respond that this factor supports enhanced damages "only where the defendant continues to infringe after a judicial finding of infringement." (Doc. #524, p. 20.) Defendants also contend in part that they

---

[6] Defendants also note that, at the summary judgment stage, the Court found some of their non-infringement positions persuasive. But the Court's summary judgment orders were entered prior to trial, and without the full presentation of live witnesses and all other evidence.

9

"only learned of the asserted '436 and '812 patents within days of Provisur bringing this action."
(Doc. #524, p. 21.)

Upon review, the Court finds that the duration of Defendants' conduct supports enhanced damages. As an initial matter, the Court rejects Defendants' legal argument that this factor is limited to an infringer's post-judgment conduct. "Although a handful of district courts have interpreted the sixth . . . factor in this narrow manner, this interpretation remains a minority view." *EagleView Tech., Inc. v. Xactware Sol., Inc.*, 522 F. Supp. 3d 40, 53 (D.N.J. 2021). Post-judgment conduct may be relevant, but such conduct is not exclusive. *See id.*

The duration of misconduct begins when the infringer first learned of the patent. *Milwaukee Electric Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 903 (E.D. Wisc. 2017). Plaintiff argues—and the Court agrees—that Defendants had been aware of the '936 patent since at least March 17, 2014. (Doc. #498, p. 20.) Plaintiff has also shown that Defendants "learned of the '436 and '812 patent applications—which the jury found to be substantially identical to the issued patents—on April 30, 2019 and November 21, 2018, respectively." (Doc. #534, p. 12.) Because Defendants' infringement continued into 2021 and 2022, the duration of Defendants' misconduct weighs in favor of enhanced damages. *See Apple Inc. v. Samsung Elec. Co., Ltd.*, 258 F. Supp. 3d 1013, 1015 (N.D. Cal. 2017) (finding that a "10 to 12 month period of infringement [may] weigh[] in favor of enhanced damages"); *I-Flow Corp. v. Apex Med. Tech., Inc.*, No. 07cv1200 DMS (NLS), 2010 WL 114005, at *3 (S.D. Cal. Jan. 6, 2010) ("Six years of misconduct is substantial, and thus this factor weighs in favor of an award of enhanced damages.")

**7. Whether Defendants Engaged in Remedial Action**

With respect to factor seven, Plaintiff argues that Defendants failed to take any remedial action. Instead, Defendants "continued selling infringing products through 2022 while, simultaneously, hiding evidence of infringement and willfulness." (Doc. #498, p. 21.) Defendants respond that they "took no remedial action because [they] saw no need." (Doc. #524, p. 21.)

Upon review, the Court finds this factor weighs in favor of enhanced damages. Despite significant evidence supporting Plaintiff's validity and infringement arguments, Defendants concede they took no remedial action. Defendants "readily admit[] here that [they] did not attempt to design-around the patents in this case because [they] saw no possibility of infringing any valid Provisur claim." (Doc. #524, p. 22.) Based on these concessions, and the record as a whole, Defendants' failure to engage in remedial action supports an award of enhanced damages.

**8. Whether Defendants Had Motivation to Harm Plaintiff**

The eighth factor considers whether the infringer was motivated to harm the plaintiff. *Read Corp.*, 970 F.2d at 827. In general, mere competition between the parties does not show a motivation to harm. *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, No. 17-1390-RGA, 2022 WL 3973499, at *2 (D. Del. Aug. 31, 2022) ("[O]rdinary competition driven by a profit motive does not constitute . . . motivation to harm."). However, "infringement by a direct competitor in a small market mitigates in favor of enhanced damages." *Jiaxing Super Lighting*, 2022 WL 3371630, at *9 (alterations and citation omitted). This is particularly true when the competition is "fierce," and the parties are "rivals." *Id.*

Plaintiff argues this factor weighs in favor of enhanced damages because the parties are "fierce competitors" and "two of the few participants in the industrial food slicing equipment

11

market." (Doc. #498, p. 22.) Defendants contend that the parties are garden-variety competitors, and that Plaintiff has not produced evidence sufficient to support this factor.

Upon review, the Court finds that factor eight weighs in favor of Plaintiff. The parties agree they are competitors in the relatively small industrial food slicing market. In addition, and as explained by Plaintiff:

> The jury saw evidence of Weber wanting to 'beat the shit out of Formax.' Mr. McCarroll struggled to identify the boundary for competition, saying that Weber would not 'hold someone hostage.' The trial evidence showed Weber instructing employees to take 'whatever it takes' and '[n]othing's off limits' approaches to competing with Provisur, and Mr. McCarroll hiring a former Provisur employee and asking him for a copy of Provisur's confidential customer list.

(Doc. #498, p. 22) (citations omitted). Based on this evidence, along with evidence showing willful infringement, Plaintiff has shown that Defendants had a motivation to harm. Therefore, this factor weighs in favor of enhanced damages.

### 9. Whether Defendants Attempted to Conceal their Misconduct

For the final factor, Plaintiff argues that Defendants concealed important evidence and witnesses during discovery and at trial. Defendants respond that "[t]here is no evidence—and indeed no allegation—that Weber concealed its allegedly infringing machines from Provisur." (Doc. #524, p. 23.) Defendants argue that Plaintiff's "other arguments continue its misrepresentations of the discovery record and the parties' discovery disputes." (Doc. #524, pp. 23-24.)

Upon review, the Court finds this factor is neutral. As discussed above, both parties have accused each other of misconduct throughout this litigation. Both parties have filed motions for sanctions, both motions were denied. Plaintiff has failed to show that Defendants attempted to

12

conceal misconduct in such a way that would support enhanced damages. Consequently, this factor is neutral.

### IV. This Case Warrants Enhanced Damages of Double the Jury's Verdict

As discussed above, factors 1, 2, 4, 5, 6, 7, and 8 weigh in favor of enhanced damages. Based on those factors—and after reviewing the entire record—the Court finds that Defendants' conduct was an "egregious case[] of misconduct beyond typical infringement." *Halo Elec.*, 579 U.S. at 103-04, 110. As explained by Plaintiff, enhanced damages are warranted because Defendants' "systemic misconduct transcended that of a garden-variety infringer." (Doc. #534, p. 5.)

Plaintiff argues that triple damages should be awarded because all nine factors weigh in its favor. However, the Court found that factors 3 and 9 are neutral. In addition, Defendants were not completely defeated at trial; the jury found non-infringement of the '089 patent.

Although enhanced damages are warranted, the circumstances of this case "are not so clear to justify treble damages either." *Probatter Sports, LLC v. Sports Tutor, Inc.*, 586 F. Supp. 3d 80, 120 (D. Conn. 2022). The Court therefore exercises its discretion and awards Plaintiff enhanced damages of double the jury's verdict. *See Halo Elec.*, 579 U.S. at 104 (recognizing that the district court "enjoy[s] discretion in deciding whether to award enhanced damages, and in what amount"); *Del Mar Avionics, Inc. v. Quinton Instr. Co.*, 836 F.2d 1320, 1329 (Fed. Cir. 1987) (holding no abuse of discretion "in doubling the damage award" and stating that "[a] trial court's exercise of discretion in such circumstances is informed by the court's familiarity with the matter in litigation and the interest of justice").

## V. CONCLUSION

Accordingly, it is hereby ORDERED that Plaintiff's Motion for Willful Infringement Enhanced Damages (Doc. #497) is GRANTED.  Plaintiff is awarded enhanced damages of double the jury's verdict on the '436, '812, and '936 patents.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: January 9, 2023

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| PROVISUR TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-06021-SRB |
| | ) | |
| WEBER, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court is Plaintiff Provisur Technologies, Inc.'s ("Plaintiff" or "Provisur")

Motion for Supplemental Damages, Pre- and Post-Judgment Interest, and an Ongoing Royalty.

(Doc. #499.)  For the reasons set forth below, the motion is GRANTED IN PART and DENIED

IN PART.

## I.  FACTUAL BACKGROUND

The Court's prior Orders and the parties' briefs have exhaustively discussed the facts of

this case.  This Order assumes familiarity with the facts and law applicable to all claims and

defenses.  Only those facts and issues necessary to resolve the pending motion are discussed

herein.  The following is a brief factual summary.  Additional facts relevant to the pending

motion are set forth in Section III.

Plaintiff designs, makes, and sells commercial food processing technologies.  Plaintiff

owns four patents that are at issue in this case (the "Patents-at-Issue"):  United States Patent

Nos. 6,997,089 ("the '089 Patent"), 7,065,936 ("the '936 Patent"), 10,625,436 ("the '436

Patent") and 10,639,812 ("the '812 Patent").  Defendants Weber, Inc., Textor Inc., Weber

Maschinenbau GmbH Breidenbach, Textor Maschinenbau GmbH, and Weber Maschinenbau

GmbH Neubrandenburg ("Defendants" or "Weber") design, manufacture, and sell commercial food processing machinery to their customers.[1]

On February 22, 2019, Plaintiff filed this lawsuit against Defendants for patent infringement.[2] Plaintiff alleged that Defendants manufacture and sell commercial slicing machines that infringe the Patents-at-Issue. The machinery at issue generally involves a high-speed industrial slicing and packaging machine comprised of a series of belts, conveyors, scanners, sensors, and packaging parts. Bulk food items—such as loaves or blocks of meat or cheese, referred to generally as food articles or products—are loaded into the slicer, sliced, and transported down the line for additional processing, sorting, weighing, and packaging. The Patents-at-Issue involve different mechanical components that play distinct roles in this overall conveyor and packaging system.

On October 14, 2022, a nine-day jury trial commenced in this case. On October 28, 2022, the jury returned its verdict. The jury found that Defendants infringed all nine asserted claims of the '936, '436, and '812 patents. The jury found that Defendants did not infringe the '089 patent. The jury also found that the Patents-at-Issue were valid and that Defendants willfully infringed the '936, '436, and '812 patents. The jury awarded Plaintiff $3,013,068 for Defendants' infringement of the '936 patent, $3,747,046.50 for Defendants' infringement of the '436 patent, and $3,747,046.50 for Defendants' infringement of the '812 patent. Therefore, the

---

[1] Defendants are interrelated corporate entities and subsidiaries. The Court acknowledges the differences between these entities. However, for purposes of clarity and consistency, this Order collectively refers to "Defendants" or "Weber."

[2] Plaintiff filed a subsequent lawsuit against Defendants for patent infringement, Case No. 20-cv-06069-SRB. In an Order dated July 28, 2022, the Court consolidated the two cases and ordered that all future filings should be made in Case No. 19-cv-06021-SRB.

total damages award in favor of Plaintiff was $10,507,161. On October 28, 2022, the Court entered judgment in favor of Plaintiff.

Plaintiff now moves for supplemental damages, pre- and post-judgment interest, and an ongoing royalty. Defendants oppose the motion. The parties' arguments are addressed below.

## II. DISCUSSION

### A. Supplemental Damages

Under 35 U.S.C. § 284, "[w]hen the damages are not found by a jury, the court shall assess them." 35 U.S.C. § 284. In general, a court may award supplemental damages for periods of infringement that were not considered by the jury. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212-13 (Fed. Cir. 2010); *Itron, Inc. v. Benghiat*, No. Civ. 99–501 (JRT/FLN), 2003 WL 22037710, at *15-16 (D. Minn. Aug. 29, 2003).

Here, Plaintiff moves for an award of supplemental damages. In particular, Plaintiff argues that "Defendants did not produce records of any product sales or offers of sale after June 6, 2022," and that "[i]f Defendants made infringing sales or offers of sale after June 6, 2022, the jury was unable to compensate Provisur." (Doc. #500, p. 9.)[3] As a result, Plaintiff requests an order requiring "Defendants to provide a Supplemental Damages Accounting," and supplemental damages "[t]o the extent additional infringing sales or offers of sale exist." (Doc. #500, p. 9.)

Upon review, the Court finds that Plaintiff is not entitled to a supplemental damages accounting or supplemental damages between June 6, 2022, and the judgment entered on October 28, 2022. The Court agrees with Defendants that:

> Provisur failed to present this [damages] argument during trial and tellingly does not point to any trial testimony in its motion to justify the award of supplemental damages. Instead, Provisur's representations to the jury, the jury instructions, and the verdict form all told the jury that its award would constitute full damages.

_____

[3] All page numbers refer to the pagination automatically generated by CM/ECF.

3

(Doc. #527, p. 7.)  Supplemental damages are not warranted under these circumstances.  *See ABT Sys., LLC v. Emerson Elec. Co.*, No. 4:11CV00374 AGF, 2013 WL 3243372, at * 2 (E.D. Mo. June 26, 2013) ("Plaintiffs had ample opportunity prior to trial to seek relief with regard to any tardy disclosures.  If Defendant's sales evidence was not clear, the time to clarify it was before or even during trial, not after the jury returned its verdict.")

Consequently, Plaintiff's request for a supplemental damages accounting and supplemental damages is denied.

### B.  Pre-Judgment Interest

Under 35 U.S.C. § 284, "the court shall award the claimant damages adequate to compensate for the infringement, . . . together with interest and costs as fixed by the court." 35 U.S.C. § 284.  "The award of pre-judgment interest is the rule, not the exception."  *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1358  (Fed. Cir. 2012).  As such, "prejudgment interest should be awarded under § 284 absent some justification for withholding such an award."  *GM Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983).

In this case, the parties raise three primary issues relating to pre-judgment interest.  Those issues are: (1) whether pre-judgment interest should be awarded; (2) the pre-judgment interest time period; and (3) the pre-judgment interest rate, and whether it should be compounded quarterly or annually.  Each issue is addressed in turn.

First, Plaintiff argues an award of pre-judgment interest is warranted to compensate it for "the foregone use of money between Defendants' infringement and the date of judgment." (Doc. #500, p. 12.)  Defendants oppose any award of pre-judgment interest.  Defendants argue the "jury's damages award was more than 'generous enough' to compensate Provisur without any prejudgment interest."  (Doc. #527, p. 8.)  Defendants also argue that pre-judgment interest

should not be awarded on the '936 patent because "Plaintiff unduly delayed in asserting the '936 patent against Weber's accused SmartLoader." (Doc. #527, p. 10.)

Upon review, the Court finds that Plaintiff is entitled to pre-judgment interest under § 284. Pre-judgment interest is warranted to adequately compensate Plaintiff for the foregone use of royalty payments and to make it whole for Defendants' infringement. The Court rejects Defendants' argument that pre-judgment interest should be denied for the '936 patent because Plaintiff delayed filing this lawsuit. Any delay in bringing suit based on "[l]aches cannot be interposed as a defense against damages where the infringement occurred within the [statute of limitations]." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 346 (2017). Defendants have also failed to show that Plaintiff unreasonably delayed filing suit as a "litigation tactic" or to "pad its bottom line." (Doc. #533, p. 12.) Under the facts of this case, the Court finds no exceptional circumstances or justification for denying pre-judgment interest. *GM Corp.*, 461 U.S. at 657; *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996).

Second, the parties dispute when Plaintiff's pre-judgment interest should begin to run. "Prejudgment interest runs from the earliest date of infringement for any patent issued at the time of the hypothetical negotiation." *Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*, 850 F.3d 1302, 1315 (Fed. Cir. 2017). Upon review of the record, Plaintiff has shown that November 9, 2015 is the earliest date of infringement for the '936 patent, and that August 29, 2019 is the earliest date of infringement for the '436 and '812 patents. (Doc. #500-1) (first infringing sale regarding the '936 patent); (Doc. #500-5) (showing first infringing sale regarding the '436 and '812 patents. Consequently, pre-judgment interest is awarded from November 9, 2015 through

5

October 28, 2022 for the '936 patent. Pre-judgment interest is awarded from August 29, 2019 through October 28, 2022 for the '436 and '812 patents.

Third, the parties dispute the applicable pre-judgment interest rate and whether pre-judgment interest should be compounded quarterly or annually. "The rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court." *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986). Here, Plaintiff requests the prime rate compounded quarterly. Defendants argue pre-judgment interest should be based on the average 52-week U.S. Treasure Bill ("T-Bill") rate compounded annually.

Upon review of the parties' arguments and applicable law, the Court agrees with Plaintiff. Courts have recognized that "the prime rate, compounded quarterly, is a conservative, middle-of-the road approach that takes into account normal market fluctuations." *NTP, Inc. v. Research in Motion, Ltd.*, 270 F. Supp. 2d 751, 763 (E.D. Va. 2003); *see also Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed. Cir. 1983) (finding no abuse of discretion in pre-judgment interest rate at or above prime). Under the facts of this case, the Court finds the prime rate—compounded quarterly—is warranted "to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement." *Bio-Rad Labs.*, 807 F.2d at 969 (Fed. Cir. 1986).

Defendants' arguments to the contrary are not persuasive. In part, Defendants contend the prime rate is not warranted because Plaintiff failed to show it "borrowed any money to cover 'lost funds' or . . . would have invested at a better rate than the T-Bill rate[.]" (Doc. #527, p. 13.) But the Federal Circuit does not require "an 'affirmative demonstration,' i.e., proof of borrowing at or above prime, for a plaintiff to be entitled to an award of prejudgment interest at the prime

rate." *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1579-80 (Fed. Cir. 1988). Consequently, the Court will award Plaintiff pre-judgment interest at the prime rate compounded quarterly.

Based on the foregoing rulings, the Court must determine the amount of pre-judgment interest. Plaintiff has submitted a declaration from Julie Davis that calculates pre-judgment interest. Ms. Davis is a Managing Director at Stout Risius Ross, LLC, and she provides audit and financial consulting services.

Ms. Davis calculated pre-judgment interest based on "the quarterly average prime rate, compounded quarterly and using a mid-period convention beginning to accrue on November 9, 2015 for the '936 patent and August 29, 2019 for the '436 and '812 patents." (Doc. #500-4, p. 4 ¶ 9.) Ms. Davis calculated pre-judgment interest as "$356,653 through October 28, 2022 for the '936 patent and $426,425 through October 28, 2022 for the '436 and '812 patents, for a total of $783,078 through October 28, 2022." (Doc. #500-4, p. 4 ¶ 10.) Ms. Davis's methodology and calculations are in accordance with the rulings set forth above.

Consequently, the Court awards Plaintiff pre-judgment interest as follows: $356,653 through October 28, 2022 for the '936 patent, and $426,425 through October 28, 2022 for the '436 and '812 patents, for a total of $783,078 through October 28, 2022.[4] The total award of $783,078 represents pre-judgment interest at the prime rate, compounded quarterly on the $10,507,161 in damages awarded by the jury.

---

[4] Plaintiff also requests pre-judgment interest for any supplemental infringing sales from June 6, 2022 through October 28, 2022. For the reasons set forth above, that request is denied.

### C. Post-Judgment Interest

Under 28 U.S.C. § 1961(a), post-judgment interest "shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). Post-judgment interest is calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment." *Id.* Post-judgment interest is computed daily and compounded annually. 28 U.S.C. § 1961(b).

Here, Plaintiff requests that "upon the Court's resolution of pre-judgment interest, enhanced damages, and attorneys' fees and costs . . . the Court award post-judgment interest on the total money judgment—inclusive of pre-judgment interest and enhanced damages—at the rate provided by 28 U.S.C. § 1961." (Doc. #500, p. 17.) Defendants state that "if the Court enters final judgment for Provisur, Weber does not dispute that the Court should include post-judgment interest at the statutory rate to be determined at a later date." (Doc. #527, p. 17.)

Pursuant to § 1961, and based on the parties' briefs, Plaintiff's request for post-judgment interest is granted. Plaintiff is awarded post-judgment interest on the total money judgment ultimately entered in this case—inclusive of pre-judgment interest and enhanced damages—at the rate provided by 28 U.S.C. § 1961.[5]

### D. Royalties for Future Sales of Infringing Products

Upon a finding of infringement, a court may award ongoing royalties to compensate the plaintiff for continuing infringement. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1343 (Fed. Cir. 2012). To determine the ongoing royalty rate, a court may

---

[5] On November 4, 2022, the Court granted Plaintiff's motion for an extension of time to file a motion for attorneys' fees and costs. Pursuant to that extension, Plaintiff's motion for attorneys' fees and costs is due twenty-one days after the Court has resolved all merits-based post-trial motions.

8

consider the amount of damages awarded by the jury, any change in the parties' bargaining positions based on the finding of infringement, and "any other post-verdict factor that would impact what a hypothetical negotiation would look like" post-verdict. *XY, LLC v. Trans Ova Genetics, LP*, 890 F.3d 1282, 1297 (Fed. Cir. 2018) (quotation marks omitted); *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008).

Here, Plaintiff requests an ongoing royalty of 36% for the entire line of any post-judgment infringing sales and offers of sale that Defendants make after the judgment date for the '436 and '812 patents.[6] The '436 patent expires on May 2, 2031, and the '812 patent expires on September 6, 2031. In addition, "[t]o ensure Defendants do not continue infringing these patents, [Plaintiff] requests that the Court order Defendants to provide [Plaintiff], on an 'Attorneys' Eyes Only' basis, a quarterly accounting until the expiration of the '436 and '812 patents of all sales, purchase orders, invoices, CAD files, product manuals, factory order confirmations relating to any line that includes a Weber Slicer S6, 905, 906, and 908 made, used, offered for sale, sold, or imported into the United States." (Doc. #500, pp. 19-20.)

In response, Defendants argue that Plaintiff is not entitled to an ongoing royalty. Defendants contend such relief is not warranted because "Provisur has never requested an injunction—nor would one be proper—because Provisur does not practice the asserted patents and Provisur only sought monetary damages. The parties have not negotiated or discussed a post-trial royalty amount, different than the cases relied upon by Provisur." (Doc. #527, p. 18.) Defendants also argue that Plaintiff's proposed royalty rate of 36% is excessive and "represents a rate three times higher than the 12% rate awarded by the jury." (Doc. #527, p. 18.) Finally, Defendants contend they should not be compelled to produce "a large volume of documentation

---

[6] The '936 Patent expired in December 2022, and Plaintiff does not seek an ongoing royalty for that patent.

such as highly-confidential CAD files and voluminous product manuals." (Doc. #527, p. 20.)
Instead, Defendants state that if the Court awards an ongoing royalty, it will "provide an
accounting for any future sales" of infringing products. (Doc. #527, p. 20.)

Upon review of the record and the parties' arguments, the Court finds that Plaintiff
should receive an ongoing royalty to account for any continued infringement. *Telcordia Tech.,
Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1379 (Fed. Cir. 2010) (recognizing that an ongoing
royalty is appropriate if the plaintiff has not been compensated for ongoing infringement). An
ongoing royalty is appropriate in lieu of additional litigation between the parties and/or an
injunction in this case. *Apple, Inc. v. Samsung Elec. Co.*, Case No.: 12–CV–00630–LHK, 2014
WL 6687122, at * 9 (N.D. Cal. Nov. 25, 2014) ("Multiple district courts have . . . awarded
ongoing royalties in lieu of an injunction.").

With respect to the royalty rate, the Court agrees with Defendants that "the maximum
ongoing royalty rate, if any, should be the 12% rate determines by the jury." (Doc. #527, p. 19
n.5). In particular, the Court finds that a 12% ongoing royalty rate is in accordance with the
jury's verdict and all other circumstances of this case. *Apple, Inc.*, 2014 WL 6687122, at *14
("Generally, the jury's damages award is a starting point for evaluating ongoing royalties.").
Plaintiff has failed to show that a 36% ongoing royalty rate is warranted in light of the jury's
verdict, or in light of any other "post-verdict factor." *XY, LLC*, 890 F.3d at 1297. The 12%
ongoing royalty shall apply to the entire line of any infringing sales and offers of sale by
Defendants of a line that includes a Weber Slicer S6, 905, 906, and 908, and which occurs post-
judgment until the expiration of the '436 patent (May 2, 2031) and the '812 patent (September 6,
2031).

Finally, the Court rejects Plaintiff's request that Defendants provide an ongoing production of technical documents. Instead, Defendants shall provide Plaintiff an accounting for royalties the fifteenth day after the close of each calendar quarter and shall make payment within 30 days after the close of each calendar quarter. *See Broadcom Corp. v. Emulex Corp.*, SACV 09–1058 JVS (ANx), 2012 WL 13036855, at *9 (C.D. Cal. Mar. 16, 2012) (ordering the same relief for ongoing royalties).

### III.  CONCLUSION

Accordingly, it is hereby ORDERED that Plaintiff's Motion for Supplemental Damages, Pre- and Post-Judgment Interest, and an Ongoing Royalty (Doc. #499) is **GRANTED IN PART** and **DENIED IN PART**.

The motion is **GRANTED** as follows:

(1) Plaintiff is awarded the following in pre-judgment interest:  $356,653 through October 28, 2022 for the '936 patent, and $426,425 through October 28, 2022 for the '436 and '812 patents, for a total of $783,078 through October 28, 2022; and

(2) Plaintiff is awarded post-judgment interest on the total money judgment ultimately entered in this case—inclusive of pre-judgment interest and enhanced damages—at the rate provided by 28 U.S.C. § 1961; and

(3) Plaintiff is awarded a 12% ongoing royalty rate for the '436 and '812 patents.  The 12% ongoing royalty applies to the entire line of any infringing sales and offers of sale by Defendants of a line that includes a Weber Slicer S6, 905, 906, and 908, and which occurs post-judgment until the expiration of the '436 patent (May 2, 2031) and the '812 patent (September 6, 2031); and

11

(4)  With respect to any ongoing royalties, Defendants shall provide Plaintiff an accounting for royalties the fifteenth day after the close of each calendar quarter and shall make payment within 30 days after the close of each calendar quarter.

The motion is **DENIED** as follows:

(1)  Plaintiff is not awarded a supplemental damages accounting or supplemental damages for the period between June 6, 2022 and October 28, 2022; and

(2) Other the accounting ordered above, Defendants are not required to produce an ongoing production of technical documents to Plaintiff; and

(3) To the extent Plaintiff requests relief not expressly granted herein.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated:  January 9, 2023

# Exhibit C



US007065936B2

(12) **United States Patent**
  Lindee et al.

(10) **Patent No.:** **US 7,065,936 B2**
(45) **Date of Patent:** **Jun. 27, 2006**

(54) **FILL AND PACKAGING APPARATUS**

(75) Inventors: **Scott A. Lindee**, Mokena, IL (US);
                **Glenn Sandberg**, New Lenox, IL (US);
                **James E. Pasek**, Tinley Park, IL (US)

(73) Assignee: **Formax, Inc.**, Mokena, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/323,618**

(22) Filed: **Dec. 18, 2002**

(65) **Prior Publication Data**
     US 2004/0118084 A1    Jun. 24, 2004

(51) Int. Cl.
     **B65B 3/04**  (2006.01)
(52) U.S. Cl. ........................... **53/251;** 53/247; 53/252; 53/258; 53/260; 53/517
(58) Field of Classification Search ................. 53/527, 53/539, 247, 540, 251, 252, 158, 543, 246, 53/257, 258, 259, 260, 261
     See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,080,033 A * | 3/1963 | Graeme et al. ............... | 193/23 |
| 3,354,613 A * | 11/1967 | Anderson et al. ............. | 53/251 |
| 3,475,184 A * | 10/1969 | La Mers et al. ............. | 53/440 |
| 3,821,913 A * | 7/1974 | Bajcar et al. ................. | 83/92 |
| 3,846,958 A * | 11/1974 | Divan ........................ | 53/502 |
| 3,932,982 A * | 1/1976 | Klapp ........................ | 53/244 |
| 4,018,326 A * | 4/1977 | Hardy ........................ | 198/418.9 |
| 4,051,652 A * | 10/1977 | Hirano et al. ................. | 57/270 |
| 4,057,951 A | 11/1977 | Schneider | |
| 4,233,799 A * | 11/1980 | Caille ........................ | 53/154 |
| 4,236,855 A | 12/1980 | Wagner et al. | |

| | | | |
|---|---|---|---|
| 4,416,103 A | 11/1983 | Ewer et al. | |
| 4,474,092 A | 10/1984 | Mally et al. | |
| 4,478,024 A | 10/1984 | Vedvik et al. | |
| 4,597,704 A | 7/1986 | Vedvik et al. | |
| 4,645,400 A | 2/1987 | Mally et al. | |
| 4,648,237 A | 3/1987 | Total | |
| 4,667,953 A * | 5/1987 | Hirakawa et al. ........... | 271/280 |
| 4,709,535 A | 12/1987 | Mahaffy et al. | |
| 4,960,198 A * | 10/1990 | Hogenkamp ............. | 198/419.2 |

(Continued)

FOREIGN PATENT DOCUMENTS

EP    1 243 386 A2    9/2002

*Primary Examiner*—Stephen F. Gerrity
*Assistant Examiner*—Thanh Truong
(74) *Attorney, Agent, or Firm*—The Law Office of Randall T. Erickson, P.C.

(57) **ABSTRACT**

An apparatus is provided for filling food product drafts into packages. A supply of open top containers are arranged in rows and carried by an elongated web of film and are movable by the web into a fill station. A shuttle conveyor has a retractable and extendable conveying surface, the conveying surface arranged above the fill station and having an end region extendable to a position arranged to deposit food product drafts into the containers of the first row by circulation of the conveying surface. The conveying surface is retractable, or extendable, to reposition the end to a position arranged to deposit food product drafts carried on the conveying surface into the containers of the second row and each subsequent row. A tamping apparatus is carried by the conveyor to retract or extend with the conveying surface end. The tamping apparatus has vertically reciprocal tamping elements arranged above the respective row being filled with food product drafts, the tamping elements actuated to press the food product drafts into the containers.

21 Claims, 3 Drawing Sheets



**Appx100**

U.S. PATENT DOCUMENTS

4,984,677 A * 1/1991 Prakken ................... 198/418.6
5,051,268 A * 9/1991 Mally ........................ 426/420
5,054,266 A   10/1991 Mello et al.
5,095,684 A * 3/1992 Walker et al. ................ 53/443
5,327,704 A   7/1994 Hoekzema et al.
5,692,362 A * 12/1997 Hoyland ...................... 53/473
5,720,149 A * 2/1998 Stimpfl ....................... 53/244
6,622,848 B1 * 9/2003 Lattimer et al. ......... 198/418.9

* cited by examiner



*FIG. 1*

Case 5:19-cv-06021-SRB    Document 1-3    Filed 02/22/19    Page 4 of 11



*FIG. 2*

Case 5:19-cv-06021-SRB   Document 1-3   Filed 02/22/19   Page 5 of 11

Appx103



*FIG. 3*

Case 5:19-cv-06021-SRB   Document 1-3   Filed 02/22/19   Page 6 of 11

# FILL AND PACKAGING APPARATUS

## TECHNICAL FIELD OF THE INVENTION

The invention relates to fill and packaging apparatus. Particularly, the invention relates to an apparatus that slices and packages food products.

## BACKGROUND OF THE INVENTION

In a typical fill and package apparatus for sliced food products, a slicer delivers groups of slices or "drafts" onto a conveyor. The drafts are conveyed spaced-apart in a stream to a staging conveyor where the stream is converted to lateral rows of drafts. Such a staging conveyor is described in U.S. Pat. No. 5,810,149 and is commercially available as the A*180 Autoloader from Formax, Inc. of Mokena, Ill., U.S.A.

The rows of drafts are delivered by the staging conveyor to a packaging machine where the rows are deposited sequentially into pockets formed in a moving lower web of film. The rows are deposited while the film is advancing to a dwell position. At the dwell position, the packaging machine stops the motion of the lower web. During the dwell time period, at a downstream sealing station, downstream according to a direction of movement of the lower web of film, the packaging machine seals an upper web of film to the lower web of film after the drafts are placed in the pockets, and then trims the completed packages from the webs. Upstream of the sealing station, upstream according to a direction of movement of the lower web of film, the packaging machine also forms another group of empty pockets during the dwell time period. After the dwell time period is over the lower web of film is advanced and new drafts are deposited into new pockets as the lower web advances to a new dwell position. The dwell time period is longer than the film advance time period for a typical operating cycle, approximately 80% dwell time period compared to 20% film advance time period.

Loading stacks or drafts into the pockets during the advance time period is a time efficient way to load the pockets. Once the row of drafts is staged up onto the end of the staging conveyor, the advancement of the staging conveyor is synchronized with the packaging machine film advance to deposit the drafts into the pockets row-by-row.

However, the present inventors have recognized that "fluff" or "bunch" type products sometimes need to be re-collected correctly in the pockets of the lower web to ensure a neat and compact filling. These products are thin sliced "piles" that resemble hand produced deli portions. They do not "stage" well, as the piles produced by the slicer can tend to elongate during transportation on the conveyors from the slicing machine to the packaging machine.

The present inventors have recognized that it would be desirable to provide a filling and packaging apparatus that neatly and economically fills and packages drafts of thin sliced food product.

## SUMMARY OF THE INVENTION

The present invention provides an apparatus that effectively "tightens-up" drafts of thin-sliced piles of food product to fit neatly into packages.

According to the invention, an apparatus is provided for filling food product drafts into packages, comprising:

a supply of open top containers arranged in rows and carried by an elongated web of film and movable by the web into a fill station; and

a shuttle conveyor having a retractable and extendable conveying surface, the conveying surface arranged above the fill station and having an end region extendable to a position arranged to deposit the food product drafts into the containers of the first row, the conveying surface then being retractable to reposition the end region to a position arranged to deposit food product drafts carried on the conveying surface into the containers of the second row.

The apparatus of the invention can also include a tamping apparatus carried by the conveyor to retract or extend with the conveying surface end region and having vertically reciprocal tamping elements arranged above the respective first or second row being filled with food product drafts, particularly drafts in the form of bunches, groups or piles of food product. The tamping elements are configured to travel downward to press the food product drafts into the containers.

The apparatus can further comprise a rotatable slicing blade, a conveying assembly, and a support for holding a loaf in a cutting path of the rotatable slicing blade. The rotatable slicing blade is arranged to rotate in the cutting path to slice drafts from the loaf, the drafts being plural slices formed in a pile on the conveying assembly. The conveying assembly includes a staging conveyor that includes a row staging conveyor that forms the piles into rows and transports the rows toward the conveying surface of the shuttle conveyor. The staging conveyor can include one or more in line conveyors for transporting the rows to the shuttle conveyor.

The shuttle conveyor can be configured to fill a group of rows of containers while the web is stationary in the fill station. The shuttle conveyor is configured to advance from a retracted position where the last row of the group is filled to an extended position toward a downstream end of the fill station, simultaneously with advancement of the web to locate a succeeding group of rows of containers in the fill station.

According to an exemplary embodiment of the invention, rows of pockets formed in a web of film are spaced below a shuttle conveyor. During a dwell time period of the packaging machine, when the web of film is stopped, at a fill station, the first row of pockets is filled with the drafts and the drafts are tamped into the pockets. The second row of pockets is then filled and tamped. The steps are repeated, until all the rows in the fill station are filled and tamped during the dwell time period. When the dwell time period is over, the web of film is advanced such that new rows of empty pockets are presented at the fill station.

According to an exemplary embodiment of the invention, the shuttle conveyor is used to fill the first row of pockets with drafts and then retracted to fill the second row of pockets with drafts, and then retracted to fill each subsequent row of pockets with drafts until all of the rows of the group are filled. After the dwell time period is over, at the same time the packaging film advances to a new dwell position, the shuttle conveyor will also advance in order to repeat the cycle for the next group of pocket rows.

Alternatively, the shuttle conveyor could fill the groups of rows in a reverse order to that just described, wherein the first filled row of pockets is the row furthest upstream in the web moving direction, and the shuttle conveyor advances to fill the second row, then advances again to fill the third row, etc. After the group of rows is filled during the dwell period, the web of film advances to present an empty new group of rows of pockets and the shuttle conveyor retracts to be in a starting position to fill the new first row.

Advantageously, to assist in tightening up the drafts in the pocket, the shuttle conveyor is arranged to deposit the drafts into the pocket in an almost vertical attitude.

According to the exemplary embodiment of the invention, each group of pockets includes four rows by four lanes for 16 pockets. Each group of pockets is filled and packaged per dwell cycle of the packaging machine. At 6 cycles per minute (96 packages per minute), there is approximately 8 seconds to fill the pockets (2 seconds to fill and tamp each row) and 2 seconds for the shuttle to return and be ready for the next group of 4 rows of 4 pockets.

Numerous other advantages and features of the present invention will be become readily apparent from the following detailed description of the invention and the embodiments thereof, from the claims and from the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic elevational view of a slicing and packaging line that incorporates the invention;

FIG. **2** is an enlarged, schematic elevational view from FIG. **1** of a pocket-filling apparatus of the invention in a first stage of operation; and

FIG. **3** is an enlarged, schematic elevational view of the pocket-filling apparatus of FIG. **2** in a second stage of operation.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

While this invention is susceptible of embodiment in many different forms, there are shown in the drawings, and will be described herein in detail, specific embodiments thereof with the understanding that the present disclosure is to be considered as an exemplification of the principles of the invention and is not intended to limit the invention to the specific embodiments illustrated.

A system according to the invention includes a slicing machine **20** which cuts slices from a loaf and deposits the slices on an output conveyor assembly **30**, forming shingled or stacked drafts A. The drafts can be piles, bunches or groups of thin sliced product. The slicing machine can be of a type as described in U.S. Pat. Nos. 5,649,463; 5,704,265; and 5,974,925; as well as patent publications EP0713753 and WO99/08844, herein incorporated by reference. The slicing machine can also be a commercially available FOR-MAX FX180 machines, available from Formax, Inc. of Mokena, Ill., U.S.A.

The conveyor assembly **30** includes a check weight conveyor, wherein unacceptable drafts can be rejected and diverted. Acceptable drafts A are moved from the conveyor assembly **30** onto a staging conveyor **44** that includes a row staging conveyor **45** wherein a single file stream of drafts is rearranged in laterally extending rows. Such a staging conveyor **44** is described in U.S. Pat. No. 5,810,149 and is commercially available as the A*180 Autoloader from Formax, Inc. of Mokena, Ill., U.S.A.

The staging conveyor **44** can include an output conveyor **46** and a ramp conveyor **48**. The row staging conveyor **45** delivers rows of drafts to the output conveyor **46**. The output conveyor delivers the rows of drafts to the ramp conveyor **48**. The ramp conveyor delivers the rows of drafts onto a shuttle conveyor **52**.

The conveyors **46**, **48**, **52** are arranged above a packaging machine **60**, such as a Multivac R530, available from Multivac, Inc. of Kansas City, Mo., U.S.A. At a fill station

**61**, the shuttle conveyor **52** delivers rows of drafts into containers in the form of a group of rows of pockets **62** formed in a lower web of film **63** by the packaging machine **60**. Downstream of the fill station **61**, in the direction D, the pockets **62**, filled with product, are sealed by an upper web of film.

FIGS. **2** and **3** illustrate that the shuttle conveyor **52** includes an endless belt **80**. The belt **80** forms a top conveying region **84** and a bottom region **88**. The belt **80** is wrapped around a stationary belt drive roller **89**, an upper forward roller **90**, an end roller **91**, a bottom forward roller **92**, an idler roller **93**, a stationary bottom roller **94**, and a stationary bottom back roller **95**_a_. The rollers **90**, **91**, **92**, **93** are rotationally mounted on front end sideplates **95** (only one shown) to be translated back and forth together. The bottom region **88** of the belt, being wrapped around the movable idler roller **93** and the stationary bottom roller **94**, effectively creates a belt accumulation region **96** between these rollers **93**, **94**. Controlled translation of the sideplates **95** holding the rollers **90**, **91**, **92**, **93** controls the extension or retraction of the top region **84** of the belt **80**, and the position of an end region **100** of the top region **84**.

Two spaced-apart, side-by-side carriages **97** are provided. Each carriage **97** is connected to a corresponding front end sideplate **95**. The rollers **90**, **91**, **92**, **93** are effectively connected to the side-by-side carriages **97** (only one shown), via the front end sideplates **95**. The carriages **97** are connected to a parallel pair of endless positioning belts **98** (only one shown). A servomotor **112** is operatively connected to the positioning belts **98**, via drive pulleys **99**, to drive an upper surface **98**_a_ of the belts **98** in either an advancing direction (downstream direction of the web of film movement) or a retracting direction (upstream direction of the web of film movement). The servomotor **112** thus controls the retraction and extension of the end region **100** via movement of the carriages **97**. Another servomotor **114** is operatively connected to the drive roller **89** and controls the circulation speed of the conveying belt **80**. A more detailed description of a shuttle conveyor and servomotor drive components is presented in U.S. patent application Ser. No. 10/201,047, filed Jul. 23, 2002, and is herein incorporated by reference.

A controller **150**, such as a programmable logic controller (PLC), a microprocessor, a CPU or other control device, is signal connected to the servomotors **112**, **114**. The controller **150** synchronizes movement of the end region **100** of the conveyor **80** via the servomotor **112**, and the speed of the belt **80** via the servomotor **114**, with the movement of the web of film **63**.

A tamping apparatus **156** is provided adjacent to the end **100** of the conveyor belt **80**. The tamping apparatus **156** includes a row of tamping mechanism **160** (only one shown). The tamping mechanisms **160** are carried by plates **161** (only one shown) that are mechanically connected to the front end conveyor sideplates **95** to move with the end region **100** when the end region **100** is retracted or advanced. The mechanisms **160** each include a tamp plate **162** mounted on a rod **164**. The tamp plate **162** is shown in an elevated position in FIG. **3**, and in both an elevated and depressed (shown dashed) position in FIG. **2**. The rod **164** is partially fit within, and actuated by, a pneumatic cylinder **166**. When the rod **164** is extended, and the tamp plate **162** is depressed, the draft A is packed more tightly into a respective pocket **62**_a_. The row of tamping mechanisms **160** correspond in number to the number of pockets in each row, i.e., each pocket within each row would be filled together and then tamped together by a corresponding tamping mechanism

Case 5:19-cv-06021-SRB   Document 1-3   Filed 02/22/19   Page 8 of 11

160. Vertical supports 163 (shown schematically) connected to the plates 161 can be used to mount the pneumatic cylinders 166.

The pneumatic cylinder 166 is activated to raise or lower the rod 164 by a solenoid valve 170 that is signal-connected to the controller 150. An optical sensor (or sensors) 174 can be used to sense the presence or absence of a draft A on the ramp conveyor region 180. The optical sensor 174 is signal-connected to the controller 150. The synchronization of the tamping mechanisms 160 with the filling of the pockets 62 can be accomplished using the optical sensor 174 and/or information of the conveyor speed from the servomotor 114.

FIG. 3 illustrates that the movable rollers 90, 91, 92, 93, operatively carried by the front end sideplates 95, have been driven to the right by the carriages 97, that are driven by the servomotor 112, by an incremental distance x. The distance x is demonstrated in FIG. 3 by the change in position of the roller 93. The end region 100 is now in position to deposit the next row of drafts A into the second row of pockets 62b. The tamping mechanisms 160 are also shifted to be above the second row of pockets 62b and the process of depositing drafts A and tamping the drafts is repeated. The process is then repeated for each subsequent row 62c, 62d.

The end region 100 of the conveyor belt 80, is part of a ramp conveyor region 180 of the conveyor belt 80. The ramp conveyor region 180 is angled downwardly toward the rows of pockets 62 in order to controllably deposit drafts into the pockets. The ramp conveyor region 180 has a steep inclination which assists in tightening the drafts A entering the pockets 62.

The group of rows of pockets is preferably filled while the web of film 63 is stationary at the fill station 61, i.e., during the dwell period of the packaging operation. After the group is filled and the dwell period is over, the web of film 63 is moved in the direction D to reveal a new group of rows of pockets for filing. Preferably as the web of film 63 is moved the shuttle conveyor is advanced to be in a position to fill the first row of the new group.

Alternatively, the shuttle conveyor could fill the groups of rows in a reverse order to that just described, wherein the first filled row of pockets is the row furthest upstream in the web moving direction D, and the shuttle conveyor advances to fill the second row, then advances again to fill the third row, etc. After the group of rows is filled during the dwell period, the web of film advances to present an empty new group of rows of pockets and the shuttle conveyor retracts to be in a starting position to fill the new first row.

From the foregoing, it will be observed that numerous variations and modifications may be effected without departing from the spirit and scope of the invention. It is to be understood that no limitation with respect to the specific apparatus illustrated herein is intended or should be inferred. It is, of course, intended to cover by the appended claims all such modifications as fall within the scope of the claims.

The invention claimed is:

**1.** An apparatus for filling food product drafts into packages, comprising:
   a supply of open top container portions arranged in rows that are displaced along a longitudinal direction and having a first row and a longitudinally displaced second row and carried by an elongated web of film and movable by said web along said longitudinal direction into a fill station; and
   a shuttle conveyor having a conveying surface, said shuttle conveyor comprises a device to retract and to extend said conveying surface, said conveying surface arranged above said fill station and having an end region longitudinally movable to a first position arranged to deposit food product drafts into said container portions of said first row by said conveying surface, and while said web remains stationary, said device retracts or extends said conveying surface to reposition said end region to a second position arranged to deposit food product drafts carried on said conveying surface into said container portions of said second row.

**2.** The apparatus according to claim **1**, further comprising a tamping apparatus carried by said conveyor to be repositioned with said conveying surface end region and having vertically reciprocal tamping elements arranged above the respective first or second row being filled with food product drafts, said tamping elements actuatable to press said food product drafts into container portions.

**3.** The apparatus according to claim **2**, wherein said apparatus further comprises a rotatable slicing blade, a conveying assembly, and a support for holding a loaf in a cutting path of said rotatable slicing blade, said slicing blade arranged to rotate in said cutting path to slice drafts from said loaf, said drafts being plural slices formed in a pile on said conveying assembly, said conveying assembly including a staging conveyor that forms the piles into rows and transports said rows onto said conveying surface of said shuttle conveyor.

**4.** The apparatus according to claim **1**, wherein said shuttle conveyor is configured to advance from a retracted position to an extended position to fill a new first row of a succeeding group of empty rows of container portions while said web advances to locate said succeeding group of empty rows of container portions in said fill station.

**5.** The apparatus according to claim **1**, wherein said shuttle conveyor is configured to fill plural rows of container portions while said web is stationary in said fill station, and said shuffle conveyor is configured to retract from an extended position to a retracted position to fill a new first row of a succeeding group of empty rows of container portions while said web advances to locate said succeeding group of empty rows of container portions in said fill station.

**6.** The apparatus according to claim **1**, wherein said container portions comprise concave formed portions of said web.

**7.** The apparatus according to claim **1**, wherein said apparatus further comprises a sealing station downstream of said fill station, said sealing station arranged to apply a cover to said container portions to close said container portions.

**8.** The apparatus according to claim **1**, wherein said apparatus further comprises a container portion-forming station upstream of said fill station, arranged to form container portions of said web.

**9.** The apparatus according to claim **1**, wherein said container portions comprise concave formed portions of said web;
   wherein said apparatus further comprises a sealing station downstream of said fill station, said sealing station arranged to apply a cover to said container portions to close said container portions; and
   wherein said apparatus further comprises a container portion-forming station upstream of said fill station, configured to form said container portions of said web.

**10.** An apparatus for filling food product drafts into pockets formed into an elongated web of film, said pockets having open tops and arranged in rows that are displaced along a longitudinal direction and having at least a first row and a longitudinally displaced second row and movable with said web along said longitudinal direction, comprising:

a fill station and a mechanism for moving said pockets longitudinally into said fill station; and

a shuttle conveyor having an endless belt conveying surface, said shuttle conveyor comprises a device to retract and to extend said conveying surface longitudinally, said conveying surface arranged above said fill station and having an end longitudinally movable to a first position arranged to deposit food product drafts into said pockets of said first row by said conveying surface, and while said web remains stationary, said device retracts or extends said conveying surface to longitudinally reposition said end to a second position arranged to deposit food product drafts carried on said conveying surface into said pockets of said second row.

**11**. The apparatus according to claim **10**, further comprising a tamping apparatus carried by said conveyor to be longitudinally repositioned with said conveying surface end and having a row of vertically reciprocal tamping elements arranged above the respective first or second row being filled with food product drafts, said tamping elements actuatable to press said food product drafts into said pockets.

**12**. The apparatus according to claim **11**, wherein said apparatus further comprises a rotatable slicing blade, a conveying assembly, and a support for holding a loaf in a cutting path of said rotatable slicing blade, said slicing blade arranged to rotate in said cutting path to slice drafts from said loaf, said drafts being plural slices formed in a pile on said conveying assembly, said conveying assembly including a staging conveyor that forms the piles into rows and transport said rows onto said conveying surface of said shuttle conveyor.

**13**. The apparatus according to claim **1**, wherein said shuttle conveyor is configured to fill plural rows of pockets while said web is stationary in said fill station, and said shuttle conveyor is configured to advance from a retracted position to an extended position to fill a new first row of a group of empty pockets while said web advances to locate a succeeding plural row of pockets in said fill station.

**14**. The apparatus according to claim **10**, wherein said shuttle conveyor is configured to fill plural rows of pockets while said web is stationary in said fill station, and said shuttle conveyor is configured to retract from an extended position to a retracted position to fill a new first row of a group of empty pockets while said web advances to locate a succeeding plural row of pockets in said fill station.

**15**. The apparatus according to claim **10**, wherein said apparatus further comprises a sealing station downstream of

said fill station, said sealing station arranged to apply a cover to said pockets to close said pockets.

**16**. The apparatus according to claim **10**, wherein said apparatus further comprises a pocket-forming station upstream of said fill station, arranged to form said pockets of said web.

**17**. The apparatus according to claim **10**, wherein said apparatus further comprises a sealing station downstream of said fill station, said sealing station configured to apply a cover to said container portions to close said container portions; and

wherein said apparatus further comprises a pocket-forming station upstream of said fill station, arranged to form said pockets of said web.

**18**. The apparatus according to claim **17**, further comprising a tamping apparatus carried by said conveyor to be longitudinally repositioned with said conveying surface end and having a row of vertically reciprocal tamping elements arranged above the respective first or second row being filled with food product drafts, said tamping elements actuatable to press said food product drafts into said pockets.

**19**. The apparatus according to claim **18**, wherein said apparatus further comprises a rotatable slicing blade, a conveying assembly, and a support for holding a loaf in a cutting path of said rotatable slicing blade, said slicing blade arranged to rotate in said cutting path to slice drafts from said loaf, said drafts being plural slices formed in a pile on said conveying assembly, said conveying assembly including a staging conveyor that forms the piles into rows and transport said rows onto said conveying surface of said shuttle conveyor.

**20**. The apparatus according to claim **19**, wherein said shuttle conveyor is configured to fill plural rows of pockets while said web is stationary in said fill station, and said shuttle conveyor is configured to advance from a retracted position to an extended position to fill a new first row of a group of empty pockets while said web advances to locate a succeeding plural row of pockets in said fill station.

**21**. The apparatus according to claim **19**, wherein said shuttle conveyor is configured to fill plural rows of pockets while said web is stationary in said fill stalion, and said shuttle conveyor is configured to retract from an extended position to a retracted position to fill a new first row of a group of empty pockets while said web advances to locate a succeeding plural row of pockets in said fill station.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,065,936 B2                                    Page 1 of  1
APPLICATION NO.  : 10/323618
DATED                  : June 27, 2006
INVENTOR(S)        : Scott A. Lindee and Glenn Sandberg

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

At column 7, line 30, change "transport" to --transports--.

At column 7, line 32, change "1" to --10--.

At column 8, line 30, change "transport" to --transports--.

At column 8, line 41, change "stalion" to --station--.

Signed and Sealed this

Seventeenth Day of October, 2006



JON W. DUDAS
*Director of the United States Patent and Trademark Office*

# EXHIBIT A

Case 5:20-cv-06069-SRB   Document 1-1   Filed 05/06/20   Page 1 of 30



US010625436B2

(12) **United States Patent**
Lindee et al.

(10) **Patent No.: US 10,625,436 B2**
(45) **Date of Patent: *Apr. 21, 2020**

(54) **HIGH SPEED SLICING MACHINE**

(71) Applicant: **PROVISUR TECHNOLOGIES, INC.**, Chicago, IL (US)

(72) Inventors: **Scott A. Lindee**, Mokena, IL (US); **James E. Pasek**, Tinley Park, IL (US); **David Hancock**, Morris, IL (US); **Thomas C. Wolcott**, LaGrange, IL (US)

(73) Assignee: **PROVISUR TECHNOLOGIES, INC.**, Chicago, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/210,583**

(22) Filed: **Dec. 5, 2018**

(65) **Prior Publication Data**
US 2019/0105794 A1 Apr. 11, 2019

**Related U.S. Application Data**

(60) Continuation of application No. 16/017,346, filed on Jun. 25, 2018, which is a division of application No. 13/099,325, filed on May 2, 2011.
(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| **B26D 7/32** | (2006.01) |
| **B26D 7/22** | (2006.01) |
(Continued)

(52) **U.S. Cl.**
CPC .............. ***B26D 7/32*** (2013.01); ***B26D 7/225*** (2013.01); *B26D 5/00* (2013.01); *B26D 7/0683* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ........ B26D 7/06; B26D 7/0625; B26D 7/225; B26D 7/0683; B26D 7/30; B26D 7/32;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,047,400 A 7/1936 Walter
4,226,176 A * 10/1980 Macchi .............. A47J 37/0857
198/728
(Continued)

FOREIGN PATENT DOCUMENTS

DE 2912446 10/1980
DE 3912446 10/1990
(Continued)

OTHER PUBLICATIONS

International Search Report dated Jan. 27, 2012.
(Continued)

*Primary Examiner* — Phong H Nguyen
(74) *Attorney, Agent, or Firm* — Klintworth & Rozenblat IP LLP

(57) **ABSTRACT**

A food article slicing machine includes a food article loading apparatus with a lift tray assembly for moving food articles from a staging position at an elevated position at a beginning of a food article feed path, a food article feed apparatus disposed over the food article loading apparatus having an upper conveyor assembly with an independently driven endless conveyor belt used in cooperation with a food article gripper for moving the food articles along the food article feed path, a food article stop gate that forms part of the food article feed path and opens to drop food article end portions, and a slicing station at an end of the food article feed path with a knife for slicing the food articles.

**16 Claims, 21 Drawing Sheets**



### Related U.S. Application Data

(60) Provisional application No. 61/343,551, filed on May 1, 2010.

(51) Int. Cl.
| | |
|---|---|
| *B26D 5/00* | (2006.01) |
| *B26D 7/06* | (2006.01) |
| *B26D 7/01* | (2006.01) |
| *B26D 7/30* | (2006.01) |

(52) U.S. Cl.
CPC .......... *B26D 7/30* (2013.01); *B26D 2007/011* (2013.01); *B26D 2210/02* (2013.01); *Y10T 83/2074* (2015.04); *Y10T 83/654* (2015.04)

(58) Field of Classification Search
CPC .. B26D 2210/00; B26D 2210/02; B26D 5/00; B26D 2007/011; B65G 15/00; B65G 15/10; B65G 15/12; B65G 15/14; B65G 15/16; B65G 15/30; B65G 15/50; Y10S 83/932; Y10T 83/6668; Y10T 83/202; Y10T 83/2192; Y10T 83/2194; Y10T 83/4531; Y10T 83/463; Y10T 83/647; Y10T 83/6502; Y10T 83/6504; Y10T 83/6505; Y10T 83/6537; Y10T 83/6945; Y10T 83/654; Y10T 83/9377; Y10T 83/9379; Y10T 83/9403
USPC ................................................. 198/804, 831
See application file for complete search history.

(56)           **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,583,435 A | 4/1986 | Fessler | |
| 4,934,232 A | 6/1990 | Weber et al. | |
| 5,191,820 A * | 3/1993 | Hartmann | B26D 7/01 83/277 |
| 5,628,237 A | 5/1997 | Lindee et al. | |
| 5,974,925 A | 11/1999 | Lindee et al. | |
| 6,415,698 B1 * | 7/2002 | Haas | A21C 11/10 83/255 |
| 2004/0016331 A1 * | 1/2004 | Wolcott | B26D 7/32 83/23 |
| 2004/0031363 A1 | 2/2004 | Lindee et al. | |

| | | |
|---|---|---|
| 2004/0055439 A1 | 3/2004 | Lindee et al. |
| 2004/0139706 A1 | 7/2004 | Drebing et al. |
| 2005/0082147 A1 | 4/2005 | Mol |
| 2005/0132855 A1 | 6/2005 | Weber |
| 2005/0199111 A1 | 9/2005 | Sandberg et al. |
| 2006/0289281 A1 | 12/2006 | Sandberg et al. |
| 2007/0214969 A1 | 9/2007 | Mueller et al. |
| 2008/0185095 A1 | 8/2008 | Gutknecht |
| 2008/0250944 A1 | 10/2008 | Pryor et al. |
| 2009/0120256 A1 * | 5/2009 | Pasek ................ B26D 7/18 83/446 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 4235985 | | 4/1994 |
| DE | 102008020248 | | 5/1994 |
| DE | 3912445 | | 8/1996 |
| DE | 19518583 | | 11/1996 |
| DE | 19518595 | | 11/1996 |
| DE | 195 25 742 | * | 1/1997 |
| DE | 10353114 | | 5/2005 |
| EP | 0398602 | | 11/1990 |
| EP | 0547389 | | 6/1993 |
| EP | 0547389 | * | 6/1993 |
| EP | 00547389 | | 6/1993 |
| EP | 0713753 A2 | | 5/1996 |
| EP | 2566670 | | 7/2016 |
| FR | 2677573 | * | 12/1992 |
| JP | 2000-288983 A | | 10/2000 |
| WO | 89/06588 | | 7/1989 |
| WO | 0230635 | | 4/2002 |
| WO | 2005/037501 | | 4/2005 |
| WO | 2010011237 | | 1/2010 |
| WO | 2011/139996 | | 11/2011 |

#### OTHER PUBLICATIONS

European search Report for European Patent Application No. EP 11 77 8126 dated Jan. 26, 2015, 3 pages.
Machine translation of DE102008020248.
Machine translation of DE10353114.
Machine translation of DE2912446.
Machine translation of DE4235985.
Machine translation of WO2005037501.
U.S. Appl. No. 61/343,551, entitled "High Speed Slicing Machine," filed May 1, 2010, 39 pages.
Machine translation of JP2000-288983.

* cited by examiner



Fig. 1

Case 5:20-cv-06069-SRB   Document 1-1   Filed 05/06/20   Page 4 of 30



## Fig. 1A



Fig. 1B

Case 5:20-cv-06069-SRB   Document 1-1   Filed 05/06/20   Page 6 of 30

Appx115

Case 5:20-cv-06069-SRB   Document 1-1   Filed 05/06/20   Page 7 of 30



Fig. 2



Fig. 2A

Case 5:20-cv-06069-SRB   Document 1-1   Filed 05/06/20   Page 8 of 30



Fig. 3

Case 5:20-cv-06069-SRB   Document 1-1   Filed 05/06/20   Page 9 of 30

**Appx118**



Fig. 5

Fig. 4

Case 5:20-cv-06069-SRB    Document 1-1    Filed 05/06/20    Page 10 of 30



Fig. 6

Case 5:20-cv-06069-SRB  Document 1-1  Filed 05/06/20  Page 11 of 30



Fig. 7

Case 5:20-cv-06069-SRB   Document 1-1   Filed 05/06/20   Page 12 of 30

Appx121



Fig. 7A



Fig. 7B

Case 5:20-cv-06069-SRB   Document 1-1   Filed 05/06/20   Page 14 of 30

Appx123



Fig. 7C



Fig. 7D



1013,1015,1017

1013a,1015a,1017a

992,994,998

1002,1004,1008

1130

1056

1003,1005,1007

1003a,1005a,1007a

**Fig. 7E**

Case 5:20-cv-06069-SRB   Document 1-1   Filed 05/06/20   Page 17 of 30



1003,1005,1007

1002,1004,1008

1134,1135,1136

1131,1132    1021

A    1009

1010a

1137    1133    992a,994a,998a    1011

1058    1139    992b,994b,998b

**Fig. 7F**



**Fig. 8**



Fig. 9

Case 5:20-cv-06069-SRB   Document 1-1   Filed 05/06/20   Page 20 of 30

Appx129



Fig. 10



Fig. 11



Fig. 12

Case 5:20-cv-06069-SRB   Document 1-1   Filed 05/06/20   Page 23 of 30



Fig. 13A

Fig. 13B

Fig. 13C

Fig. 13D

# HIGH SPEED SLICING MACHINE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation application of U.S. Ser. No. 16/017,346, filed Jun. 25, 2018, which is a divisional application of U.S. Ser. No. 13/099,325, filed on May 2, 2011, which claims the benefit of U.S. Provisional Application No. 61/343,551, filed May 1, 2010, the contents of which are incorporated herein in their entirety.

## BACKGROUND OF THE INVENTION

Many different kinds of food articles or food products, such as food slabs, food bellies, or food loaves are produced in a wide variety of shapes and sizes. There are meat loaves made from various meats, including ham, pork, beef, lamb, turkey, and fish. The meat in the food loaf may be in large pieces or may be thoroughly comminuted. These meat loaves come in different shapes (round, square, rectangular, oval, etc.) and in different lengths up to six feet (183 cm) or even longer. The cross-sectional sizes of the loaves are quite different; the maximum transverse dimension may be as small as 1.5 inches (4 cm) or as large as ten inches (25.4 cm). Loaves of cheese or other foods come in the same great ranges as to composition, shape, length, and transverse size.

Typically, the food loaves are sliced, the slices are grouped in accordance with a particular weight requirement, and the groups of slices are packaged and sold at retail. The number of slices in a group may vary, depending on the size and consistency of the food article and the desire of the producer, the wholesaler, or the retailer. For some products, neatly aligned stacked slice groups are preferred. For others, the slices are shingled or folded so that a purchaser can see a part of every slice through a transparent package.

Food articles can be sliced on high speed slicing machines such as disclosed in Published Patent Document WO 2010/011237 A1 or U.S. Pat. No. 5,974,925; or as commercially available as the Power Max 4000™ or FX180® slicers available from Formax, Inc. of Mokena, Ill., USA.

The FX180® machine can be configured as an automatically loaded, continuous feed machine, or an automatically loaded, back-clamp or gripper type machine.

For an automatically loaded, continuous feed machine, side-by-side upper and lower conveyor pairs drive food articles into the cutting plane. A gate is located in front of the conveyors. The initial food articles are loaded with leading ends abutting the gate. The gate is lowered and the food articles proceed into the conveyors. When the initial food articles are sliced to the extent that the trailing ends of the food articles clear the gate, the gate is raised and new food articles are loaded in the feed paths, held back by the gate. Shortly thereafter the gate is lowered and new food articles slide down to where lead ends of the new food articles abut trailing ends of the initial food articles being sliced. The new food articles are driven into the cutting plane trailing the initial food articles. Food articles are sequentially and continuously loaded in this manner, lead end-to-trailing end, in abutting contact with the preceding food articles.

U.S. Pat. No. 5,628,237 and European patent EP 0 713 753 describe a back-clamp or gripper type slicing machine. According to this type of slicing machine, food articles are loaded onto a lift tray and the lift tray is raised to a ready-to-sweep position. Loaf grippers are retracted after the previous food articles are sliced. During retraction of the

loaf grippers, loaf-to-slicing blade gate doors are closed and ends of the previous food articles are dropped through a loaf end door. After the grippers have reached the retracted position or "home position" remote from the slicing blade, a loaf sweep mechanism is activated, moving the food articles laterally together into the slicing position. A spacing mechanism moves down and spaces the food articles apart. The grippers then advance after it has been determined that the loaf sweep mechanism has moved the food articles to the slicing position. The grippers have onboard sensing mechanisms that are triggered by contact with the food articles. After sensing and gripping the food articles, the food articles are retracted slightly, and the loaf-to-slicing blade gate doors are opened and the food articles are advanced to the slicing plane of the slicing blade. The loaf sweep mechanism retracts and the loaf lift tray lowers, ready for the next reload cycle. According to this design, in practice, the reload cycle is accomplished in about eight seconds. In a high-volume slicing operation, reload cycle time can be a significant limitation to optimum production efficiency.

The machine disclosed in WO 2010/011237 A1 provides an automated, food article tray loading method and apparatus wherein food articles can be loaded into the lift tray into designated and separated lanes which automatically assume a preload condition, and after the food articles are loaded, food article separation is maintained on the lift tray. A food article transfer receives the food articles on the lift tray in their separated positions and transfers the food articles into the slicing feed paths while maintaining the separated positions. A food article end disposal system utilizes a transport that laterally moves end portions outside of the feed path and ejects the end portions as the transport is moved back into the feed path to receive the subsequent end portions. The machine utilizes food article grippers that are fixed onto conveyor belts which support and drive the food articles in the feed paths.

The present inventors have recognized that it would be desirable to slice plural food articles with independent feeding and weighing capabilities, with hygienic and operational enhancements.

## SUMMARY OF THE INVENTION

The invention provides a mechanism and method for slicing multiple food articles with independency of feed rate and the ability to weigh each product group from each food article respectively to achieve optimal weight control and yield of each food article.

The present invention provides a high-speed slicing apparatus and a weighing and classifying conveyor combination that provides plural advantages in machine cost, productivity, food hygiene, and operation.

The invention provides a lift tray that is located in line with the food article feed paths and is lowered to receive food articles and raised into the feed paths. There is no need for lateral shifting of food articles into the feed paths. Food article grippers are driven along the feed paths by an overhead conveyor. A laser food article end detection system is employed in each feed path to detect the terminal end of the food article to control the positioning of the gripper for that path.

The invention provides the use of an automatic debris or scrap removal conveyor that also provides for end portion removal.

The invention provides an automated cleanup position wherein the elevated food article feed mechanism can be collapsed to a more convenience plane or maintenance

position, and the blade cover is automatically pivoted to a cleanup position. The combination provides for enhanced portion control and yield. A food article feed mechanism ensures accurate feeding by use of servo driven and controlled feed belts and grippers. The slicing mechanism includes three independent drives for slicing multiple food articles simultaneously.

An improved food article stop gate is provided that also serves as a door for the removal of food article end portions.

A horizontally radiating laser intrusion detector is used to shut down systems when an unwanted intrusion by an operator is detected.

An automated, food article tray loading method and apparatus is provided wherein food articles can be loaded into the lift tray into designated and separated lanes which automatically assume a preload condition, and after the food articles are loaded, food article separation is maintained on the lift tray.

Numerous other advantages and features of the present invention will become readily apparent from the following detailed description of the invention and the embodiments thereof, and from the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a near side elevational view of a slicing machine and a weighing and classifying conveyor combination of the present invention;

FIG. 1A is an enlarged fragmentary view taken from FIG. 1;

FIG. 1B is a perspective view of the slicing machine of FIG. 1 in a clean-up configuration;

FIG. 2 is a plan view of the combination of FIG. 1 with some panels and parts removed or made transparent illustrating some underlying components;

FIG. 2A is a bottom perspective view of a portion of FIG. 2;

FIG. 3 is a sectional view taken generally along line 3-3 of FIG. 2 with some panels and parts removed or made transparent and underlying components revealed;

FIG. 4 is a schematic, sectional view taken generally along line 4-4 of FIG. 6 with some panels and parts removed or made transparent and underlying components revealed;

FIG. 5 is a schematic, sectional view taken generally along line 5-5 of FIG. 6 with some panels and parts removed or made transparent and underlying components revealed;

FIG. 6 is a sectional view taken generally along line 6-6 of FIG. 3 with some panels and parts removed or made transparent and underlying components revealed;

FIG. 7 is a fragmentary elevational view taken generally along line 7-7 of FIG. 2 with some panels and parts removed or made transparent and underlying components revealed;

FIG. 7A is a fragmentary perspective view of a portion of FIG. 7;

FIG. 7B is an enlarged fragmentary view of apportion of FIG. 7A;

FIG. 7C is an enlarged rear perspective view of a portion of FIG. 7;

FIG. 7D is a top perspective view of a portion of FIG. 7;

FIG. 7E is an enlarged fragmentary view of a portion of FIG. 7;

FIG. 7F is an enlarged fragmentary view of an alternate embodiment of a lower conveyor.

FIG. 8 is a fragmentary rear perspective view of the apparatus of FIG. 1;

FIG. 9 is a far side perspective view of the apparatus of FIG. 1 with a lift tray in a lowered position;

FIG. 10 is a top perspective rear view of the lift tray of FIG. 9 with a tray platform removed;

FIG. 11 is an enlarged, fragmentary near side perspective view of a portion of the slicing machine of FIG. 1;

FIG. 12 is an enlarged, fragmentary far side perspective view with a door removed to show underlying components;

FIG. 13A is a schematic diagram of the loaf feed apparatus in a first stage of operation;

FIG. 13B is a schematic diagram of the loaf feed apparatus in a second stage of operation;

FIG. 13C is a schematic diagram of the loaf feed apparatus in a third stage of operation; and

FIG. 13D is a schematic diagram of the loaf feed apparatus taken generally along line 13D-13D of FIG. 13C.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

While this invention is susceptible of embodiment in many different forms, there are shown in the drawings, and will be described herein in detail, specific embodiments thereof with the understanding that the present disclosure is to be considered as an exemplification of the principles of the invention and is not intended to limit the invention to the specific embodiments illustrated.

Published Patent Application No. WO 2010/011237 and U.S. Pat. No. 5,628,237 are herein incorporated by reference.

Overall Description

FIGS. 1-3 illustrate a high-speed slicing apparatus 100 and a weighing and classifying conveyor or output conveyor 102 according to a preferred embodiment of the invention. The slicing apparatus 100 includes a base section 104, a collapsible frame 105, an automatic food article loading apparatus 108 that receives food articles 110 to-be-sliced, a food article feed apparatus 120, a food article end and scrap removal conveyor 122 (FIGS. 13C and 13D), a laser safety guard system 123, a slicing head apparatus 124, and a slice receiving conveyor 130. The slicing head apparatus includes a slicing blade 125 that defines a slicing plane and an orifice plate or slicing block 126 that guides food articles into the slicing plane, the blade cutting closely to the orifice plate. The slicing apparatus also includes a computer display touch screen 131 that is pivotally mounted on and supported by a support 132.

Base Section

The base section 104 includes a compartment 136 having side walls 138a, 138b, a bottom wall 140, and an inclined top wall 142. The apparatus 100 is supported on four adjustable feet 144. The compartment 136 has a tapered side profile from back to front wherein the top wall 142 slants down from back to front. The slanted orientation of the top wall 142 ensures water drainage off the top of the compartment 136. The compartment is supported on adjustable feet 144.

The compartment 136 includes a near side door 152, a far side door 156 (FIG. 9), and a rear door 162 that permit access into the compartment or to modules normally held within the compartment 136. The compartment 136 typically affords an enclosure for a computer, motor control equipment, a low voltage supply, and a high voltage supply and other mechanisms as described below. The compartment may also include a pneumatic supply or a hydraulic supply, or both (not shown).

Collapsible Frame and Elevated Housings

The base section 104 supports the collapsible frame 105 as shown in FIGS. 1, 1B and 9. The collapsible frame 105

includes a foldable support mechanism **174** that supports a food article feed mechanism **190**.

The foldable support mechanism **174** includes a servomotor **175** that drives a gear reducer **176** having a drive shaft **178** that extends out of far side of the compartment **136** (FIG. **9**). The drive shaft **178** is rotationally fixed to parallel levers **180**a, **180**b which swing out with a turning of the drive shaft **178**. The levers **180**a, **180**b are pivotally connected to a column **182** via a rotary connection **184**. The column **182** is pivotally connected at a pivot connection **192** to the frame **190** which supports the food article feed apparatus **120**.

For cleaning and maintenance purposes, the collapsible frame **105** is collapsed down by actuating the servomotor **175** and gear reducer **176** to rotate the levers **180**a, **180**b, which draws down the column **182** as shown in FIG. **1**B. The frame **190**, and all equipment supported thereby, is lowered for more convenient maintenance and cleaning as illustrated in FIG. **1**B. In some cases, this eliminates the need for ladders or platforms when servicing the slicing apparatus **100**.

The slicing head apparatus **124** is covered by a guard **119** that is attached to the frame **190** such that when the frame is pivoted down as shown in FIG. **1**B, the guard **119** is pivoted away from a slicing head base **117** to expose the slicing blade **125** and internals for cleaning and maintenance.

Additionally, the elevation of the food article feed apparatus can be adjusted by using the servomotor to selectively pivot the levers **180**a, **180**b and lower the rear of the frame **190**. At a front, the frame **190** is supported on a cross shaft **193** that is eccentrically fixed at each end to a round cam **194** (FIG. **1**A). The cam is journaled in a round opening **195** in side supports **197**a, **197**b and the cam is fixed for non-rotation to the respective side support by fasteners **199**. The far side is shown in FIG. **1**A, with the understanding that the near side is mirror image identical across the longitudinal vertical center plane of the machine. As shown in FIG. **1**A, because the dimension "a" is smaller than the dimension "b", the shaft ends can be temporarily loosened by removing the fasteners and the shaft and cams can be rotated 180 degrees about a centerline of the shaft, and the cams can be re-fastened to be fixed to the side supports. The elevation will be different between the two 180-degree adjustable positions. Thus, the machine will accommodate two different height settings for different types of food articles.

Food Article Feed Apparatus

An upper conveyor assembly **530** of the food article feed apparatus **120** is shown in FIG. **2**. The conveyor assembly **530** includes three independently driven endless conveyor belts **802**, **804**, **806**. Each belt **802**, **804**, **806** is identically driven so only the drive for the belt **802** will be described.

The belt **802** is wrapped around a toothed front drive roller or pulley **812** and a back-idler roller or pulley **816**. The belt **802** preferably has teeth that engage teeth of the two rollers **812**, **816**. Each drive roller **812** includes a toothed outer diameter **812**a and a toothed, recessed diameter **812**b.

An endless drive belt **820** wraps around the recessed diameter **812**b. The drive belt **820** also wraps around a drive roller **824** that is fixed to a drive shaft **828**. The drive shaft **828** extends transversely to the belt **802** and is journaled for rotation within a bearing **830** mounted to a near side frame member **836**.

The drive shaft **828** penetrates a far side frame member **838** and extends to a bearing **843**, coupled to a gear reducer

**842** mounted to a support frame **854**. The gear reducer **842** is coupled to a servomotor **850** that is mounted to the support frame **854**.

The servomotor **850** drives the drive shaft **828** which turns the roller **824** which circulates the belt **820** which rotates the roller **812** which circulates the belt **802**.

Three servomotors **850** are mounted to the support frame **854** and all are located within an upper compartment **855** that is supported by the frame **190**.

The idler rollers **816** are provided with a pair of mirror image identical adjustable cam belt tension adjustment mechanisms **882**a, **882**b. As shown in FIG. **7**A, each mechanism **882**a, **882**b includes a fork **885** that is braced from the respective side frame member **836**, **838** by an adjustable cam **883**. The fork **885** is guided by upper and lower pins **886**a, **886**b so as to slide rearward and forward and has an end **891** that captures an axle **889** that rotationally supports the idle rollers **816**. For adjustment, the cam fastener **883**a is loosened so as to be rotatable on the respective side frame member **836**, **838**, rotated to achieve the desired belt tension, and then the cam fastener is tightened to hold the cam fixed.

FIG. **7**B illustrates a gripper **894** used in cooperation with the belt **802**. The gripper **894** is mounted to a bottom run of the belt **802** and is translated along the food article path by the belt **802**. The gripper **894** is clamped to a belt joint and guide assembly **896** by a fixture **901** that engages the assembly **896** and is fixed thereto by a clamping set screw **897**. The assembly **896** comprises a pair of upper members **899** and a lower member **900**. The upper members **899** can include teeth **899**a that mesh engage the teeth of the belt **802** once the members **899**, **900** are fastened together to splice the free ends **802**e, **802**f of the belt **802** (FIG. **7**D). For clamping, fasteners **902**, **904** (FIG. **7**D) are provided which are inserted from above the members **899** through plain holes in the members **899** and tightly threaded into threaded holes in the member **900**.

The lower member **900** includes guides **906**, **907** that contain slide bearings **906**a, **907**a composed of friction reducing material. The slide bearings **906**a, **907**a partly surround longitudinal rails **912**, **913** that are in parallel with, and straddle the belt **802**. The rails **912**, **913** support the gripper along its working path from a retracted position to a fully forward position near to the slicing plane.

For each gripper there are two rails **912**, **913** to support and guide that gripper. Thus, there are two rails that straddle the belt **804** and two rails that straddle the belt **806**.

The gripper **894** is connected to the fixture **901** by a front plate **920** having a predominant lateral face and a rear plate **922** having a predominant longitudinal face. Each gripper **894** is provided with two air lines **930**, **932** for two-way pneumatic gripper open-and-close operability.

The air lines **930**, **932** are guided through lower rings **940** and upper rings **942** to an air tube storage area **950** above the food article feed apparatus **120** (FIG. **7**D). The air tube lines are routed around weighted rollers or slides **951** that are guided by longitudinal slots **952** and extend to a source of pressurized air. Thus, the movement of the rollers or slides along the slots under force of gravity, will take up slack in the air tubes when the grippers **894** are moving toward, and when in, the retracted position.

The gripper **894** travels from the retracted home position shown in FIG. **7**A to the advanced, forward position approaching the slicing plane.

The grippers **894** are as described in Published Patent Application No. WO 2010/011237, herein incorporated by reference.

**Lower Conveyor**

As illustrated in FIGS. 3, 6, 7, and 7E at a front end of the food article feed apparatus 120, are three lower feed conveyors 992, 994, 998, including endless belts 1002, 1004, 1008, respectively. The endless belts 1002, 1004 1008 are independently driven and are directly opposed to presser plates 1003, 1005, 1007 respectively.

FIG. 6 shows the conveyor 992 has a drive roller 1010 having a central hub 1012 with a central bore 1014. The drive roller 1010 has tubular stub axles 1016, 1018 extending from opposite ends of the central hub 1012. The tubular stub axles 1016, 1018 are journaled for rotation by bearings 1020, 1022 that are fastened to carrier blocks 1023a.

The conveyor 994 includes a drive roller 1038 having a central hub 1042 with a bore 1044. The drive roller 1038 has tubular stub axles 1046 and 1048 extending from opposite ends of the central hub 1042. The tubular stub axles 1046, 1040 are journaled by bearings 1050, 1052 respectively that are attached to carrier blocks 1023b.

A motor housing 1054, including a base plate 1054b and a cover 1054a, is mounted to an end of an upper conveyor support bar 1056. The base plate 1054b of each side of the machine is fastened to a linear actuator, such as a pneumatic cylinder 1055a and 1055b respectively. The cylinders 1055a, 1055b are connected together by the support bar 1056. Each cylinder slides on a fixed vertical rod 1057a, 1057b respectively. Thus, controlled air to the cylinders 1055a, 1055b can be used to uniformly raise or lower the near side housing 1054 and the far side housing 1054 uniformly.

A spindle 1060 extends through the motor housing 1054, through a sleeve 1064, through a coupling 1065, through the tubular stub axle 1016, through the central bore 1014, through the tubular stub axle 1018, through the tubular stub axle 1046, and partly into the bore 1044. The spindle 1060 has a hexagonal cross-section base region 1070, a round cross-section intermediate region 1072, and a hexagonal cross-section distal region 1074. The hexagonal cross-section base region 1070 is locked for rotation with a surrounding sleeve 1071 to rotate therewith.

The intermediate region 1072 is sized to pass through the sleeve 1064, through the tubular stub axle 1016, through the central bore 1014, and through the tubular stub axle 1018 to be freely rotatable therein. The distal region 1074 is configured to closely fit into a hexagonal shaped central channel 1078 of the tubular stub axle 1046 to be rotationally fixed with the tubular stub axle 1046 and the drive roller 1038.

The sleeve 1064 includes a hexagonal perimeter end 1064a that engages a hexagonal opening 1065a of the coupling 1065. The coupling 1065 includes an opposite hexagonal opening 1065a that engages a hexagonal perimeter end 1016a of the tubular stub axle 1016. The coupling 1065 couples the sleeve 1064 and the stub axle 1016 for mutual rotation such that the sleeve 1064 and the drive roller 1010 are locked for rotation together, i.e., turning of the sleeve 1064 turns the drive roller 1010.

Within the motor housing 1054 are two servomotors 1090, 1092 mounted to the housing by fasteners. As shown in FIGS. 4 and 6, the servomotor 1090 has a vertically oriented output shaft 1096 that rotates about a vertical axis connected to a worm gear 1098 that is enmesh with and drives a drive gear 1100 that rotates about a horizontal axis. The drive gear 1100 drives the sleeve 1071 that drives the region 1072 of the spindle to rotate the spindle 1060. Rotation of the spindle 1060 rotates the drive roller 1038 via the hexagonal cross-section distal end region 1074.

Adjacent to the servomotor 1090 is the servomotor 1092. The servomotor 1092 is configured substantially identically with the servomotor 1090 except the worm gear 1098, as shown in schematic form in FIG. 5, of the servomotor 1092 drives a drive gear 1100 that drives the sleeve 1064 to rotate. The sleeve 1064 rotates independently of the round cross-section region 1072 of the spindle 1060, and drives a stub axle 1016 to rotate, which rotates the drive roller 1010.

The sleeves 1071 and 1064 are journaled for rotation by bearings. The drive gears 1100, 1100 are fastened to the respective sleeve 1071, 1064 using fasteners 1116.

Each conveyor belt 1002, 1004, 1008 is wrapped around the respective drive roller and a front idle roller 1134, 1135, 1136 that is supported by respective side frames 1131, 1132.

Also, as shown in FIGS. 7, 7E, and 13A-13C, the underside of the support bar 1056 carries pneumatic cylinders 1130. Each pneumatic cylinder 1130 is supplied with a preselected air pressure to extend a piston rod 1013, 1015, 1017 to press down on presser plates 1003, 1005, 1007 to lightly press down on a top of the product below, clamping the food article between the presser plates 1003, 1005, 1007 and the belts 1002, 1004, 1008. Piston rods 1013a, 1015a, 1017a in their extended position and presser plates 1003, 1005, 1007, in their depressed position 1003a, 1005b, 1007a are illustrated in FIG. 7E. The conveyor belts 1002, 1004, 1008 drive the food articles through corresponding orifices in the slicing block and into the slicing plane.

FIG. 7F illustrates an alternate embodiment of the lower conveyor. The same reference signs indicate similar parts as described above. In the embodiment illustrated in FIG. 7F, the lower conveyor 992a, 994a, 998a is pivotable about an axis A parallel to the central axis of a drive roller 1010a. Each conveyor belt 1002, 1004, 1008 is wrapped around the respective drive roller and a front idle roller 1134, 1135, 1136 that is supported by respective side frames 1131, 1132. Side frames 1131, 1132 may be connected to a transverse bottom surface or bar 1133 which provides at least a region of contact for at least one piston rod 1137 disposed below the top surface of the conveyors. A support bar 1058 below the lower conveyors carries one or more pneumatic cylinders 1139, such as three pneumatic cylinders, supplied with a pre-selected air pressure, each of which extends a piston rod to pivot the lower conveyor about the pivot axis. Extension of the piston rods tilts the lower conveying surface towards presser plates 1003, 1005, 1007 to provide pressure in grasping the food product between the presser plates 1003, 1005, 1007 and the lower conveyor 992a, 994a, 998a. The tilt or pivot of the lower conveyor can be adjustable over a variable angular distance, such as 7 degrees. The lower conveyor 992b, 994b, 998b is illustrated in is lowered position.

The drive roller 1010a can be driven by a hexagonal shaft 1011 connected to a motor (not shown in FIG. 7F). Hexagonal shaft 1011 comprises a circular channel 1009 which allows the hexagonal shaft, and accordingly the drive roller 1010a, to pivot about the axis A of the circular channel 1009. A combination of multiple concentric hexagonal shafts with a circular channel for coupling about a circular shaft can be used to drive adjacent lower conveyors.

Side frames 1131, 1132 comprises an opening 1021 in the shape of an arc, which accommodates the cross-sectional dimensions of a support or alignment bar 1019, which can extend across the span of lower conveyors and intersect the side frames of each lower conveyor. The angular angle of the arc corresponds to the degree of angular movement of the lower conveyor.

Feed Paths

The illustrated apparatus provides three feed paths, although any number of paths are encompassed by the invention. The near side feed path is defined by the gripper 394 driven by the belt 802 which feeds the near side food article into the space between the conveyor belt 998 and presser plate 1007. The middle feed path is defined by the gripper 394 driven by the belt 804 which feeds the middle food article into the space between the conveyor 994 and the presser plate 1005. The far side fed path is defined by the gripper 394 driven by the belt 806 which feeds the far side food article into the space between the conveyor 992 and the presser plate 1003.

Food Article Loading Apparatus

As illustrated in FIG. 1, the automatic food article loading apparatus 108 includes a lift tray assembly 220, and a lift tray positioning apparatus 228. The lift tray assembly 220 receives food articles to-be-sliced. The tray positioning apparatus 228 pivots the tray assembly 220 to be parallel with, and below the food article feed apparatus 120 in a staging position.

Lift Tray Positioning Apparatus

FIGS. 8-10 illustrate the food article lift tray assembly 220 includes a frame 290 that supports movable food article support tray 302. The tray 302 is removed in FIG. 10. The frame 290 includes an end plate 291. Food article are loaded onto the tray 302 until they abut the end plate 291. The tray 302 includes four spaced-apart guard rails 303 that define three lanes corresponding to three feed paths for the slicing machine.

As illustrated in FIGS. 1 and 10, the frame 290 is connected by a rear connection 330 and a front connection 332 to a lever 336. The lever 336 is pivotally mounted onto the shaft 193.

The tray positioning apparatus 228 includes a pneumatic or hydraulic, extendable cylinder 350 that has a rod 352 pivotally connected to the lever 336 or the frame 290 at a connection 353, and a cylinder body 354 pivotally connected to the bottom wall 140 at a connection 356. Extension or retraction of the rod 352 pivots the lever 336 and frame 290 about the connection 342.

Lift Tray Assembly

As shown in FIG. 10, an inner frame 375 supports the tray 302 within the frame 290. The inner frame 375 is movable vertically with respect to the frame 290. The inner frame 375 is liftable by pneumatic cylinders 380 to an elevated position above the staging position below the feed paths to lift the food articles to be in the food paths and to be gripped by the grippers. The cylinders 380 have rods connected to cross members of the frame 375 and cylinder bodies fastened to cross members of the frame 290. In the elevated position, the tray top surface 302a is just above the top of the end plate 291 so the food articles can be moved longitudinally off the tray 302.

Food Article Gate

As illustrated in FIG. 13A-13D a food article gate 2020 is operable to be used as a gate, to be used as a floor for supporting the food article, and to be used as a trap door to drop a food article remainder end through the trap door against a baffle 2022 and onto the scrap removal conveyor 122. The scrap removal conveyor 122 is also located below the cutting plane to dispose of shaving scrap caused by the blade on the food article during idle dwell periods.

The scrap removal conveyor 122 can be continuously circulated by use of a drum motor on one of the rollers. The

conveyor delivers scrap to a discharge chute 2030 (FIGS. 13D and 9) where the scrap can be collected in a bucket or other means.

The gate 2020 can be operated to be positioned according to FIG. 13A-13C by a linear actuator such as a servomotor actuator or a pneumatic cylinder, as shown in FIGS. 11 and 12. A servomotor actuator 2036 is pivotally connected to the upper compartment 855 at a pivot point 2038 and has an actuator rod 2040 pivotally connected to a lever 2042 which is fixedly connected to an axle rod 2044. The axle rod 2044 sealing penetrates through the cabinet wall as shown in FIG. 11. The axle rod 2044 is fixed to the gate 2020. The axle rod 2044 is journaled at an opposite end to a bracket 2048. By extension or retraction of the rod 2044 the gate 2020 can be selectively pivoted by machine control.

Laser Detectors

A separate food article end detector is used for each of the three illustrated food paths. Preferably, the detectors are laser distance sensors 2002, 2004, 2006. Once the food articles are pivoted by the tray positioning apparatus 228 to the staging position below the feed paths, the sensors 2002, 2004, 2006 sense the ends of each food article in the three lanes on the tray 302, and communicate that information to the machine control. The machine control uses this information to control the servomotors 850 to control the positioning of the grippers to the ends of each food article and also controls the actuation of each gripper. By knowing the exact end of the food article, the grippers know when to be activated to seize the food article.

Slicing Head Section

The slicing head section is as described in WO 2010/011237, herein incorporated by reference.

The slicing block with orifices is also as described in WO 2010/011237, herein incorporated by reference.

The jump conveyor can also be configured as described in U.S. Ser. No. 11/449,574 filed Jun. 8, 2006 or WO 2010/011237, herein incorporated by reference.

Laser Safety Guard System

The laser safety guard system 123 is illustrated in FIGS. 1 and 8. The system comprises a central sensor that projects a horizontal fan beam approximately 360 degrees or as much of an angle as needed. If an obstruction is sensed, such as an operator's arm, one or more machine operations are halted by the machine control. The machine operations, such as the lift tray positioning apparatus, may be halted by machine controls when an obstruction in the fan beam is sensed. Other operations such as the slicing movement of the slicing blade, or the food article feeding apparatus, may also be halted with the laser safety guard system.

From the foregoing, it will be observed that numerous variations and modifications may be effected without departing from the spirit and scope of the invention. It is to be understood that no limitation with respect to the specific apparatus illustrated herein is intended or should be inferred.

The invention claimed is:

1. A food article slicing machine, comprising:

a food article loading apparatus with a lift tray assembly for moving food articles from a staging position to an elevated position at a beginning of a food article feed path;

a food article feed apparatus disposed over the food article loading apparatus having an upper conveyor assembly with a driven endless conveyor belt used in cooperation with a food article gripper for moving the food articles along the food article feed path;

a slicing station at an end of the food article feed path with a knife for slicing the food articles; and

a food article stop gate disposed upstream of the slicing station that forms a portion of the food article feed path.

wherein the food articles are supported in position along the food article feed path by at least the food article stop gate when the lift tray assembly is moved when in its elevated position, and

wherein the food article stop gate also opens to drop food article end portions.

**2**. The food article slicing machine of claim **1**, wherein movement of the conveyor belt is coordinated with movement of the food article gripper.

**3**. The food article slicing machine of claim **1**, wherein the conveyor belt is used in cooperation with the food article gripper for moving the food articles along the food article feed path when the gripper seizes a food article.

**4**. The food article slicing machine of claim **1**, wherein the food article gripper is driven and controlled when the gripper seizes a food article.

**5**. The food article slicing machine of claim **1**, wherein the conveyor belt is mechanically connected to the food article gripper.

**6**. The food article slicing machine of claim **1**, wherein the food article gripper is mounted to a bottom run of the conveyor belt.

**7**. The food article slicing machine of claim **1**, wherein the food article gripper is clamped to a belt joint and guide assembly by a fixture.

**8**. The food article slicing machine of claim **1**, wherein the food article stop gate is configured to pivot.

**9**. A food article slicing machine, comprising:

a slicing station comprising a knife blade and a knife blade drive driving the blade along a cutting path in a cutting plane;

a food article loading apparatus including a lift tray assembly moveable between a staging position and an elevated position, the elevated position being a position where food articles disposed within the lift tray assembly are in a food article feed path;

a food article feed apparatus disposed over said food article loading apparatus and having a conveyor assembly with independently driven endless conveyor belts,

wherein each of the conveyor belts is used in cooperation with an independently driven and controlled food article gripper for moving a food article along the food article feed path,

wherein the conveyor assembly is an upper conveyor assembly; and

a food article stop gate disposed upstream of the slicing station that forms a portion of the food article feed path.

wherein the food articles are supported in position along the food article feed path by at least the food article stop gate when the lift tray assembly is moved when in its elevated position, the food articles passing over the food article stop gate when the food articles move along the food article feed path, and

wherein the food article stop gate also serves as a door for the removal of food article end portions.

**10**. The food article slicing machine of claim **9**, wherein movement of each of the conveyor belts is coordinated with movement of the food article gripper.

**11**. The food article slicing machine of claim **9**, wherein each of the conveyor belts is used in cooperation with the food article gripper for moving the food articles along the food article feed path when the gripper is in a closed position in which the gripper seizes a food article.

**12**. The food article slicing machine of claim **9**, wherein the food article gripper is independently driven and controlled when the gripper is in a closed position in which the gripper seizes a food article.

**13**. The food article slicing machine of claim **9**, wherein at least one of the conveyor belts is mechanically connected to the food article gripper.

**14**. The food article slicing machine of claim **9**, wherein the food article gripper is mounted to a bottom run of the conveyor belts.

**15**. The food article slicing machine of claim **9**, wherein the food article gripper is clamped to a belt joint and guide assembly by a fixture.

**16**. The food article slicing machine of claim **9**, wherein the food article stop gate is configured to pivot.

* * * * *

# EXHIBIT B



US010639812B2

## (12) United States Patent
### Lindee et al.

(10) Patent No.: **US 10,639,812 B2**
(45) Date of Patent: **May 5, 2020**

(54) **HIGH SPEED SLICING MACHINE**

(71) Applicant: **FORMAX, INC.**, Mokena (IL)

(72) Inventors: **Scott A. Lindee**, Mokena, IL (US);
**James E. Pasek**, Tinley Park, IL (US);
**David Hancock**, Morris, IL (US);
**Thomas C. Wolcott**, LaGrange, IL (US)

(73) Assignee: **PROVISUR TECHNOLOGIES, INC.**, Chicago, IL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 127 days.

(21) Appl. No.: **16/017,346**

(22) Filed: **Jun. 25, 2018**

(65) **Prior Publication Data**
US 2018/0311853 A1 Nov. 1, 2018

**Related U.S. Application Data**

(62) Division of application No. 13/099,325, filed on May 2, 2011.

(Continued)

(51) **Int. Cl.**
**B26D 7/22** (2006.01)
**B26D 7/01** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............... **B26D 7/32** (2013.01); **B26D 7/225** (2013.01); **B26D 5/00** (2013.01); **B26D 7/0683** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ........ B26D 7/06; B26D 7/0625; B26D 7/225; B26D 7/0683; B26D 7/30; B26D 7/32;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,047,400 A 7/1936 Walter
4,226,176 A 10/1980 Macchi
(Continued)

FOREIGN PATENT DOCUMENTS

DE 2912446 10/1980
DE 3912446 10/1990
(Continued)

OTHER PUBLICATIONS

Machine translation of DE19525742.
(Continued)

*Primary Examiner* — Phong H Nguyen
(74) *Attorney, Agent, or Firm* — Klintworth & Rozenblat IP LLP

(57) **ABSTRACT**

A high-speed food article slicing machine with a slicing station, a moveable frame supporting a food article feed mechanism frame, a food article gate, and a safety guard system for detecting an intrusion into the machine. Food articles are loaded onto a lift tray and raised to a staging position where food articles are in contact with a food article gate. The lift tray is located in line with the food article feed paths such that lateral shifting of food articles into the feed paths is not needed. Food article grippers, individually driven along feed paths by an overhead conveyor, move food articles over the food article gate towards the slicing station. The food article gate functions to assist in removal of food article end portions. The slicing machines utilizes a horizontally radiating laser intrusion detector to shut down systems when an unwanted intrusion is sensed.

**11 Claims, 21 Drawing Sheets**



## Related U.S. Application Data

(60) Provisional application No. 61/343,551, filed on May 1, 2010.

(51) **Int. Cl.**
| | |
|---|---|
| *B26D 7/32* | (2006.01) |
| *B26D 5/00* | (2006.01) |
| *B26D 7/06* | (2006.01) |
| *B26D 7/30* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *B26D 7/30* (2013.01); *B26D 2007/011* (2013.01); *B26D 2210/02* (2013.01); *Y10T 83/2074* (2015.04); *Y10T 83/654* (2015.04)

(58) **Field of Classification Search**
CPC ............... B26D 7/0608; B26D 7/0633; B26D 2210/00; B26D 2210/02; B26D 5/00; B26D 2007/011; B65G 15/00; B65G 15/10; B65G 15/12; B65G 15/14; B65G 15/16; B65G 15/30; B65G 15/50; Y10S 83/932; Y10T 83/6668; Y10T 83/202; Y10T 83/2192; Y10T 83/2194; Y10T 83/463; Y10T 83/647; Y10T 83/6504; Y10T 83/6505; Y10T 83/6537; Y10T 83/654; Y10T 83/9377; Y10T 83/2074
See application file for complete search history.

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,583,435 | A | 4/1986 | Fessler |
| 4,934,232 | A | 6/1990 | Weber et al. |
| 5,191,820 | A | 3/1993 | Hartmann |
| 5,628,237 | A | 5/1997 | Lindee et al. |
| 5,974,925 | A | 11/1999 | Lindee et al. |
| 6,415,698 | B1 | 7/2002 | Haas et al. |
| 2004/0016331 | A1 | 1/2004 | Wolcott et al. |
| 2004/0031363 | A1 | 2/2004 | Lindee et al. |
| 2004/0055439 | A1 | 3/2004 | Lindee et al. |
| 2004/0139706 | A1 | 7/2004 | Drebing et al. |
| 2005/0082147 | A1 | 4/2005 | Mol |
| 2005/0132855 | A1 | 6/2005 | Weber |
| 2005/0199111 | A1 | 9/2005 | Sandberg et al. |
| 2006/0289281 | A1 | 12/2006 | Sandberg et al. |
| 2007/0214969 | A1 | 9/2007 | Mueller et al. |
| 2008/0185095 | A1 | 8/2008 | Gutknecht |
| 2008/0250944 | A1 | 10/2008 | Pryor et al. |
| 2009/0120256 | A1 | 5/2009 | Pasek |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 4235985 | 4/1994 |
| DE | 102008020248 | 5/1994 |
| DE | 3912445 | 8/1996 |
| DE | 19518583 | 11/1996 |
| DE | 19518595 | 11/1996 |
| DE | 195 25 742 A1 | 1/1997 |
| DE | 10353114 | 5/2005 |
| EP | 0398602 | 11/1990 |
| EP | 00547389 | 6/1993 |
| EP | 0713753 A2 | 5/1996 |
| EP | 2566670 | 7/2016 |
| FR | 2677573 A1 | 12/1992 |
| JP | 2000-288983 A | 10/2000 |
| WO | 89/06588 | 7/1989 |
| WO | 0230635 | 4/2002 |
| WO | 2005/037501 | 4/2005 |
| WO | 2010011237 | 1/2010 |
| WO | 2011/139996 | 11/2011 |

### OTHER PUBLICATIONS

Machine translation of FR2677573.
Machine translation of JP2000-288983.
International Search Report dated Jan. 27, 2012.
European search Report for European Patent Application No. EP 11 77 8126 dated Jan. 26, 2015, 3 pages.
Machine translation of DE102008020248.
Machine translation of DE10353114.
Machine translation of DE2912446.
Machine translation of DE4235985.
Machine translation of WO2005037501.
U.S. Appl. No. 61/343,551, entitled "High Speed Slicing Machine," filed May 1, 2010, 39 pages.



Fig. 1

Case 5:20-cv-06069-SRB   Document 1-2   Filed 05/06/20   Page 4 of 30



## Fig. 1A

Case 5:20-cv-06069-SRB   Document 1-2   Filed 05/06/20   Page 5 of 30



Fig. 1B



Fig. 2

Case 5:20-cv-06069-SRB  Document 1-2  Filed 05/06/20  Page 7 of 30



Fig. 2A



Fig. 3



Fig. 5

Fig. 4

Case 5:20-cv-06069-SRB   Document 1-2   Filed 05/06/20   Page 10 of 30



Fig. 6

Case 5:20-cv-06069-SRB   Document 1-2   Filed 05/06/20   Page 11 of 30



Fig. 7

Case 5:20-cv-06069-SRB Document 1-2 Filed 05/06/20 Page 12 of 30

Appx151



Fig. 7A

Case 5:20-cv-06069-SRB   Document 1-2   Filed 05/06/20   Page 13 of 30

Appx152



Fig. 7B

Case 5:20-cv-06069-SRB   Document 1-2   Filed 05/06/20   Page 14 of 30



Fig. 7C

Case 5:20-cv-06069-SRB   Document 1-2   Filed 05/06/20   Page 15 of 30

Appx154



Fig. 7D

Case 5:20-cv-06069-SRB   Document 1-2   Filed 05/06/20   Page 16 of 30

Appx155



1013,1015,1017

1013a,1015a,1017a

992,994,998

1002,1004,1008

1130

1056

1003,1005,1007

1003a,1005a,1007a

**Fig. 7E**

Case 5:20-cv-06069-SRB   Document 1-2   Filed 05/06/20   Page 17 of 30

Appx156



**Fig. 7F**

Case 5:20-cv-06069-SRB   Document 1-2   Filed 05/06/20   Page 18 of 30

Appx157



**Fig. 8**



Fig. 9

Case 5:20-cv-06069-SRB   Document 1-2   Filed 05/06/20   Page 20 of 30



Fig. 10

Case 5:20-cv-06069-SRB   Document 1-2   Filed 05/06/20   Page 21 of 30

Appx160



855

2044

2020

190

2048

Fig. 11



Fig. 12



Fig. 13A

Fig. 13B

Fig. 13C

Fig. 13D

Case 5:20-cv-06069-SRB   Document 1-2   Filed 05/06/20   Page 24 of 30

**HIGH SPEED SLICING MACHINE**

CROSS-REFERENCE TO RELATED
APPLICATIONS

This application claims the benefit of U.S. Provisional
Application No. 61/343,551, filed May 1, 2010, and is a
divisional application of U.S. Ser. No. 13/099,325, filed on
May 2, 2011, the contents of which are incorporated herein
in their entirety.

BACKGROUND OF THE INVENTION

Many different kinds of food articles or food products,
such as food slabs, food bellies, or food loaves are produced
in a wide variety of shapes and sizes. There are meat loaves
made from various meats, including ham, pork, beef, lamb,
turkey, and fish. The meat in the food loaf may be in large
pieces or may be thoroughly comminuted. These meat
loaves come in different shapes (round, square, rectangular,
oval, etc.) and in different lengths up to six feet (183 cm) or
even longer. The cross-sectional sizes of the loaves are quite
different; the maximum transverse dimension may be as
small as 1.5 inches (4 cm) or as large as ten inches (25.4 cm).
Loaves of cheese or other foods come in the same great
ranges as to composition, shape, length, and transverse size.

Typically, the food loaves are sliced, the slices are
grouped in accordance with a particular weight requirement,
and the groups of slices are packaged and sold at retail. The
number of slices in a group may vary, depending on the size
and consistency of the food article and the desire of the
producer, the wholesaler, or the retailer. For some products,
neatly aligned stacked slice groups are preferred. For others,
the slices are shingled or folded so that a purchaser can see
a part of every slice through a transparent package.

Food articles can be sliced on high speed slicing machines
such as disclosed in Published Patent Document WO 2010/
011237 A1 or U.S. Pat. No. 5,628,237 or 5,974,925; or as
commercially available as the Power Max 4000™ and
FX180® slicers available from Formax, Inc. of Mokena, Ill.,
USA.

The FX180® machine can be configured as an automati-
cally loaded, continuous feed machine, or an automatically
loaded, back-clamp or gripper type machine.

For an automatically loaded, continuous feed machine,
side-by-side upper and lower conveyor pairs drive food
articles into the cutting plane. A gate is located in front of the
conveyors. The initial food articles are loaded with leading
ends abutting the gate. The gate is lowered and the food
articles proceed into the conveyors. When the initial food
articles are sliced to the extent that the trailing ends of the
food article clear the gate, the gate is raised and new food
articles are loaded in the feed paths, held back by the gate.
Shortly thereafter the gate is lowered and new food articles
slide down to where lead ends of the new food articles abut
trailing ends of the initial food articles being sliced. The new
food articles are driven into the cutting plane trailing the
initial food articles. Food articles are sequentially and con-
tinuously loaded in this manner, lead end-to-trailing end, in
abutting contact with the preceding food articles.

U.S. Pat. No. 5,628,237 and European patent EP 0 713
753 describe a back-clamp or gripper type slicing machine.
According to this type of slicing machine, food articles are
loaded onto a lift tray and the lift tray is raised to a
ready-to-sweep position. Loaf grippers are retracted after the
previous food articles are sliced. During retraction of the
loaf grippers, loaf-to-slicing blade gate doors are closed and

ends of the previous food articles are dropped through a loaf
end door. After the grippers have reached the retracted
position or "home position" remote from the slicing blade,
a loaf sweep mechanism is activated, moving the food
articles laterally together into the slicing position. A spacing
mechanism moves down and spaces the food articles apart.
The grippers then advance after it has been determined that
the loaf sweep mechanism has moved the food articles to the
slicing position. The grippers have onboard sensing mecha-
nisms that are triggered by contact with the food articles.
After sensing and gripping the food articles, the food articles
are retracted slightly, and the loaf-to-slicing blade gate doors
are opened and the food articles are advanced to the slicing
plane of the slicing blade. The loaf sweep mechanism
retracts and the loaf lift tray lowers, ready for the next reload
cycle. According to this design, in practice, the reload cycle
is accomplished in about eight seconds. In a high-volume
slicing operation, reload cycle time can be a significant
limitation to optimum production efficiency.

The machine disclosed in WO 2010/011237 A1 provides
an automated, food article tray loading method and appara-
tus wherein food articles can be loaded into the lift tray into
designated and separated lanes which automatically assume
a preload condition, and after the food articles are loaded,
food article separation is maintained on the lift tray. A food
article transfer receives the food articles on the lift tray in
their separated positions and transfers the food articles into
the slicing feed paths while maintaining the separated posi-
tions. A food article end disposal system utilizes a transport
that laterally moves end portions outside of the feed path and
ejects the end portions as the transport is moved back into
the feed path to receive the subsequent end portions. The
machine utilizes food article grippers that are fixed onto
conveyor belts which support and drive the food articles in
the feed paths.

The present inventors have recognized that it would be
desirable to slice plural food articles with independent
feeding and weighing capabilities, with hygienic and opera-
tional enhancements.

SUMMARY OF THE INVENTION

The invention provides a mechanism and method for
slicing multiple food articles with independency of feed rate
and the ability to weigh each product group from each food
article respectively to achieve optimal weight control and
yield of each food article.

The present invention provides a high-speed slicing appa-
ratus and a weighing and classifying conveyor combination
that provides plural advantages in machine cost, productiv-
ity, food hygiene, and operation.

The invention provides a lift tray that is located in line
with the food article feed paths and is lowered to receive
food articles and raised into the feed paths. There is no need
for lateral shifting of food articles into the feed paths. Food
article grippers are driven along the feed paths by an
overhead conveyor. A laser food article end detection system
is employed in each feed path to detect the terminal end of
the food article to control the positioning of the gripper for
that path.

The invention provides the use of an automatic debris or
scrap removal conveyor that also provides for end portion
removal.

The invention provides an automated cleanup position
wherein the elevated food article feed mechanism can be
collapsed to a more convenience plane or maintenance
position, and the blade cover is automatically pivoted to a

cleanup position. The combination provides for enhanced portion control and yield. A food article feed mechanism ensures accurate feeding by the use of servo driven and controlled feed belts and grippers. The slicing mechanism includes three independent drives for slicing multiple food articles simultaneously.

An improved food article stop gate is provided that also serves as a door for the removal of food article end portions.

A horizontally radiating laser intrusion detector is used to shut down systems when an unwanted intrusion by an operator is detected.

An automated, food article tray loading method and apparatus is provided wherein food articles can be loaded into the lift tray into designated and separated lanes which automatically assume a preload condition, and after the food articles are loaded, food article separation is maintained on the lift tray.

Numerous other advantages and features of the present invention will become readily apparent from the following detailed description of the invention and the embodiments thereof, and from the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a near side elevational view of a slicing machine and a weighing and classifying conveyor combination of the present invention;

FIG. 1A is an enlarged fragmentary view taken from FIG. 1;

FIG. 1B is a perspective view of the slicing machine of FIG. 1 in a clean-up configuration.

FIG. 2 is a plan view of the combination of FIG. 1 with some panels and parts removed or made transparent illustrating some underlying components;

FIG. 2A is a bottom perspective view of a portion of FIG. 2;

FIG. 3 is a sectional view taken generally along line 3-3 of FIG. 2 with some panels and parts removed or made transparent and underlying components revealed;

FIG. 4 is a schematic, sectional view taken generally along line 4-4 of FIG. 6 with some panels and parts removed or made transparent and underlying components revealed;

FIG. 5 is a schematic, sectional view taken generally along line 5-5 of FIG. 6 with some panels and parts removed or made transparent and underlying components revealed;

FIG. 6 is a sectional view taken generally along line 6-6 of FIG. 3 with some panels and parts removed or made transparent and underlying components revealed;

FIG. 7 is a fragmentary elevational view taken generally along line 7-7 of FIG. 2 with some panels and parts removed or made transparent and underlying components revealed;

FIG. 7A is a fragmentary perspective view of a portion of FIG. 7;

FIG. 7B is an enlarged fragmentary view of apportion of FIG. 7A;

FIG. 7C is an enlarged rear perspective view of a portion of FIG. 7;

FIG. 7D is a top perspective view of a portion of FIG. 7;

FIG. 7E is an enlarged fragmentary view of a portion of FIG. 7;

FIG. 7F is an enlarged fragmentary view of an alternate embodiment of a lower conveyor.

FIG. 8 is a fragmentary rear perspective view of the apparatus of FIG. 7;

FIG. 9 is a far side perspective view of the apparatus of FIG. 1 with a lift tray in a lowered position;

FIG. 10 is a top perspective rear view of the lift tray of FIG. 9 with a tray platform removed;

FIG. 11 is an enlarged, fragmentary near side perspective view of a portion of the slicing machine of FIG. 1;

FIG. 12 is an enlarged, fragmentary far side perspective view with a door removed to show underlying components;

FIG. 13A is a schematic diagram of the loaf feed apparatus in a first stage of operation;

FIG. 13B is a schematic diagram of the loaf feed apparatus in a second stage of operation;

FIG. 13C is a schematic diagram of the loaf feed apparatus in a third stage of operation; and

FIG. 13D is a schematic diagram of the loaf feed apparatus taken generally along line 13D-13D of FIG. 13C.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

While this invention is susceptible of embodiment in many different forms, there are shown in the drawings, and will be described herein in detail, specific embodiments thereof with the understanding that the present disclosure is to be considered as an exemplification of the principles of the invention and is not intended to limit the invention to the specific embodiments illustrated.

Published Patent Application No. WO 2010/011237 and U.S. Pat. No. 5,628,237 are herein incorporated by reference.

### Overall Description

FIGS. 1-3 illustrate a high-speed slicing apparatus 100 and a weighing and classifying conveyor or output conveyor 102 according to a preferred embodiment of the invention. The slicing apparatus 100 includes a base section 104, a collapsible frame 105, an automatic food article loading apparatus 108 that receives food articles 110 to-be-sliced, a food article feed apparatus 120, a food article end and scrap removal conveyor 122 (FIGS. 13C and 13D), a laser safety guard system 123, a slicing head apparatus 124, and a slice receiving conveyor 130. The slicing head apparatus includes a slicing blade 125 that defines a slicing plane and an orifice plate or slicing block 126 that guides food articles into the slicing plane, the blade cutting closely to the orifice plate. The slicing apparatus also includes a computer display touch screen 131 that is pivotally mounted on and supported by a support 132.

### Base Section

The base section 104 includes a compartment 136 having side walls 138a, 138b, a bottom wall 140, and an inclined top wall 142. The apparatus 100 is supported on four adjustable feet 144. The compartment 136 has a tapered side profile from back to front wherein the top wall 142 slants down from back to front. The slanted orientation of the top wall 142 ensures water drainage off the top of the compartment 136. The compartment is supported on adjustable feet 144.

The compartment 136 includes a near side door 152, a far side door 156 (FIG. 9), and a rear door 162 that permit access into the compartment or to modules normally held within the compartment 136. The compartment 136 typically affords an enclosure for a computer, motor control equipment, a low voltage supply, and a high voltage supply

5
6

and other mechanisms as described below. The compartment may also include a pneumatic supply or a hydraulic supply, or both (not shown).

## Collapsible Frame and Elevated Housings

The base section 104 supports the collapsible frame 105 as shown in FIGS. 1, 1B and 9. The collapsible frame 105 includes a foldable support mechanism 174 that supports a food article feed mechanism 190.

The foldable support mechanism 174 includes a servomotor 175 that drives a gear reducer 176 having a drive shaft 178 that extends out of far side of the compartment 136 (FIG. 9). The drive shaft 178 is rotationally fixed to parallel levers 180a, 180b which swing out with a turning of the drive shaft 178. The levers 180a, 180b are pivotally connected to a column 182 via a rotary connection 184. The column 182 is pivotally connected at a pivot connection 192 to the frame 190 which supports the food article feed apparatus 120.

For cleaning and maintenance purposes, the collapsible frame 105 is collapsed down by actuating the servomotor 175 and gear reducer 176 to rotate the levers 180a, 180b, which draws down the column 182 as shown in FIG. 1B. The frame 190, and all equipment supported thereby, is lowered for more convenient maintenance and cleaning as illustrated in FIG. 1B. In some cases, this eliminates the need for ladders or platforms when servicing the slicing apparatus 100.

The slicing head 124 is covered by a guard 119 that is attached to the frame 190 such that when the frame is pivoted down as shown in FIG. 1B, the guard 119 is pivoted away from a slicing head base 117 to expose the slicing blade 125 and internals for cleaning and maintenance.

Additionally, the elevation of the food article feed apparatus can be adjusted by using the servomotor to selectively pivot the levers 180a, 180b and lower the rear of the frame 190. At a front, the frame 190 is supported on a cross shaft 193 that is eccentrically fixed at each end to a round cam 194 (FIG. 1A). The cam is journaled in a round opening 195 in side supports 197a, 197b and the cam is fixed for non-rotation to the respective side support by fasteners 199. The far side is shown in FIG. 1A, with the understanding that the near side is mirror image identical across the longitudinal vertical center plane of the machine. As shown in FIG. 1A, because the dimension "a" is smaller than the dimension "b", the shaft ends can be temporarily loosened by removing the fasteners and the shaft and cams can be rotated 180 degrees about a centerline of the shaft, and the cams can be re-fastened to be fixed to the side supports. The elevation will be different between the two 180-degree adjustable positions. Thus, the machine will accommodate two different height settings for different types of food articles.

## Food Article Feed Apparatus

An upper conveyor assembly 530 of the food article feed apparatus 120 is shown in FIG. 2. The conveyor assembly 530 includes three independently driven endless conveyor belts 802, 804, 806. Each belt 802, 804, 806 is identically driven so only the drive for the belt 802 will be described.

The belt 802 is wrapped around a toothed front drive roller or pulley 812 and a back-idler roller or pulley 816. The belt 802 preferably has teeth that engage teeth of the two rollers 812, 816. Each drive roller 812 includes a toothed outer diameter 812a and a toothed, recessed diameter 812b.

An endless drive belt 820 wraps around the recessed diameter 812b. The drive belt 820 also wraps around a drive roller 824 that is fixed to a drive shaft 828. The drive shaft 828 extends transversely to the belt 802 and is journaled for rotation within a bearing 830 mounted to a near side frame member 836.

The drive shaft 828 penetrates a far side frame member 838 and extends to a bearing 843, coupled to a gear reducer 842 mounted to a support frame 854. The gear reducer 842 is coupled to a servomotor 850 that is mounted to the support frame 854.

The servomotor 850 drives the drive shaft 828 which turns the roller 824 which circulates the belt 820 which rotates the roller 812 which circulates the belt 802.

Three servomotors 850 are mounted to the support frame 854 and all are located within an upper compartment 855 that is supported by the frame 190.

The idler rollers 816 are provided with a pair of mirror image identical adjustable cam belt tension adjustment mechanisms 882a, 882b. As shown in FIG. 7A, each mechanism 882a, 882b includes a fork 885 that is braced from the respective side frame member 836, 838 by an adjustable cam 883. The fork 885 is guided by upper and lower pins 886a, 886b so as to slide rearward and forward and has an end 891 that captures an axle 889 that rotationally supports the idle rollers 816. For adjustment, the cam fastener 883a is loosened so as to be rotatable on the respective side frame member 836, 838, rotated to achieve the desired belt tension, and then the cam fastener is tightened to hold the cam fixed.

FIG. 7B illustrates a gripper 894 used in cooperation with the belt 802. The gripper 894 is mounted to a bottom run of the belt 802 and is translated along the food article path by the belt 802. The gripper 894 is clamped to a belt joint and guide assembly 896 by a fixture 901 that engages the assembly 896 and is fixed thereto by a clamping set screw 897. The assembly 896 comprises a pair of upper members 899 and a lower member 900. The upper members 899 can include teeth 899a that mesh engage the teeth of the belt 802 once the members 899, 900 are fastened together to splice the free ends 802e, 802f of the belt 802 (FIG. 7D). For clamping, fasteners 902, 904 (FIG. 7D) are provided which are inserted from above the members 899 through plain holes in the members 899 and tightly threaded into threaded holes in the member 900.

The lower member 900 includes guides 906, 907 that contain slide bearings 906a, 907a composed of friction reducing material. The slide bearings 906a, 907a partly surround longitudinal rails 912, 913 that are in parallel with, and straddle the belt 802. The rails 912, 913 support the gripper along its working path from a retracted position to a fully forward position near to the slicing plane.

For each gripper there are two rails 912, 913 to support and guide that gripper. Thus, there are two rails that straddle the belt 804 and two rails that straddle the belt 806.

The gripper 894 is connected to the fixture 901 by a front plate 920 having a predominant lateral face and a rear plate 922 having a predominant longitudinal face. Each gripper 894 is provided with two air lines 930, 932 for two-way pneumatic gripper open-and-close operability.

The air lines 930, 932 are guided through lower rings 940 and upper rings 942 to an air tube storage area 950 above the food article feed apparatus 120 (FIG. 7D). The air tube lines are routed around weighted rollers or slides 951 that are guided by longitudinal slots 952 and extend to a source of pressurized air. Thus, the movement of the rollers or slides along the slots under force of gravity, will take up slack in

the air tubes when the grippers **894** are moving toward, and when in, the retracted position.

The gripper **894** travels from the retracted home position shown in FIG. 7A to the advanced, forward position approaching the slicing plane.

The grippers **894** are as described in Published Patent Application No. WO 2010/011237, herein incorporated by reference.

### Lower Conveyor

As illustrated in FIGS. **3**, **6**, **7**, and **7E** at a front end of the food article feed apparatus **120**, are three lower feed conveyors **992**, **994**, **998**, having endless belts **1002**, **1004**, **1008**, respectively. The endless belts **1002**, **1004** **1008** are independently driven and are directly opposed to presser plates **1003**, **1005**, **1007** respectively.

FIG. **6** shows the conveyor **992** has a drive roller **1010** having a central hub **1012** with a central bore **1014**. The drive roller **1010** has tubular stub axles **1016**, **1018** extending from opposite ends of the central hub **1012**. The tubular stub axles **1016**, **1018** are journaled for rotation by bearings **1020**, **1022** that are fastened to carrier blocks **1023a**.

The conveyor **994** includes a drive roller **1038** having a central hub **1042** with a bore **1044**. The drive roller **1038** has tubular stub axles **1046** and **1048** extending from opposite ends of the central hub **1042**. The tubular stub axles **1046**, **1040** are journaled by bearings **1050**, **1052** respectively that are attached to carrier blocks **1023b**.

A motor housing **1054**, including a base plate **1054b** and a cover **1054a**, is mounted to an end of an upper conveyor support bar **1056**. The base plate **1054b** of each side of the machine is fastened to a linear actuator, such as a pneumatic cylinder **1055a** and **1055b** respectively. The cylinders **1055a**, **1055b** are connected together by the support bar **1056**. Each cylinder slides on a fixed vertical rod **1057a**, **1057b** respectively. Thus, controlled air to the cylinders **1055a**, **1055b** can be used to uniformly raise or lower the near side motor housing **1054** and the far side motor housing **1054** uniformly.

A spindle **1060** extends through the motor housing **1054**, through a sleeve **1064**, through a coupling **1065**, through the tubular stub axle **1016**, through the central bore **1014**, through the tubular stub axle **1018**, through the tubular stub axle **1046**, and partly into the bore **1044**. The spindle **1060** has a hexagonal cross-section base region **1070**, a round cross-section intermediate region **1072**, and a hexagonal cross-section distal region **1074**. The hexagonal cross-section base region **1070** is locked for rotation with a surrounding sleeve **1071** to rotate therewith.

The intermediate region **1072** is sized to pass through the sleeve **1064** through the tubular stub axle **1016**, through the central bore **1014**, and through the tubular stub axle **1018** to be freely rotatable therein. The distal region **1074** is configured to closely fit into a hexagonal shaped central channel **1078** of the tubular stub axle **1046** to be rotationally fixed with the tubular stub axle **1046** and the drive roller **1038**.

The sleeve **1064** includes a hexagonal perimeter end **1064a** that engages a hexagonal opening **1065b** of the coupling **1065**. The coupling **1065** includes an opposite hexagonal opening **1065a** that engages a hexagonal perimeter end **1016a** of the tubular stub axle **1016**. The coupling **1065** couples the sleeve **1064** and the stub axle **1016** for mutual rotation such that the sleeve **1064** and the drive roller **1010** are locked for rotation together, i.e., turning of the sleeve **1064** turns the drive roller **1010**.

Within the motor housing **1054** are two servomotors **1090**, **1092** mounted to the housing by fasteners. As shown in FIGS. **4** and **6**, the servomotor **1090** has a vertically oriented output shaft **1096** that rotates about a vertical axis connected to a worm gear **1098** that is enmesh with and drives a drive gear **1100** that rotates about a horizontal axis. The drive gear **1100** drives the sleeve **1071** that drives the region **1070** of the spindle to rotate the spindle **1060**. Rotation of the spindle **1060** rotates the drive roller **1038** via the hexagonal cross-section distal end region **1074**.

Adjacent to the servomotor **1090** is the servomotor **1092**. The servomotor **1092** is configured substantially identically with the servomotor **1090** except the worm gear **1098**, as shown in schematic form in FIG. **5**, of the servomotor **1092** drives a drive gear **1100** that drives the sleeve **1064** to rotate. The sleeve **1064** rotates independently of the round cross-section region **1072** of the spindle **1060**, and drives a stub axle **1016** to rotate, which rotates the drive roller **1010**.

The sleeves **1071** and **1064** are journaled for rotation by bearings. The drive gears **1100**, **1100** are fastened to the respective sleeve **1071**, **1064** using fasteners **1116**.

Each conveyor belt **1002**, **1004**, **1008** is wrapped around the respective drive roller and a front idle roller **1134**, **1135**, **1136** that is supported by respective side frames **1131**, **1132**.

Also, as shown in FIGS. **7**, **7E**, and **13A-13C**, the underside of the support bar **1056** carries pneumatic cylinders **1130**. Each pneumatic cylinder **1130** is supplied with a preselected air pressure to extend a piston rod **1013**, **1015**, **1017** to press down on presser plates **1003**, **1005**, **1007** to lightly press down on a top of the product below, clamping the food article between the presser plates **1003**, **1005**, **1007** and the belts **1002**, **1004**, **1008**. Piston rods **1013a**, **1015a**, **1017a** in their extended position and presser plates **1003**, **1005**, **1007**, in their depressed position **1003a**, **1005b**, **1007a** are illustrated in FIG. 7E. The conveyor belts **1002**, **1004**, **1008** drive the food articles through corresponding orifices in the slicing block and into the slicing plane.

FIG. 7F illustrates an alternate embodiment of the lower conveyor. The same reference signs indicate similar parts as described above. In the embodiment illustrated in FIG. 7F, the lower conveyor **992a**, **994a**, **998a** is pivotable about an axis A parallel to the central axis of a drive roller **1010a**. Each conveyor belt **1002**, **1004**, **1008** is wrapped around the respective drive roller and a front idle roller **1134**, **1135**, **1136** that is supported by respective side frames **1131**, **1132**. Side frames **1131**, **1132** may be connected to a transverse bottom surface or bar **1133** which provides at least a region of contact for at least one piston rod **1137** disposed below the top surface of the conveyors. A support bar **1058** below the lower conveyors carries one or more pneumatic cylinders **1139**, such as three pneumatic cylinders, supplied with a pre-selected air pressure, each of which extends a piston rod to pivot the lower conveyor about the pivot axis. Extension of the piston rods tilts the lower conveying surface towards presser plates **1003**, **1005**, **1007** to provide pressure in grasping the food product between the presser plates **1003**, **1005**, **1007** and the lower conveyor **992a**, **994a**, **998a**. The tilt or pivot of the lower conveyor can be adjustable over a variable angular distance, such as 7 degrees. The lower conveyor **992b**, **994b**, **998b** is illustrated in is lowered position.

The drive roller **1010a** can be driven by a hexagonal shaft **1011** connected to a motor (not shown in FIG. 7F). Hexagonal shaft **1011** comprises a circular channel **1009** which allows the hexagonal shaft, and accordingly the drive roller **1010a**, to pivot about the axis A of the circular channel **1009**. A combination of multiple concentric hexagonal shafts with

9          10

a circular channel for coupling about a circular shaft can be used to drive adjacent lower conveyors.

Side frames 1131, 1132 comprises an opening 1021 in the shape of an arc, which accommodates the cross-sectional dimensions of a support or alignment bar 1019, which can extend across the span of lower conveyors and intersect the side frames of each lower conveyor. The angular angle of the arc corresponds to the degree of angular movement of the lower conveyor.

### Feed Paths

The illustrated apparatus provides three feed paths, although any number of paths are encompassed by the invention. The near side feed path is defined by the gripper 394 driven by the belt 802 which feeds the near side food article into the space between the conveyor belt 998 and presser plate 1007. The middle feed path is defined by the gripper 394 driven by the belt 804 which feeds the middle food article into the space between the conveyor 994 and the presser plate 1005. The far side fed path is defined by the gripper 394 driven by the belt 806 which feeds the far side food article into the space between the conveyor 992 and the presser plate 1003.

### Food Article Loading Apparatus

As illustrated in FIG. 1, an automatic food article loading apparatus 108 includes a lift tray assembly 220, and a lift tray positioning apparatus 228. The lift tray assembly 220 receives food articles to-be-sliced. The tray positioning apparatus 228 pivots the tray assembly 220 to be parallel with, and below the food article feed apparatus 120 in a staging position.

### Lift Tray Positioning Apparatus

FIGS. 8-10 illustrate the food article lift tray assembly 220 includes a frame 290 that supports movable food article support tray 302. The tray 302 is removed in FIG. 10. The frame 290 includes an end plate 291. Food article are loaded onto the tray 302 until they abut the end plate 291. The tray 302 includes four spaced-apart guard rails 303 that define three lanes corresponding to three feed paths for the slicing machine.

As illustrated in FIGS. 1 and 10, the frame 290 is connected by a rear connection 330 and a front connection 332 to a lever 336. The lever 336 is pivotally mounted onto the shaft 193.

The tray positioning apparatus 228 includes a pneumatic or hydraulic, extendable cylinder 350 that has a rod 352 pivotally connected to the lever 336 or the frame 290 at a connection 353, and a cylinder body 354 pivotally connected to the floor 140 at a connection 356. Extension or retraction of the rod 352 pivots the lever 336 and frame 290 about the connection 342.

### Lift Tray Assembly

As shown in FIG. 10, an inner frame 375 supports the tray 302 within the frame 290. The inner frame 375 is movable vertically with respect to the frame 290. The inner frame 375 is liftable by pneumatic cylinders 380 to an elevated position above the staging position below the feed paths to lift the food articles to be in the food path and to be gripped by the grippers. The cylinders 380 have rods connected to cross members of the frame 375 and cylinder bodies fastened to cross members of the frame 290. In the elevated position, the tray top surface 302a is just above the top of the end plate 291 so the food articles can be moved longitudinally off the tray 302.

### Food Article Gate

As illustrated in FIG. 13A-13D a food article gate 2020 is operable to be used as a gate, to be used as a floor for supporting the food article, and to be used as a trap door to drop a food article remainder end through the trap door against a baffle 2022 and onto a the scrap removal conveyor 122. The scrap removal conveyor 122 is also located below the cutting plane to dispose of shaving scrap caused by the blade on the food article during idle dwell periods.

The scrap removal conveyor 122 can be continuously circulated by use of a drum motor on one of the rollers. The conveyor delivers scrap to a discharge chute 2030 (FIGS. 13D and 9) where the scrap can be collected in a bucket or other means.

The gate 2020 can be operated to be positioned according to FIG. 13A-13C by a linear actuator such as a servomotor actuator or a pneumatic cylinder, as shown in FIGS. 11 and 12. A servomotor actuator 2036 is pivotally connected to the upper compartment 855 at a pivot point 2038 and has an actuator rod 2040 pivotally connected to a lever 2042 which is fixedly connected to an axle rod 2044. The axle rod 2044 sealing penetrates through the cabinet wall as shown in FIG. 11. The axle rod 2044 is fixed to the gate 2020. The axle rod 2044 is journaled at an opposite end to a bracket 2048. By extension or retraction of the rod 2044 the gate 2020 can be selectively pivoted. By machine control.

### Laser Detectors

A separate food article end detector is used for each of the three illustrated food paths. Preferably, the detectors are laser distance sensors 2002, 2004, 2006. Once the food articles are pivoted by the tray positioning apparatus 228 to the staging position below the feed paths, the sensors 2002, 2004, 2006 sense the ends of each food article in the three lanes on the tray 302, and communicate that information to the machine control. The machine control uses this information to control the servomotors 850 to control the positioning of the grippers to the ends of each food article and also controls the actuation of each gripper. By knowing the exact end of the food article, the grippers know when to be activated to seize the food article.

### Slicing Head Section

The slicing head section is as described in WO 2010/011237, herein incorporated by reference.

The slicing block with orifices is also as described in WO 2010/011237, herein incorporated by reference.

The jump conveyor can also be configured as described in U.S. Ser. No. 11/449,574 filed Jun. 8, 2006 or WO 2010/011237, herein incorporated by reference.

### Laser Safety Guard System

The laser safety guard system 123 is illustrated in FIGS. 1 and 8. The system comprises a central sensor that projects a horizontal fan beam approximately 360 degrees or as much of an angle as needed. If an obstruction is sensed, such as an operator's arm, one or more machine operations are halted by the machine control. The machine operations, such as the

11

lift tray positioning apparatus, may be halted by machine controls when an obstruction in the fan beam is sensed. Other operations such as the slicing movement of the slicing blade, or the food article feeding apparatus, may also be halted with the laser safety guard system.

From the foregoing, it will be observed that numerous variations and modifications may be effected without departing from the spirit and scope of the invention. It is to be understood that no limitation with respect to the specific apparatus illustrated herein is intended or should be inferred.

The invention claimed is:

1. A food article slicing machine comprising:

a) a slicing station comprising a knife blade and a knife blade drive driving the blade along a cutting path in a cutting plane;

b) a food article loading apparatus;

c) a food article feed apparatus disposed over said food article loading apparatus;

d) said food article feed apparatus having a conveyor assembly with independently driven endless conveyor belts,

e) wherein each of the conveyor belts is connected to a food article gripper for moving a food article along a food article feed path;

f) the conveyor assembly is an upper conveyor assembly;

g) a food article stop gate disposed upstream of the slicing station forms a portion of the food article feed path;

h) wherein the food article loading apparatus includes a lift tray assembly moveable between a staging position and an elevated position, said elevated position being a position wherein the food articles disposed within the lift tray assembly are in the food article feed path;

i) the food articles are supported in position along the food article feed path by at least the food article stop gate when the lift tray assembly is moved from its elevated position,

j) wherein the food article stop gate also serves as a door for the removal of food article end portions.

12

2. The food article slicing machine of claim 1, wherein the food article feed path comprise lanes within a lift tray.

3. The food article slicing machine of claim 1, wherein the food article feed path feeds the food article between a front lower conveyor and an upper presser plate upstream of the slicing station.

4. The food article slicing machine of claim 3, wherein the lower conveyor pivots between a first position which decreases a distance between the upper presser plate and the lower conveyor, and a second position which increases the distance between the upper presser plate and the lower conveyor.

5. The food article slicing machine of claim 1, wherein each independently driven endless conveyor belt is wrapped around a drive roller; the drive roller having a toothed outer diameter for engaging with the endless conveyor belt and a toothed recessed diameter for engaging with a drive belt.

6. The food article slicing machine of claim 5, wherein the drive belt is connected to a drive shaft connected to a servomotor.

7. The food article slicing machine of claim 6, wherein each endless conveyor belt is driven independently by a servomotor; each servomotor arranged on the same side of the endless conveyor belts.

8. The food article slicing machine of claim 1, wherein each independently driven endless conveyor belt can be timed to move food articles towards the slicing station at the same rate.

9. The food article slicing machine of claim 1, wherein movement of each conveyor belt is in a plane parallel to the food article feed path.

10. The food article slicing machine of claim 1, wherein a plane defined by a surface of each conveyer belt is parallel to the food article feed path.

11. The food article slicing machine of claim 1, wherein the lift tray assembly pivots between the staging position and the elevated position.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2023-1438, -1476

**Short Case Caption:** Provisur Technologies, Inc. v. Weber, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __13,936__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __04/21/2023__

Signature: _/s/ William H. Milliken_

Name: __William H. Milliken__

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2023-1438, -1476

**Short Case Caption:** Provisur Technologies, Inc. v. Weber, Inc.

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains __0__ number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 04/21/2023

Signature: /s/ William H. Milliken

Name: William H. Milliken