*In the*

# United States Court of Appeals

*for the*

# Federal Circuit

---

PROVISUR TECHNOLOGIES, INC.,
*Plaintiff-Cross-Appellant*

v.

WEBER, INC., TEXTOR, INC., WEBER MASCHINENBAU GMBH
BREIDENBACH, TEXTOR MASCHINENBAU GMBH,
WEBER MASCHINENBAU GMBH NEUBRANDENBURG,
*Defendants-Appellants*

---

*Appeals from the United States District Court for the Western District of Missouri,
in Case Nos. 5:19-cv-06021-SRB and 5:20-cv-06069-SRB · Honorable Stephen R. Bough, Judge*

# CROSS-APPELLANT'S PRINCIPAL AND RESPONSE BRIEF

CRAIG C. MARTIN
SARA T. HORTON
MICHAEL BABBITT
REN-HOW HARN
HENRY C. THOMAS
**WILLKIE FARR & GALLAGHER LLP**
300 No. LaSalle Drive, 50th Floor, Chicago, IL 60654
Tel.: (312) 728-9050
cmartin@willkie.com • shorton@willkie.com • mbabbitt@willkie.com
rharn@willkie.com • hthomas@willkie.com

*Counsel for Plaintiff and Cross-Appellant Provisur Technologies, Inc.*

 

# REPRESENTATIVE PATENT CLAIMS AT ISSUE

Three of Cross-Appellant Provisur Technologies, Inc.'s patents are at issue in this appeal: U.S. Patent Nos 10,625,436, 10,639,812, and 7,065,936. The following claims are representative of those patents for purposes of appeal.

## '436 Patent claim 9

9. A food article slicing machine, comprising:

a food article loading apparatus with a lift tray assembly for moving food articles from a staging position to an elevated position at a beginning of a food article feed path;

a food article feed apparatus disposed over the food article loading apparatus having an upper conveyor assembly with a driven endless conveyor belt used in cooperation with a food article gripper for moving the food articles along the food article feed path;

a slicing station at an end of the food article feed path with a knife for slicing the food articles; and

a food article stop gate disposed upstream of the slicing station that forms a portion of the food article feed path,

wherein the food articles are supported in position along the food article feed path by at least the food article stop gate when the lift tray assembly is moved when in its elevated position, and

wherein the food article stop gate also opens to drop food article end portions.

## '812 Patent claim 1

1. A food article slicing machine comprising:

a) a slicing station comprising a knife blade and a knife blade drive driving the blade along a cutting path in a cutting plane;

b) a food article loading apparatus;

c) a food article feed apparatus disposed over said food article loading apparatus,

d) said food article feed apparatus having a conveyor assembly with independently driven endless conveyor belts,

e) wherein each of the conveyor belts is connected to a food article gripper for moving a food article along a food article feed path,

f) the conveyor assembly is an upper conveyor assembly,

g) a food article stop gate disposed upstream of the slicing station forms a portion of the food article feed path,

h) wherein the food article loading apparatus includes a lift tray assembly moveable between a staging position and an elevated position, said elevated position being a position wherein the food articles disposed within the lift tray assembly are in the food article feed path,

i) the food articles are supported in position along the food article feed path by at least the food article stop gate when the lift tray assembly is moved from its elevated position,

j) wherein the food article stop gate also serves as a door for the removal of food article end portions.


**'936 Patent claim 14**

10.     An apparatus for filling food product drafts into pockets formed into an elongated web of film, said pockets having open tops and arranged in rows that are displaced along a longitudinal direction and having at least a first row and a longitudinally displaced second row and movable with said web along said longitudinal direction, comprising:

a fill station and a mechanism for moving said pockets longitudinally into said fill station;

and a shuttle conveyor having an endless belt conveying surface, said shuttle conveyor comprises a device to retract and to extend said conveying surface longitudinally, said conveying surface arranged above said fill station and having an end longitudinally movable to a first position arranged to deposit food product drafts into said pockets of said first row by said conveying surface, and while said web remains stationary, said device retracts or extends said conveying surface to longitudinally reposition said end to a second position arranged to deposit food product drafts carried on said conveying surface into said pockets of said second row.

**14.** The apparatus according to claim 10, wherein said shuttle conveyor is configured to fill plural rows of pockets while said web is stationary in said fill station, and said shuttle conveyor is configured to retract from an extended position to a retracted position to fill a new first row of a group of empty pockets while said web advances to locate a succeeding plural row of pockets in said fill station.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

| | |
|---:|:---|
| **Case Number** | 2023-1438, -1476 |
| **Short Case Caption** | Provisur Technologies, Inc. v. Weber, Inc. |
| **Filing Party/Entity** | Provisur Technologies, Inc. |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. <u>Fed. Cir. R. 47.4(c)</u>.

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/28/2023

Signature: /s/ Michael G. Babbitt

Name: Michael G. Babbitt

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Provisur Technologies, Inc. | | Provisur S LLC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐　Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| Jeffrey J. Simon<br>Husch Blackwell LLP | Mitchell M. Feldhake<br>Willkie Farr & Gallagher LLP | Matt D. Basil<br>Willkie Farr & Gallagher LLP |
| --- | --- | --- |
| Heather M. Schneider<br>Willkie Farr & Gallagher LLP | Taylor Brooke Concannon Hausmann<br>Husch Blackwell LLP | Tessa K. Jacob<br>Husch Blackwell LLP |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
| --- | --- | --- |
| | | |
| | | |

## TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................................. xi

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF THE ISSUES ................................................................... 1

STATEMENT OF THE CASE ...................................................................... 1

    A.    The Parties .................................................................................... 1

    B.    Provisur's Patents .......................................................................... 2

    C.    The Present Litigation ..................................................................... 3

SUMMARY OF THE ARGUMENT ............................................................. 7

STANDARDS OF REVIEW ....................................................................... 11

ARGUMENT ......................................................................................... 12

I.    The Jury's Infringement Findings Should Not Be Disturbed ....................... 12

    A.    The Evidence Supports The Jury's Finding That The Accused Slicers Infringed The '812 And '436 Patents, Including The "Disposed Over" Limitation ................................................................ 12

        1.    Provisur's Evidence Demonstrated That The Accused Slicers Had A Feed Apparatus "Disposed Over" A Food Loading Apparatus Under The District Court's Claim Construction. ....................................................................... 13

        2.    Weber's Reliance On The IPR Proceedings To Rewrite the Claim Is Misplaced. ................................................... 17

        3.    The Accused Slicers Are Materially Different From The 904 Slicer Because They Include Independent Belts. ......... 25

        4.    The District Court Properly Instructed The Jury On Its Construction Of "Disposed Over." .................................... 26

    B.    The Evidence Supports The Jury's Finding That The Accused SmartLoader Infringed The '936 Patent. ......................................... 29

1.     Dr. Vorst Testified That He Was Able To Operate The SmartLoader As An Infringing Advance-To Fill Conveyor. ................................................................30

2.     Dr. Vorst's Testimony Supports The Jury's Conclusion That The SmartLoader Was "Configured To" Advance To Fill Because He Enabled That Functionality Without Re-Programming The SmartLoader's Software. .....................31

3.     This Court Should Reject Weber's Invitation To Second-Guess Dr. Vorst's Testimony. .................................................33

4.     Weber's Complaints Regarding Allegations Of Discovery Misconduct Are Meritless. .......................................35

5.     The District Court Correctly Instructed The Jury On The Advance-To-Fill Limitation. ........................................37

II.    The Jury's Willfulness Finding Should Not Be Disturbed ............................39

    A.    The Trial Evidence Amply Supports The Jury's Willfulness Finding. ..........................................................................39

       1.     The District Court Did Not Err In Admitting Mr. White's Testimony. .........................................................40

          a.    Mr. White Did Not Testify Regarding Weber's Failure To Obtain An Opinion Of Counsel. ..........................40

          b.    The Remainder Of Mr. White's Testimony Was Admissible. ...................................................43

       2.     Weber's Patent Matrix Was Highly Relevant To Willfulness. ................................................................44

       3.     Weber's Concealment Was Highly Relevant To Willfulness. ................................................................46

    B.    Weber Is Not Entitled To A New Trial On Willfulness. ....................48

III.    Weber Is Not Entitled To A New Trial On Damages. .................................51

A.      Dr. Vorst's Expert Opinion Was Properly Admitted And Amply Supports The Jury's Award Of Damages Under Of The Entire Market Value Rule. ............................................................53

B.      The District Court Properly Instructed The Jury On Damages...........55

CONCLUSION .....................................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Display Sys., Inc. v. Kent State Univ.*,
212 F.3d 1272 (Fed. Cir. 2000) ........................................................29

*Afros S.p.A. v. Krauss–Maffei Corp.*,
671 F. Supp. 1402 (D. Del. 1987)......................................................47

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ........................................................40

*BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch.
Organisation*,
28 F.4th 1247 (Fed. Cir. 2022) ........................................................45

*Bettcher Indus., Inc. v. Bunzl USA, Inc.*,
661 F.3d 629 (Fed. Cir. 2011) ....................................................27, 28

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
977 F.2d 1555 (Fed. Cir. 1992) ........................................................27

*Ecolab, Inc. v. Paraclipse, Inc.*,
285 F.3d 1362 (Fed. Cir. 2002) ........................................................26

*EFCO Corp. v. Symons Corp.*,
219 F.3d 734 (8th Cir. 2000) ............................................................12

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) ........................................................11

*Gilster v. Primebank*,
747 F.3d 1007 (8th Cir. 2014) ..............................................37, 50, 51

*United States v. Grandison*,
781 F.3d 987 (8th Cir. 2015) ............................................................36

*Hallmark Cards, Inc. v. Murley*,
703 F.3d 456 (8th Cir. 2013) ............................................................48

*Hathaway v. Runyon*,
  132 F.3d 1214 (8th Cir. 1997) ...........................................................11

*Johnson v. Mead Johnson & Co., LLC*,
  754 F.3d 557 (8th Cir. 2014) .............................................................33

*Keller Farms, Inc. v. McGarity Flying Serv., LLC*,
  944 F.3d 975 (8th Cir. 2019) .............................................................11

*Littleton v. McNeely*,
  562 F.3d 880 (8th Cir. 2009) .............................................................11

*Minks v. Polaris Indus., Inc.*,
  546 F.3d 1364 (Fed. Cir. 2008) .........................................................26

*Morrissey v. Welsh Co.*,
  821 F.2d 1294 (8th Cir. 1987) ...........................................................50

*Omega Eng'g, Inc, v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) .........................................................21

*Owen v. Patton*,
  925 F.2d 1111 (8th Cir. 1991) ...........................................................50

*Plantronics, Inc. v. Aliph, Inc.*,
  724 F.3d 1343 (Fed. Cir. 2013) .........................................................21

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  904 F.3d 965 (Fed. Cir. 2018) ...................................................*passim*

*Reeves v. Sanderson Plumbing Prod., Inc.*,
  530 U.S. 133 (2000).....................................................................35, 47

*United States v. Ribaste*,
  905 F.2d 1140 (8th Cir. 1990) ...........................................................57

*Safety Nat'l Cas. Corp. v. Austin Resolutions, Inc.*,
  639 F.3d 498 (8th Cir. 2011) ...............................................12, 14, 36

*Sheriff v. Midwest Health Partners, P.C.*,
  619 F.3d 923 (8th Cir. 2010) .............................................................11

*Shiley, Inc. v. Bentley Labs., Inc.*,
    794 F.2d 1561 (Fed. Cir. 1986) ....................................................9, 39

*Sulzer Textil A.G. v. Picanol N.V.*,
    358 F.3d 1356 (Fed. Cir. 2004) .....................................27, 37, 38, 57

*Sunny Fresh Foods, Inc. v. Michael Foods, Inc.*,
    130 F. App'x 459 (Fed. Cir. 2005) ...................................................27

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001) ..................................................31, 32

*TQ Delta LLC v. Adtran, Inc.*,
    No. CV 14-954-RGA, 2021 WL 1200595 (D. Del. Mar. 30, 2021) .................32

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) .......................................................29

*Versata Software, Inc. v. SAP Am., Inc.*,
    717 F.3d 1255 (Fed. Cir. 2013) ................................................*passim*

*Virnetx, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) .......................................................56

*White v. Pence*,
    961 F.2d 776 (8th Cir. 1992) ...........................................................55

*Whittenburg v. Werner Enterprises, Inc.*,
    561 F.3d 1122 (10th Cir. 2009) .......................................................51

*Wright v. West*,
    505 U.S. 277 (1992).........................................................................47

**Statutes**

28 U.S.C. § 1295(a) ...............................................................................1

28 U.S.C. § 1331 ....................................................................................1

28 U.S.C. § 1338 ....................................................................................1

35 U.S.C. § 298 ............................................................................*passim*

**Other Authorities**

Fed. Cir. R. 32(b)(1)...................................................................................1

# STATEMENT OF RELATED CASES

No other appeal in or from the same civil action was previously before this or any other appellate Court. Certain patents asserted in this case, however, were the subject of IPR decisions that this Court has reviewed on appeal:

- In *Provisur Technologies, Inc. v. Weber, Inc.*, No. 21-1851, 2022 WL 17688071 (Fed. Cir. Dec. 15, 2022), this Court addressed Board decisions regarding U.S. Patent No. 7,065,936 (at issue in this appeal) and related U.S. Patent No. 7,533,513 (asserted below but not at issue in this appeal).

- In *Provisur Technologies, Inc. v. Weber, Inc.*, 50 F.4th 117 (Fed. Cir. 2022), this Court addressed Board decisions regarding U.S. Patent No. 6,997,089 (asserted below but not at issue in this appeal).

- In *Provisur Technologies, Inc. v. Weber, Inc.*, No. 21-1883, 2022 WL 3131838 (Fed. Cir. Aug. 5, 2022), this Court addressed a Board decision regarding U.S. Patent No. 9,399,531 (asserted below but not at issue in this appeal).

- *Provisur Technologies, Inc. v. Weber, Inc.*, No. 21-1853, 2021 WL 4811421 (Fed. Cir. Jul. 13, 2021), involved a Board decision concerning U.S. Patent No. 6,320,141 (asserted below but not at issue in this appeal). Provisur voluntarily dismissed that appeal.

Additionally, the following pending cases may directly affect or be directly affected by the Court's decision in this appeal:

- *Weber, Inc. v. Provisur Technologies, Inc.*, Nos. 22-1751, 22-1813 (Fed. Cir. filed May 4, 2022), involves Board decisions concerning U.S. Patent Nos. 10,639,812 and 10,625,436 (at issue in this appeal).

- *Provisur Technologies, Inc. v. Weber, Inc.*, No. 5:21-cv-06113 (W.D. Mo. filed Sept. 21, 2021), involves Provisur's U.S. Patent No. 8,408,109 (not at issue in this appeal), and U.S. Patent Nos. 10,639,812 and 10,625,436 (at issue in this appeal with respect to different Weber products).

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. The district court entered judgment on October 28, 2022, Appx68, and denied Weber's post-trial motions on January 9, 2023, Appx69-72. Weber filed its notice of appeal on January 19, 2023. Appx50229-50230. This Court's jurisdiction rests on 28 U.S.C. § 1295(a).[1]

## STATEMENT OF THE ISSUES

1. Whether Weber is entitled to reversal and judgment as a matter of law of non-infringement.

2. Whether Weber is entitled to reversal and judgment as a matter of law that it did not willfully infringe.

3. Whether Weber is entitled to a new trial on damages.

## STATEMENT OF THE CASE

### A.     The Parties

Plaintiff-appellee Provisur Technologies, Inc. is an industry-leading designer and seller of commercial food slicing machines and related products. Through its brand Formax, Provisur has been a leading force in the U.S. and global food

---

[1] Provisur subsequently filed a notice of cross-appeal, which has been docketed as No. 2023-1476. However, Provisur has since determined not to challenge any portion of the district court's judgment. Provisur accordingly intends to file a stipulation or motion seeking dismissal of its cross-appeal. This brief complies with the type-volume limitation for principal briefs under Fed. Cir. R. 32(b)(1).

processing markets since developing the first high-capacity food forming system more than 45 years ago. These systems are composed of scales, slicers, scanners, loading conveyors, and pick-and-place robots that prepare a wide variety of deli meats, cheeses, and bacon. Provisur has driven innovation in the food processing industry and has diligently sought and received numerous patents for its innovations.

Defendants-appellants are several interrelated corporate entities and subsidiaries, headquartered in Germany, whom we refer to collectively as Weber. Like Provisur, Weber designs, manufacturers, and sells industrial food-processing machinery, including slicers and food-packaging machines.

### B.    Provisur's Patents

1.  Provisur's '812 and '436 patents claim a "food article slicing machine" such as the one shown below:



Fig. 1B

Appx145 (rotated).

The slicer contains a "food article feed apparatus having a conveyor assembly with independently driven endless conveyor belts" and "food article loading apparatus" that "includes a lift tray assembly." Appx169 (11:16, 19-21, 29-28). Food is placed into "lift tray assembly," and when the tray pivots upward, "grippers" of the "food article feed apparatus" guide the food forward for slicing. Appx169 (11:22-25).

The patents describe the location of the "feed apparatus" in relation to the "loading apparatus." In particular, limitation 1.c of the '812 patent recites a "food article feed apparatus disposed over said food article loading apparatus." Appx169 (11:17-18)

2. Provisur's '936 patent claims a "fill and packaging apparatus" for loading sliced food drafts into packages. Appx105 (1:1). The relevant claim here (claim 14) involves an "advance to fill" embodiment, in which the shuttle conveyor that carries the sliced food drafts away from a slicer begins in a retracted position (*i.e.*, closest to the slicer) and then advances away from the slicer as it fills the drafts into successive rows of empty packaging pockets. Appx108(7:39-45).

## C.    The Present Litigation

1. In February 2019, Provisur filed suit against Weber for patent infringement in the Western District of Missouri. Appx300-379. In May 2020, Provisur filed a second suit with claims based on additional patents. Appx51000-51084. Those

cases were consolidated for purposes of trial. As is pertinent on appeal, Provisur alleged (1) that Weber's 905, 906, 908, and S6 food slicers sold since 2010 infringed Provisur's '812 and '436 patents; and (2) that Weber's SmartLoader food-packaging machine infringed Provisur's '936 patent.

2. After Provisur filed suit, the parties engaged in extensive discovery and pre-trial litigation. In addition, Weber filed a series of IPR petitions regarding the patents asserted in this infringement action, which were resolved by the Patent Trial and Appeal Board during the pendency of this case. All asserted claims were found not unpatentable by the Board. *See* Appx2127, Appx54916, Appx54948.

In October 2022, a jury trial commenced on Provisur's infringement claims. Over the course of a nine-day trial, Provisur presented the jury with extensive evidence demonstrating that Weber's accused slicers and SmartLoader infringed the patents in suit—including technical documentation, product videos, and the testimony of Provisur's technical expert, Dr. Keith Vorst. Dr. Vorst was uniquely well-qualified to provide that testimony, as a full professor at Iowa State University with a Ph.D from Michigan State "in food science and technology with a focus area in packaging." Appx41240 (754:8-9). Indeed, Dr. Vorst directs a research center at Iowa State that is among the largest in the United States focused on food packaging. Appx41241 (755:9-13).

The jury also heard extensive evidence of Weber's willful infringement. In particular, Weber had systematically tracked and rated Provisur's patented technologies using a sophisticated program known as PATOffice. In Weber's PATOffice "patent matrix," Weber's employees rated the patents at issue here with a "3"—the highest possible score—confirming that they were "relevant" to Weber's business. But despite that recognition, Weber did not employ any of the many steps that were identified by Provisur's expert, John White, as part of industry-standard norms to avoid patent infringement. *See* pp. 40-41, *infra*.

The jury also heard evidence that Weber sought to conceal its knowledge and ratings of Provisur's patents. In particular, during depositions that occurred *before* Weber had produced its patent matrix to Provisur, Weber witnesses falsely denied having seen Provisur's patents before. After the patent matrix was produced, it became clear that those witnesses had not only seen the patents, but analyzed them and rated them in Weber's tracking system. In addition, Weber's interrogatory responses regarding its knowledge of the patents shifted over the course of the litigation—with multiple "supplementations" before Weber provided its final answer—despite the fact that Weber's patent matrix recorded its knowledge of the patents in black and white the entire time. *See* pp. 46-47, *infra.*

With respect to damages, Dr. Vorst testified that "[i]t was the patented features identified in the Provisur patent[s]" that "drove the demand or substantially created

5

the value for each customer of the accused products slicing lines in this case." Appx41310 (824:17-21). That testimony was based on Dr. Vorst's own extensive experience in evaluating food-processing lines and identifying the value attributable to their component parts. *E.g.*, Appx33785 (487:06-488:20). He also explained that he was unaware of any other features of the accused slicing lines that substantially created their value after his review of the record. Appx41310 (824:22-24). On that basis, Provisur sought an award of damages under the entire market value rule. Its damages expert, Julie Davies, providing testimony regarding an appropriate royalty in light of Dr. Vorst's conclusion on the value of the infringing features.

3. The jury found that the accused slicers infringe the '812 and '436 patents and that the SmartLoader infringes the '936 patent. Appx61. The jury further found that Weber had willfully infringed those patents, and awarded Provisur the full damages it had sought on those patents: approximately $3.75 million each for both the '812 and the '436 patent and approximately $3 million for the '936 patent, for a total of approximately $10.5 million. Appx62-63. The jury did not accept Provisur's claim that Weber's products infringe another Provisur patent (U.S. Patent No. 6,997,089). Appx61.

4. Following the jury's verdict, the district court denied Weber's motions for judgment as a matter of law on infringement and willfulness, and for a new trial on infringement, willfulness, and damages. Appx69-72.

The district court granted Provisur's motion for enhancement of damages, concluding that Weber's "systematic misconduct transcended that of a garden-variety infringer." Appx85 (quoting Provisur's briefing). The court found that Weber's infringement was "an egregious case[] of misconduct" where "Defendants had a motivation to harm" Provisur. Appx84-85. Although Weber was "plainly aware of Provisur's patents," Weber "intentionally copied Plaintiff's patented ideas." Appx77. The court further observed that the issues of invalidity and non-infringement "were not close" and "[n]ot a single Weber employee testified about any belief of invalidity or non-infringement." Appx77, Appx81. The court exercised its discretion to double the jury's damage award (declining to award treble damages). Appx86.

This appeal followed.

## SUMMARY OF THE ARGUMENT

I. The jury's infringement verdict should not be disturbed.

A. The trial evidence amply supports the jury's finding that Weber's slicers infringe the '812 and '436 patents, including the requirement that the slicer's "feed apparatus" be "disposed over" the loading apparatus. Provisur proved that the slicer's "product guide" corresponded to the accused "feed apparatus," and that the product guide was "disposed over" the loading apparatus in the relevant sense—*i.e.*, that it was above and laterally aligned with the loading apparatus.

Weber does not meaningfully contest Provisur's infringement evidence. Instead, Weber observes that a *different* component—the slicer's ball-screw actuator—is laterally offset from the loading apparatus's lift tray. But nothing required the jury to treat the ball-screw actuator as a part of the "feed apparatus" that must be "disposed over" the slicer's loading apparatus. Weber's contrary submission rests on a misreading of a passage it plucks, out-of-context, from the Board's IPR decision. There is thus no basis to set aside the jury's infringement verdict.

B. The trial evidence also supports the jury's finding that Weber's SmartLoader infringes claim 14 of the '936 patent. Although Weber labors to obscure the point, Provisur's technical expert testified that he was able to cause the SmartLoader to operate as an advance-to-fill conveyor under the Court's claim construction. His testimony showed that the SmartLoader was "configured to" advance to fill because users enabled that infringing functionality by adjusting parameters in the SmartLoader's software interface screen—without any reprograming of the software. That is exactly what he said he did when he inspected the product himself. Weber now argues that the testimony of Provisur's expert should not have been credited, but this Court may not invade the jury's fact-finding role by re-weighing the parties' competing expert testimony. And there is no merit

to Weber's contentions that the jury's infringement verdict rests on unsupported contentions of discovery misconduct or on instructional error.

II.  The jury's willfulness verdict should not be disturbed.

Weber cannot overcome the jury's finding by picking apart particular pieces of Provisur's evidence, in violation of the basic rule that willfulness turns on "the totality of the circumstances presented in the case." *Shiley, Inc. v. Bentley Labs., Inc.*, 794 F.2d 1561, 1568 (Fed. Cir. 1986).  Those circumstances included Provisur's evidence that Weber had systematically tracked Provisur's patents on its "patent matrix," recognized their relevance by assigning them the highest possible rating, and nonetheless failed to take any of the industry-standard steps to avoid infringement that Provisur's expert identified.  No Weber employee testified about any good-faith belief as to non-infringement or invalidity, and Weber's trial defense did not present close issues on either point.  And the evidence showed that Weber had sought to conceal its knowledge and ratings of Provisur's patents.

The testimony of Provisur's expert was properly admitted.  Based on his industry experience, he gave his opinions about the kinds of steps a reasonable company would take to avoid patent infringement.  His testimony did not violate 35 U.S.C. § 298 because he did not fault Weber for failing to seek advice of counsel, and the "third party" services he mentioned among the industry-standard steps to avoid infringement were not *legal* services.  He mentioned nothing about Weber's

lawyers or any legal advice. And, contrary to Weber's contention, he did not offer an improper opinion on Weber's subjective intent. In all events, any error in admitting this testimony would be harmless, given the other abundant evidence of willful infringement presented at trial.

Weber's patent matrix was probative of willful infringement because it established beyond any doubt that Weber recognized the relevance of Provisur's patents. And Weber's concealment of its knowledge and ratings of Provisur's patents was particularly probative evidence of willfulness because it bespeaks consciousness of wrongdoing.

III. Weber is not entitled to a new trial on damages.

A. The district court properly admitted the damages testimony of Provisur's technical expert, Dr. Vorst, which established the predicate for invocation of the entire market value rule under this Court's precedents. Indeed, Dr. Vorst was the only witness at trial qualified to testify about what drove the demand for the accused slicing lines in the food processing industry based on his years of experience doing exactly that. Weber's critiques of his testimony go only to its weight; they do not show that the testimony should have been excluded under *Daubert* or that it was legally insufficient to support application of the entire market value rule.

B. The district court properly instructed the jury on damages. The district court's instruction on the entire market value rule was entirely consistent with and

was a direct quote from this Court's repeated articulations of that rule. And the district court did not err in declining to add redundant language to its instruction on the requirement of apportionment.

## STANDARDS OF REVIEW

While Federal Circuit law governs issues of substantive patent law, regional circuit law governs a district court's ruling on a post-trial motion for judgment as a matter of law. *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1202 (Fed. Cir. 2010). A post-trial motion for judgment as a matter of law may be granted only if there was "'*a complete absence of probative facts* to support the conclusion reached' so that no reasonable juror could have found for the nonmoving party." *Sheriff v. Midwest Health Partners, P.C.*, 619 F.3d 923, 928 (8th Cir. 2010) (quoting *Hathaway v. Runyon*, 132 F.3d 1214, 1220 (8th Cir. 1997)) (emphasis added).

A motion for a new trial is "generally disfavored" and should be granted "only where a serious miscarriage of justice may have occurred." *Keller Farms, Inc. v. McGarity Flying Serv., LLC*, 944 F.3d 975, 984 (8th Cir. 2019). For a new trial to be appropriate, the erroneous rulings must have "had a substantial influence on the jury's verdict." *Littleton v. McNeely*, 562 F.3d 880, 888 (8th Cir. 2009). "When a district court, employing the proper legal standards, denies a new trial motion based on sufficiency of the evidence, the district court's ruling is 'virtually unassailable.'"

*EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 739 (8th Cir. 2000). Courts must consider the evidence "in the light most favorable to the non-moving party." *Id.* at 738.

"A district court's rulings on admissibility of evidence are entitled to great deference" and will be reversed only if the court committed a "clear abuse of discretion." *Safety Nat'l Cas. Corp. v. Austin Resolutions, Inc.*, 639 F.3d 498, 503 (8th Cir. 2011). A court should not disturb a jury's verdict "absent a showing that the evidence was so prejudicial" that "a new trial . . . would be likely to produce a different result." *Id.*

## ARGUMENT

### I. The Jury's Infringement Findings Should Not Be Disturbed.

#### A. The Evidence Supports The Jury's Finding That The Accused Slicers Infringed The '812 And '436 Patents, Including The "Disposed Over" Limitation.

Weber errs in contending (Br. 34-43) that the evidence does not support the jury's finding that the accused slicers satisfy the "disposed over" limitation of the '812 and '436 patent claims. Weber makes no effort to grapple with Provisur's trial evidence of infringement, which showed that each accused slicer had an upper "feed apparatus" that was "disposed over" the food loading apparatus—under the construction of "disposed over" adopted by the district court based on the IPR record. Weber instead rests its entire argument on a misreading of an out-of-context

passage from the Board's decision in parallel IPR proceedings to manufacture a new (and incorrect) claim construction. That argument provides no basis for reversal.

> **1. Provisur's Evidence Demonstrated That The Accused Slicers Had A Feed Apparatus "Disposed Over" A Food Loading Apparatus Under The District Court's Claim Construction.**

a. The patents at issue require, among other things, a "food article feed apparatus *disposed over* the food article loading apparatus having an upper conveyor assembly with a driven endless conveyor belt used in cooperation with a food article gripper for moving the food articles along the food article feed path." Appx138 (10:61-65) (emphasis added). Finding no disagreement between the parties, and in line with the Board's conclusion in prior IPR proceedings, the district court "construe[d] 'disposed over' to mean 'that the food article feed apparatus and its conveyor belts and grippers are positioned above and in vertical and lateral alignment with the food article loading apparatus and its lift tray assembly.'" Appx64381.

b. Provisur's trial evidence conformed precisely to the district court's claim construction and amply supported the jury infringement verdict. In particular, Provisur proved that the accused slicers have an upper conveyor assembly called the "product guide." Appx87046. The product guide is, itself, made up of a number of components: plastic rollers, retainers, pressure roller elements, drive units, clamping

devices, locking pins, and a "[s]upport frame with toothed transport belts."
Appx87194.



Fig. 169: Product guide

*Id.* The purpose of the product guide is to be "lowered onto the products from above"
in order to "facilitate[] their uniform transport" towards the slicer blade. *Id.*

When presenting its infringement proof, Provisur identified this upper
"product guide" as being the claimed "feed apparatus" of the '436 and '812 patents.
Appx41269 (783:11-12); Appx41276 (790:16-18); Appx41286 (800:1-8).



Appx93692.

This product guide—*i.e.*, the component accused as the "feed apparatus"—is indisputably disposed directly over the loading apparatus in the accused slicers, in vertical and lateral alignment. Provisur's technical expert confirmed that "the feed apparatus product guide [is] directly above and over the loading apparatus in the accused products," as shown in the product manual. Appx41277 (791:3-6). According to the trial testimony, if the product guide were not directly disposed over the loading apparatus and did not have inline lateral alignment, "this slicing machine would [not] work." Appx41277 (791:3-6). Throughout trial, Provisur and its experts touted this "inline" aspect of the invention as a "huge improvement" such that "there's no need for lateral shifting." Appx41266 (780:14-18). Indeed, Provisur dubbed the '436 and '812 asserted patents as the "*Inline* Varioslicer" patents at trial

15

to emphasize the importance of the lateral alignment to the case (as well as variable independent gripper technology). *E.g.*, Appx41256 (770:2-18); Appx41262 (776:19-21).

Provisur's technical expert was clear that when he concluded that the product guide was "disposed over" the loading apparatus, he "used the court's instruction of that claim." Appx41276 (790:7-10); Appx93691. He testified:

> Q. And I'd like to clarify one other thing from yesterday too, Dr. Vorst. We talked a lot about your evidence of infringement for the feed apparatus that is directly disposed over the loading apparatus in Element C.
>
> A. Yes, sir.
>
> Q. Do you remember that?
>
> A. Uh-huh. Yes, sir.
>
> Q Is it your opinion that defendant's accused product feed apparatus that they call the product guides are positioned directly above and in vertical and lateral alignment with the loading apparatus, which they call the product conveyor as in the court's claim construction?
>
> A. Yes, sir. It is.

Appx41329 (843:11-23).

Provisur presented ample evidence that the product guide in Weber's accused slicers was disposed over the loading apparatus—*i.e.*, inline, in vertical and lateral alignment with the loading apparatus. The infringement analysis was supported by, *inter alia*, manuals, promotional videos, computer renderings of the parts, and a

"personal inspection" of the machine. Appx41277 (791:7-25); Appx41306-41307 (820:19-821:10). Of particular note, Provisur's technical expert explained to the jury that during his personal inspection, he "was able to get up on a stepladder and look down . . . directly over the S6" accused slicer. Appx41278 (792:1-8). This birds-eye view allowed Dr. Vorst to confirm that the product guide, which Provisur identified as the infringing feed apparatus of the accused slicers, was "directly disposed over" the loading apparatus in vertical and lateral alignment. Appx41277-41278 (791:23-792:8).

Critically, Weber does not challenge *any* of this evidence on appeal. Indeed, although Weber contends (incorrectly, for the reasons explained below) that Provisur's infringement case improperly focused on the accused slicers' product guides, *see* Weber Br. 41 & n.5, Weber makes no attempt to challenge Dr. Vorst's testimony regarding the arrangement of the product guide and loading apparatus in the accused slicers. Thus, because Weber does not even *attempt* to show that the jury's finding lacks substantial evidence, it is undisputed that the "product guide" in the accused slicers is disposed over the loading apparatus.

### 2. Weber's Reliance On The IPR Proceedings To Rewrite the Claim Is Misplaced.

Weber's trial strategy was to ignore Provisur's proof about the location of the accused slicers' infringing upper product guide, and to focus instead on whether a *different* machine component—the "ball screw that drives the grippers"—was in

17

lateral alignment with the lift tray. Appx41999-42001 (1513:2-1515:8). However, nothing in the record requires the claims to have a ball screw actuator as part of the "feed apparatus" as Weber contends.

a. The district court, the Board, Provisur, and Weber all construed the claims without any ball screw actuator requirement. The Board found "that the proper construction of 'disposed over' means that the food article feed apparatus and its conveyor belts and grippers are 'positioned above and in vertical and lateral alignment with' the food article loading apparatus and its lift tray assembly." Appx59387. The Board's claim construction analysis (Section III.C of its decision) does not mention any ball screw actuator, *see* Appx59381-59388; nor do the claims, specification, or original prosecution history. Weber proposed that the district court adopt the Board's construction during summary judgment, Provisur agreed to it, and the district court instructed the jury on it. *See* Appx64381, Appx28.

There is thus no basis for Weber's contention that, by adopting the Board's claim construction, "[t]he district court construed the disposed-over limitation to require that the entire feed apparatus, *including the mechanism that drives the slicer's grippers*, be positioned above and in 'lateral alignment' with the loading apparatus's lift tray." Weber Br. 35 (emphasis added, original emphasis removed). The Board did not mention "the mechanism that drives the slicer's grippers" in its claim construction, and the district court did not mention it in adopting the same

construction. *See* Appx64381. The district court thus never held that the ball screw was part of the feed apparatus. Appx64381-64385. Rather, at the summary judgment stage, the district court specifically acknowledged Provisur's position that the "food article feed apparatus corresponds to what Defendants describe as a product guide." Appx64383. Applying the claim construction of "disposed over" it had adopted four pages before, the district court held that Provisur's contentions *as to the product guide* "would support a finding of infringement." Appx64385.

At trial, Provisur presented the same evidence regarding the "product guide" that the district court had previously determined "would support a finding of infringement" under its construction of "disposed over." *See* pp. 13-17, *supra*. Weber's position—that Provisur needed to prove that the accused slicers' "ball-screw actuator" was *also* disposed over the loading apparatus—is thus unsupportable.

b. Weber's contrary argument proceeds from an out of context passage of the Board's factual analysis, where the Board addressed Weber's contention that the "disposed over" limitation was rendered obvious by a proposed hypothetical combination of Weber's 904 slicer and a second prior art reference, Lindee. Weber quotes the Board's fact finding that "From Figure 1 of the 2006 904 Operating Manual, *supra*, it is clear that the ball screw actuator (part of the feed apparatus) for the product holder (food article gripper) is not 'positioned above and in vertical and

lateral alignment with' the product conveyor (part of the loading apparatus), but is instead laterally offset when the slicer is viewed from above." Appx59357.

Read in context, however, the Board's reference to the ball screw actuator as "part of the feed apparatus" is merely a re-statement of what Weber had *asserted* in its IPR petition. It is not a claim construction pronouncement about what components comprise the claimed "feed apparatus." Indeed, the paragraph of the Board's decision that immediately follows makes clear that the Board did not intend to endorse Weber's assertion regarding which components constitute the feed apparatus. There, the Board summarized its decision as follows:

> To summarize, limitation 1.3 of claim 1 recites "a food article feed apparatus disposed over said food article loading apparatus." The combination proposed in the Petition results in the Lindee's timing belt system replacing or substituting for the 904 Operating Manuals' ball screws, which are laterally offset from the 904 Operating Manuals' product conveyor. In this combination, Lindee's conveyor belts (part of the food article feed apparatus *according to the Petition*) would not be "disposed over" (i.e., "positioned over and in vertical and lateral alignment with") the 904 Operating Manuals' product conveyor (part of the food article loading apparatus *according to the Petition*), as required by limitation 1.3 of claim 1.

Appx59430 (emphases added; citation omitted). Likewise, the Board found that Weber had not demonstrated obviousness because "Lindee's timing belts (part of the *asserted* feed apparatus)" would not be "'disposed over' the product bed conveyor (part of the *asserted* loading apparatus)." Appx59353 (emphasis added). As the emphasized clauses make clear, the Board's statements about which

components constitute the feed apparatus and the loading apparatus were merely restatements or summaries of *Weber's allegations* in its IPR petition—not a claim construction by the Board.

That understanding is reinforced by Provisur's submissions to the Board, which repeatedly referred to Weber's allegations about which components of the proposed combination corresponded to the claimed "feed apparatus" without endorsing those allegations. For example, Provisur noted that the relevant "endless conveyor belts" that formed a part of the proposed combination's feed apparatus had been "*identified by Weber* as Lindee's timing belt," Appx61739 (emphasis added), and those conveyor belts would not be "disposed over" the loading apparatus as required to satisfy the claim. *See also* Appx61737, Appx61805, Appx61807. Provisur did not endorse Weber's allegations.[2]

In sum, the Board's IPR decisions rest on a construction of what it means for one component of the product to be "disposed over" another: The former must be "positioned above and in vertical and lateral alignment with" the latter. Appx59314. But the Board did not construe *which components* of the slicer constitute its "feed

---

[2] Because Provisur did not endorse Weber's allegations at all, Provisur's submissions to the Board cannot possibly be read as a disavowal of claim scope, which can occur only "when the patentee unequivocally and unambiguously disavows a certain meaning." *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1350 (Fed. Cir. 2013); *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003) ("[O]ur precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable.").

apparatus"—that is, what it is that must be "disposed over" the loading apparatus. Nor did Weber ever ask the district court to construe the claim's "feed apparatus" language to include a ball screw actuator (or other drive mechanism). Thus, Provisur properly showed at trial that the accused slicers' "product guide" was the asserted "feed apparatus"—and that *this* apparatus was "disposed over" the loading apparatus, consistent with the Board and district court claim construction. *See* pp. 13-17, *supra*.

Weber is therefore incorrect that the Board's construction "necessarily excludes slicers like the 904 slicer whose drive mechanism is laterally offset." Weber Br. 37. Indeed, the Board was not focused not on Weber's own 904 slicer, as Weber misleadingly implies, but rather a hypothetical combination of the 904 slicer and the Lindee reference. Although Weber asserted that the 904 slicer in the 904 manual disclosed "a food article feed apparatus disposed over the food article loading apparatus . . . with a food article gripper," Appx51184, Weber did not assert that the 904 slicer manual disclosed an "upper conveyor assembly with a driven endless conveyor belt," *see* Appx51184-51186. Weber instead relied on a combination with Lindee, which allegedly disclosed those components. *See* Appx51187-51189.

Weber argued that, in the proposed hypothetical combination, a person of ordinary skill in the art would have been motivated to locate Lindee's belt drive

system directly above the loading apparatus, thereby disclosing the "disposed over" limitation in Provisur's patents. Appx59357. But the Board rejected that argument. It instead found that, if one were to replace the 904 slicer's ball screw actuator with Lindee's timing belts, the natural location for the timing belts would be where the ball screw actuator was located—which "would result in the *timing belts* being laterally offset from the product conveyor." *Id.* (emphasis added); *see also id.* (emphasizing that "both the 2006 904 Operating Manual and Lindee teach that the *conveyor belts* which drive the grippers are off to the side of the lift tray assembly") (emphasis added).

In other words, the Board did not reject Weber's obviousness argument because the 904 slicer's ball screw actuator was not located in lateral alignment with the loading apparatus. Rather, the Board made that finding because the 904 slicer's ball screw actuator marked the location of the timing belts in the hypothetical prior-art combination, which Weber had identified as part of the relevant feed apparatus—and thus those *timing belts* would not have been disposed over the loading apparatus. Appx59357-59358. That conclusion was consistent with the Board claim construction, which read "disposed over" to require alignment of "the food article feed apparatus and its *conveyor belts* and *grippers*," Appx59314 (emphasis added), but said nothing about "drive mechanisms."

To be sure, in the hypothetical combination that Weber proposed, *it happened to be the case* that the conveyor belts that Weber identified as part of the feed apparatus were *also* the component that directly drove the food grippers. But as explained, the Board never endorsed Weber's allegations about which components comprise the feed apparatus—and the Board certainly never suggested that any component that drives a slicer's grippers would necessarily be part of its feed apparatus. To the contrary, in its claim-construction analysis the Board noted that the specification for the '812 patent showed "servomoters and shafts that are not vertically above the loading apparatus." Appx59385. It explained that those drive elements—unlike a slicer's belts and grippers—are *not* required to be in lateral alignment with the loading apparatus. *Id.*

At the *Markman* phase, moreover, the district court directly addressed and rejected Weber's argument that the feed apparatus's "upper conveyor assembly" should be construed to mean an "overhead conveyor system *for positioning and driving food article gripper(s)*." Appx53124 (emphasis added). The court rejected Weber's attempt to narrow the claim and instead construed the term to mean an "overhead conveyor system positioned over the food article loading apparatus." Appx53126. That construction permitted Provisur to prove infringement by identifying the product guide at the accused feed apparatus, even though the product guide's belts do not drive the grippers in the accused slicers. Weber had not appealed

that claim-construction ruling, and Weber should not be permitted to evade its import by inventing a construction of "feed apparatus" that appears nowhere in the decisions of the Board or the district court.

### 3. The Accused Slicers Are Materially Different From The 904 Slicer Because They Include Independent Belts.

Fundamentally, Weber's argument on appeal rests on the false premise that "the prior art slicers and accused slicers here are identical in all relevant respects." Weber Br. 1; *see also id.* at 34-35, 39-40. This was exactly the same argument that Weber made to the jury, and properly rejected by the jury. At trial, Provisur showed—and the jury agreed—that Weber 904 and 905 prior art products did not have the claimed "conveyor assembly with independently driven endless conveyor belts." Appx139 (11:39-41); Appx169 (11:19-21); Appx41285 (799:17-20); Appx86678; Appx41860-41864 (1374:5-1378:3). Indeed, the evidence showed that *no* Weber machine had "vario" drives (the term used by Weber to denote independent grippers, Appx40732 (246:2-14)) before the priority date of Provisur's patents in 2010. Appx86678; Appx41860-41864 (1374:5-1378:3). In contrast, the jury's infringement verdict confirms the jury's finding that the accused slicers *were* different because they did in fact have this claim element.

Weber has not even attempted to show on appeal that the jury's findings on validity lack substantial evidence. There is accordingly no basis for Weber's contention that "a configuration found not to invalidate was found to infringe."

Weber Br. 35. The configuration found not to invalidate (Weber's pre-2010 slicers that lacked independent grippers) *was* materially different from the configuration found to infringe (Weber's subsequent products that copies Provisur's patented independent-gripper innovation).

### 4. The District Court Properly Instructed The Jury On Its Construction Of "Disposed Over."

For similar reasons, there is no merit to Weber's argument (Br. 40-43) that the district court's jury instruction on the "disposed over" limitation gave rise to reversible error because it was insufficiently detailed. As an initial matter, Weber's challenge to the jury instruction, if accepted and found to constitute prejudicial error by this Court, would lead only to an award of a new trial. *E.g.*, *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1381 (Fed. Cir. 2008); *Ecolab, Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1376 (Fed. Cir. 2002). It is logically irrelevant to Weber's request for judgment as a matter of law.

As for Weber's conclusory request for a new trial (Br. 43), Weber fails to establish any error in the court's instruction. The district court correctly instructed the jury that "'disposed over' has been construed by the Court to mean 'positioned above and in vertical and lateral alignment with.'" Appx28 (Instruction No. 9). Weber does not contend that the instruction misstated the law or was inconsistent with the district court's claim construction. Instead, Weber contends that the court should have supplied additional detail, derived from the Board's IPR decisions, by

instructing that "lateral alignment" requires that "there must be 'no offset between the overheard conveyor assembly of feed apparatus and the lift tray assembly of the loading apparatus' when viewed from above." Weber Br. 40 (citing Appx40340; Appx59309).

But this Court has routinely held that, with respect to claim construction, "the particular form and precise nature of jury instructions are matters within the sound discretion of the district court." *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004); *see also Sunny Fresh Foods, Inc. v. Michael Foods, Inc.*, 130 F. App'x 459, 464-65 (Fed. Cir. 2005). This Court's review is limited to determining only whether "errors in the instructions as a whole clearly misled the jury." *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 638 (Fed. Cir. 2011). In light of those well-established principles, a party cannot simply insist on whatever level of detail it would prefer; rather, there is no error if, "on the whole, the jury instructions were adequate to ensure that the jury fully understood the legal issues for each element of the case." *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1570 (Fed. Cir. 1992). Here, no further detail was required. Indeed, there is no meaningful difference between the language used in the court's instruction (a requirement of "lateral alignment") and the language that Weber proposed to add (a requirement of "no [lateral] offset"). To state the obvious, the district court's

decision not to add redundant detail to its instruction could not have "clearly misled the jury." *Bettcher Indus., Inc.*, 661 F.3d at 638.

Nor did Weber suffer any conceivable prejudice from the court's instruction. Weber is wrong to complain (Br. 41) that the instruction improperly permitted the jury to find infringement without considering the lateral alignment of the accused slicers' ball-screw actuator. The court's instruction did not state that the jury could ignore the location of the ball-screw actuator *if* the jury found that it was a part of the "feed apparatus" that was required to be "disposed over" the loading apparatus. And Provisur never urged the jury to do so: As explained above, Provisur's infringement case was that the ball-screw actuator was not a part of the "feed apparatus" at all; it was *on that basis* that the location of the ball-screw actuator could be ignored in determining infringement. *See* pp. 13-17, *supra.*

At the same time, nothing in Weber's proposed instruction would have required the jury to treat the ball-screw actuator as part of the "feed apparatus" that would have to be "disposed over" the loading apparatus. *See* Weber Br. 40 (arguing that the jury should have been instructed that "there must be 'no offset between the *overhead conveyer assembly* of feed apparatus and the lift tray assembly of the loading apparatus' when viewed from above") (emphasis added). Thus, even giving Weber's proposed instruction would not have addressed the supposed prejudice that Weber (mistakenly) complains of here, which means that Weber cannot possibly

establish reversible error.  *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("A party seeking to alter a judgment based on erroneous jury instructions must establish that [the proposed instruction] would have remedied the error.") (quoting *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1281 (Fed. Cir. 2000)).[3]

### B.  The Evidence Supports The Jury's Finding That The Accused SmartLoader Infringed The '936 Patent.

Weber argues (Br. 43-53) that the accused SmartLoader does not satisfy the advance-to-fill requirement of claim 14 of the '936 patent.  But that argument turns entirely on incorrect descriptions of the evidence adduced at trial.  Consulting the *actual* trial evidence (as opposed to Weber's pervasive misdescriptions) confirms that the jury's infringement finding was well-supported:  Provisur's technical expert, Dr. Vorst, testified that he was able to operate the SmartLoader as an advance-to-fill conveyor—*i.e.*, in the manner that Weber acknowledges infringes claim 14 of the '936 patent.  His testimony supports the jury's finding that the SmartLoader is "configured to" advance to fill because he was able to activate that infringing functionality by adjusting parameters in the SmartLoader's user interface—*without*

---

[3] To be clear, instructing the jury that the ball-screw actuator was part of the "feed apparatus" would have been erroneous, because Provisur could validly prove that the relevant "feed apparatus" was the accused slicers' product guide.  *See* pp. 13-17, *supra*.  For purposes of the prejudice inquiry, however, the important point is that Weber did not even request such an instruction.

any re-programming of the SmartLoader's software. And although Weber persists in arguing that the jury should not have credited Dr. Vorst's testimony, there is no basis for this Court to second-guess the jury's factual findings. Finally, Weber's complaints about supposedly improper allegations of discovery misconduct and meritless objections to the district court's jury instructions likewise provide no basis to disturb the jury's infringement finding.

### 1. Dr. Vorst Testified That He Was Able To Operate The SmartLoader As An Infringing Advance-To Fill Conveyor.

Weber is simply incorrect to assert that Provisur's Dr. Vorst testified only that the SmartLoader could "theoretically" operate as an advance-to-fill conveyor, and that he relied on "a demonstrative animation hypothesizing what the SmartLoader *might* look like." Weber Br. 46-47. There was nothing "theoretical" or "hypothetical" about Dr. Vorst's testimony: He testified that, during his inspection at Weber's facility, he was able to cause the SmartLoader to advance to fill "by changing the parameters" in its software interface. Appx41397-41398 (911:25-912:1). In particular, Dr. Vorst was able to access the SmartLoader's advance-to-fill functionality by adjusting the start and end positions and the circulation speed of the SmartLoader's conveyor belt. Appx41397 (911:3-6). As Dr. Vorst explained, he "was able to actually go in and do it" by pressing the buttons on the display interface of the machine. Appx41404 (918:19). He testified that he saw the infringing configuration with his own eyes.

Weber is likewise incorrect in asserting (Br. 46) that Dr. Vorst "admitted that he never observed the SmartLoader" operating as an advance-to-fill conveyor. In the cited testimony, Dr. Vorst acknowledged that that he did not have *video* of the SmartLoader advancing to fill. *See* Appx41441-41443 (955:7-12, 957:8-11). That acknowledgement has no bearing on Dr. Vorst's *separate* testimony that he was able to set the SmartLoader's software parameters to cause it to advance to fill.

> **2.  Dr. Vorst's Testimony Supports The Jury's Conclusion That The SmartLoader Was "Configured To" Advance To Fill Because He Enabled That Functionality Without Re-Programming The SmartLoader's Software.**

Weber is also wrong that Dr. Vorst's testimony showed only that the SmartLoader is "capable of being modified to operate in an infringing manner" (Weber Br. 47) (quoting *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001)) such that the SmartLoader is not "configured to" advance to fill.

As explained, Dr. Vorst testified that he was able to cause the SmartLoader to advance to fill by changing software parameters that he could access during his inspection of the SmartLoader. Appx41397-41398 (911:25-912:1). Although Dr. Vorst at times referred to "configur[ing]" (*e.g.*, Appx41396 (910:24)) or "programming" (*e.g.*, Appx41397 (911:3-6)) of the SmartLoader, this process involved only "changing the parameters of the selected program," Appx41397-41398 (911:21-912:1). As Dr. Vorst explained, "you can go in and you can

manipulate the HMI or the interface to advance or retract, and that's what we did when we did the inspection." Appx41396-41397 (910:25-911:2). He configured the SmartLoader to advance to fill by pressing a few buttons in the user interface.

This Court has made clear that a product may be "configured to" perform a claimed functionality even if the user must adjust software parameters or settings to "activate[] functions already present in the software." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1263 (Fed. Cir. 2013). Because that is all Dr. Vorst did here, his testimony supports the jury's finding that the SmartLoader is "configured to" advance to fill. *See id.* at 1263 (stressing that the plaintiff's expert "did not alter or modify [the defendant's] code in order to achieve the claimed functionality"); *TQ Delta LLC v. Adtran, Inc.*, No. CV 14-954-RGA, 2021 WL 1200595, at *5 (D. Del. Mar. 30, 2021) (a product is "configured to" perform a claimed functionality even if it "is initially disabled," so long as that functionality can be enabled "without the need to rebuild, rewrite or recompile the code for, or redesign any of that hardware or software").[4]

---

[4] Weber's errs in relying (Br. 47) on this Court's decision in *Telemac*. There, "a restriction built into the software program" that operated the allegedly infringing mobile phone and "prevented" the phone from operating in an infringing manner. 247 F.3d at 1330. Here, by contrast, the fact that Dr. Vorst was able to operate the SmartLoader as an advance-to-file conveyor demonstrates that it lacks any such restriction.

### 3. This Court Should Reject Weber's Invitation To Second-Guess Dr. Vorst's Testimony.

Weber also re-hashes a series of arguments that it presented to the jury in an effort to discredit Dr. Vorst's testimony. But this Court "owes the jury great deference in its role as the factfinder," and none of Weber's critiques of Dr. Vorst's opinion meets "the high standard needed to disregard the jury's fact-finding function." *Versata Software*, 717 F.3d at 1262.

Weber first argues (Br. 48) that the (supposedly) unrebutted testimony of its source-code expert, Ricardo Valerdi, confirmed that the SmartLoader's software lacks any parameters that would enable it to advance to fill. But Valerdi's testimony *was* rebutted by Dr. Vorst's testimony that he personally observed the SmartLoader advancing to fill after he had adjusted its software parameters. Thus, Weber merely points to a dispute between the parties' experts, which the jury resolved in Provisur's favor. Weber's insistence that the jury *should* have accepted its expert's conclusion obviously does not demonstrate that the jury was *required* to do so. *See Versata Software*, 717 F.3d at 1262; *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014) (courts should not "weigh or assess the correctness of competing expert opinions").[5]

---

[5] In any event, Valerdi acknowledged that Weber had modified the SmartLoader's source code, and he was uncertain whether the version he examined matched the one that Dr. Vorst had used to adjust the SmartLoader's parameters. Appx41933-41935 (1447:19-1449:11). Although Weber now insists (Br. 49 n.6)

Weber also notes (Br. 48-49) that its own expert, Charles Reinholtz, testified that he was unable to cause the SmartLoader to advance to fill by inputting parameters into its software interference. But the jury heard Reinholtz' claim, weighed it against Dr. Vorst's contrary sworn testimony, and resolved the dispute in Provisur's favor. Moreover, Reinholtz *agreed* with Dr. Vorst that a user could use the SmartLoader's interface to adjust the SmartLoader's front position and rear position and the circulation speed of its conveyor belt. Appx42119 (1633:6-15). And Reinholtz was constrained to acknowledge that the SmartLoader's conveyor belt could in fact circulate while the end of the conveyor advanced, Appx42122 (1636:18-20), as would be required for the SmartLoader to deposit food while advancing. Particularly under these circumstances, Weber cannot identify any sound basis for this Court to re-weigh the competing testimony of the parties' experts.

In the same vein, Weber insists (Br. 49) that its SmartLoader could not operate as an advance-to-fill conveyor "without defying the laws of physics." For that proposition, Weber cites the testimony of its own witnesses. *See* Weber Br. 50. But

_____

that the source-code modifications were unrelated to the SmartLoader's advance-to-fill capability, the record does not support that contention. Weber relies exclusively on a supposed concession from Provisur's source-code expert (who did not testify at trial), but the cited portion of the expert report refers to an "example" of a change that Weber had acknowledged making in the source code. Appx23200 (¶ 39). The report did not purport to exclude the possibility that Weber had made other changes to the source code, including changes relevant to the SmartLoader's capability to advance to fill.

when a party moves for judgment as a matter of law, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000). There is no basis for Weber's apparent belief that the jury was required to credit the testimony of its witnesses.

### 4. Weber's Complaints Regarding Allegations Of Discovery Misconduct Are Meritless.

There is no merit to Weber's contention (Br. 51-53) that the jury's infringement finding improperly rests on unsupported contentions of discovery misconduct. As an initial matter, Weber's allegation (Br. 51) that the jury heard "highly prejudicial" testimony regarding Weber's interference with Dr. Vorst's inspection of the SmartLoader is logically irrelevant to Weber's appellate claim that it is entitled to judgment as a matter of law. As we have explained above, Dr. Vorst's trial testimony that he had personally observed the SmartLoader operating as an advance-to-fill conveyor is sufficient to support the jury's infringement finding— without any reference to the testimony that Weber now challenges. *See* pp. 30-32, *supra*.

To the extent that Weber means to argue that the challenged testimony warrants a new trial, that argument is equally meritless. Weber complains about Dr. Vorst's explanation that Weber had imposed limitations on his inspection that prevented him from obtaining a video of the SmartLoader operating as an advance-

to-fill conveyor. As the district court correctly noted, however, the testimony that Weber now challenges was elicited by *Weber's own cross-examination* of Dr. Vorst, who "had to respond." Appx41442 (956:14); *see also* Appx41441 (955:7-12). Weber can hardly complain about the admission of testimony that it invited. *See, e.g.*, *United States v. Grandison*, 781 F.3d 987, 991 (8th Cir. 2015). In any event, Weber makes no serious effort to show that the district court committed a "clear abuse of discretion" in permitting Dr. Vorst to answer the questions that Weber put to him. *Safety Nat'l Cas. Corp. v. Austin Resolutions, Inc.*, 639 F.3d 498, 503 (8th Cir. 2011). Nor can Weber credibly maintain that a handful of responses from Dr. Vorst—amidst nine days of trial testimony—were "so prejudicial" that a "new trial . . . would be likely to produce a different result." *Id.*

Weber also asserts (Br. 52-53) that Provisur's closing argument improperly referred to the limitations placed on Dr. Vorst's inspection. But that issue was not among the three objections to Provisur's closing that Weber purported to "note . . . for the record." Appx42616 (2130:8-9). It therefore is not preserved for appellate review.[6] In any event, Weber's conclusory argument does not demonstrate the sort of pervasively improper and prejudicial comments that would be required to justify

---

[6] As explained below, Weber's halfhearted attempt to "note" its objections— without any corresponding request for a ruling or remedial action from the district court—failed to preserve any challenge to Provisur's closing. *See* pp. 49-50, *infra*.

reversal based on a party's closing argument. *See, e.g.*, *Gilster v. Primebank*, 747 F.3d 1007, 1010 (8th Cir. 2014).

### 5. The District Court Correctly Instructed The Jury On The Advance-To-Fill Limitation.

Weber is also incorrect in arguing (Br. 53-54) that the district court erred in instructing the jury on the advance-to-fill requirement. Again, that allegation of instructional error is logically irrelevant to Weber's request for judgment as a matter of law. And Weber's conclusory contention (Br. 54) that the alleged instructional error warrants a new trial is meritless.

As Weber acknowledges (Br. 53), the district court instructed the jury that "claim 14 is construed as requiring an advancing conveyor." Appx29. Weber insists that the district court should have added additional detail, by instructing that "[t]his means that the shuttle conveyor must start in a retracted position, and then advances as it fills each new row of emp[t]y packages." Appx30862. But once again, "the particular form and precise nature of jury instructions are matters within the sound discretion of the district court." *Sulzer Textil A.G*, 358 F.3d at 1366. Weber cannot demonstrate error merely because it would have preferred a more detailed instruction.

Weber also cannot establish prejudice—*i.e.*, that "the outcome of the case would have been different," *Sulzer Textil A.G*, 358 F.3d at 1367, if the district court had given Weber's preferred instruction. Weber argues (Br. 54) that the court's

instruction may have led the jury to find infringement based on videos of the SmartLoader's conveyor advancing *after* it had completed a retract-to-fill operation. But Dr. Vorst testified that the claims "require advancing *to fill*." Appx41441 (955:5-6) (emphasis added). And as Weber itself notes (Br. 51), Dr. Vorst acknowledged that Provisur did not have videos of the SmartLoader operating in that advance-to-fill manner. *E.g.*, Appx41441 (955:7-18). Given that acknowledgment, the jury surely would not have relied on the videos Weber now points to—with the conveyor advancing *after* filling—as evidence that the SmartLoader was configured to advance to fill.

Rather, the relevant proof was supplied by Dr. Vorst's testimony that he had personally observed the SmartLoader advancing to fill. *See* pp. 30-32, *supra*. Dr. Vorst testified that, when operating as an advance-to-fill conveyor, the SmartLoader "takes the food drafts and puts them into the individual pockets in the advancing motion"—"as it advances." Appx39569 (899:16-18) (describing demonstrative animation of SmartLoader's advance-to-fill operation). Because that description precisely tracks both the district court's construction of the limitation and the additional detail that Weber insists should have been included the instruction, Weber cannot show prejudice. *See Sulzer Textil A.G.*, 358 F.3d at 1367 (instructional error was not prejudicial where "[t]he evidence presented at trial reflected the court's claim construction").

II.    **The Jury's Willfulness Finding Should Not Be Disturbed.**

A.    **The Trial Evidence Amply Supports The Jury's Willfulness Finding.**

Weber is wrong to contend (Br. 54-61) that the trial evidence was insufficient to support the jury's finding that Weber willfully infringed Provisur's patents. Weber errs by seeking to pick apart particular pieces of Provisur's evidence, in violation of this Court's settled rule that willfulness turns on "the totality of the circumstances presented in the case." *Shiley, Inc. v. Bentley Labs., Inc.*, 794 F.2d 1561, 1568 (Fed. Cir. 1986).

Here, those circumstances include undisputed evidence that Weber systematically tracked and rated Provisur's patented technologies, and that it rated the patents at issue here with the highest possible score—confirming that they were "relevant" to Weber's business. Despite that, Weber does not contest that it failed to take *any* of the steps that Provisur's expert, Mr. White, identified as part of industry-standard norms to avoid patent infringement. Indeed, as the district court noted in enhancing Provisur's damages after trial, "[n]ot a single Weber employee testified about any belief of invalidity or non-infringement of the asserted patents." Appx77 (quoting Provisur's briefing). Moreover, as the district court observed (in a finding that Weber does not challenge on appeal), Weber's trial defense "did not involve close issues on validity, infringement, or damages," as evidenced by "[t]he jury . . . need[ing] less than four hours to reach their verdicts" after a nine-day trial.

Appx81.  Finally, Weber makes no serious effort to dispute that the jury could find that Weber sought to conceal its knowledge—and ratings—of Provisur's patents, even as this litigation proceeded towards trial.

It is telling that, in the face of this mountain of evidence of deliberate and willful infringement, Weber does not cite *a single shred of evidence* that it actually believed that its products did not infringe or that Provisur's patents were invalid. Weber instead contends that Mr. White's testimony that Weber failed to comply with industry norms was inadmissible, and that evidence that Weber rated Provisur's patents and then sought to conceal its knowledge of the patents was irrelevant to willfulness.  Weber Br. 55-59.  None of these contentions offers any reason for this Court to "second-guess the jury or substitute [the court's] judgment for its judgment" on willfulness.  *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017) (alteration in original).

> ### 1.    The District Court Did Not Err In Admitting Mr. White's Testimony.

> #### a.    Mr. White Did Not Testify Regarding Weber's Failure To Obtain An Opinion Of Counsel.

Weber's lead argument on willfulness (Br. 55-57) is that Mr. White's testimony violated 35 U.S.C. § 298, which provides that "[t]he failure of an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used

to prove that the accused infringer willfully infringed the patent." But Mr. White's testimony did not implicate Section 298 because he did not testify regarding Weber's failure to obtain legal advice.

Mr. White instead testified about industry standards for intellectual property management—such as stopping sales, seeking a license, or designing-around—and that Weber failed to adhere to them. Appx41140 (654:2-7), Appx41142-41144 (656:17-658:15). Although Mr. White is a lawyer, he testified that the actions required to comply with industry standards do not require lawyers. In fact, Mr. White explained that PATOffice (the patent monitoring system used by Weber) is itself an example of a non-attorney resource that companies such as Weber use to evaluate patents *without* seeking advice of counsel. Appx41139-41140 (653:18-654:7). Mr. White never suggested that Weber should have hired attorneys to analyze Provisur's patents. Mr. White testified only that industry standards required Weber to have *somebody* analyze those patents. *See, e.g.*, *id*. No trial evidence supports—and ample evidence contradicts—Weber's argument that Mr. White testified about Weber's failure to seek legal advice.

Weber seizes upon Mr. White's general reference at trial to a "firm that I used to operate." Weber Br. 55 (citing Appx41140 (654:4-5)). But contrary to Weber's telling, Mr. White's "firm" was not a law firm, and the evidence at trial did not

suggest otherwise.[7]   Nor does Weber cite any legal authority in support of its conclusory assertion (Br. 56) that services such as a "landscape search," "background search," or "freedom to operate analysis" can be performed only by attorneys.

Finally, Weber seeks to manufacture a concession that Mr. White's trial testimony referred to the absence of legal advice by pointing to Provisur's opposition to Weber's pre-trial *Daubert* motion.  *See* Weber Br. 56.  In that filing, Provisur acknowledged that Mr. White had "considered . . . whether Defendants sought advice of counsel" and argued that this was permissible.  Appx26685.  But the quoted statement referred to Mr. White's *expert report*—not to his trial testimony, which (obviously) post-dated the *Daubert* briefing.  And Mr. White's expert report *did* refer to the absence of evidence that Weber had obtained legal advice.  *See, e.g.*, Appx9061-9062 (¶115) (lack of evidence that Weber "had ever sought advice from outside counsel" before Provisur filed suit); Appx9065 (¶ 121) (stressing that Weber's patent team lacked "legal training").  In response to Weber's *Daubert* motion, however, the district court ruled that Mr. White could not offer any opinion regarding Weber's failure to obtain advice of counsel.  Appx8.  As we have just

---

[7] The truth, as disclosed in Mr. White's expert report and during his deposition, is the "firm" referenced by Mr. White refers to a patent search company he formerly ran called RWS IP Services.  Appx9023 (¶ 7).  Mr. White's testimony that non-law firm third parties can be involved in patent diligence was thus based on his own experience with such a firm.

explained, Weber cites no evidence that Mr. White violated that limitation at trial. And the fact that Provisur acknowledged that portions of Mr. White's expert opinion *that he did not deliver at trial* referred to the absence of legal advice is plainly not a concession that his *trial testimony* did so as well.

### b. The Remainder Of Mr. White's Testimony Was Admissible.

Weber also complains (Br. 57-58) that Mr. White's testimony referred to various facts uncovered in discovery, including Weber's tracking and ratings of Provisur's patents, the deposition testimony of Weber witnesses who had rated Provisur's patents but then denied having seen them before, and Weber's shifting interrogatory responses regarding its first knowledge of the patents at issue.

The nature of Weber's complaint is difficult to discern. Weber does not appear to dispute the accuracy of any of these points, which Mr. White offered merely to provide the factual background for his opinion that Weber had failed to follow industry standards—despite its knowing of Provisur's patents and recognizing that they were relevant.[8] Weber suggests (Br. 57) that Mr. White

---

[8] Weber incorrectly asserts (Br. 57) that Mr. White "never explained what the [PATOffice] ratings meant." In the trial testimony that Weber itself cites, Mr. White explained that "[t]he ratings varied, from what I saw, from 0 to a 3. Zero being no relevance; a 3 being the highest score on the other end of it." Appx41115 (629:1-3). This understanding was later confirmed by Weber CEO Tobias Weber, who explained that the rating scale indicated how relevant a patent was to Weber's business. Appx41617 (1131:8-14).

"intimat[ed]" that Weber's witnesses had lied during their depositions, but Weber cites no portion of Mr. White's testimony that invited the jury to draw that inference. Indeed, if Weber is concerned that the jury would have inferred that its witnesses lied in their deposition, that is only because it is a logical inference to draw when a deponent's self-serving testimony is later undercut by documents that are belatedly produced after the deposition.

More broadly, there is no basis for Weber's suggestion (Br. 57-58) that Mr. White offered improper expert testimony regarding Weber's subjective intent. The district court held that Mr. White could not "opine on Defendants' subjective state of mind," Appx7, and Weber cites nothing in Mr. White's trial testimony that violated the court's limitation.

### 2. Weber's Patent Matrix Was Highly Relevant To Willfulness.

Weber is likewise incorrect to argue (Br. 58-59) that Weber's PATOffice matrix was irrelevant to willfulness. The evidence showed that Weber Germany had a sophisticated software system, PATOffice, for monitoring and rating Provisur's patent portfolio. *See* Appx47609-47614 (PX893); Appx41112 (626:11-21). The software automatically scored Provisur's patents, and it assigned a high score to the asserted patents (or applications). Appx41112 (626:11-21). In addition to the score generated by the software, Weber's employees assigned their own ratings. *Id.* Numerous individuals within Weber Breidenbach GmbH rated each of these patents

and applications a "3," which was the highest score available. *See* Appx47609-47614 (PX893); Appx41127 (641:10-16) ('936 patent); Appx41131 (645:5-14) ('812 patent); Appx41137 (651:1-5) ('436 patent). Those ratings confirmed Weber's understanding that Provisur's patents were highly relevant to Weber's business. Appx41617 (1131:8-14). The jury was entitled to weigh this evidence, and the rest, to conclude Weber had knowledge of the infringement.

Weber's ratings of the patents as relevant to its business thus distinguish this case from Weber's cited case, *BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Organisation*, 28 F.4th 1247 (Fed. Cir. 2022). There, this court held that the evidence was insufficient to support a willfulness finding because it showed only that "certain . . . witnesses were aware and kept track of [the] patents." *Id.* at 1274. Here, the patent matrix shows not only that Weber was aware of and tracked the patents (as in *BASF*), but also that Weber recognized the patents' relevance to its business (a fact not present in *BASF*).

Weber nonetheless took *no steps* to avoid infringement. To the contrary, Weber Germany shielded Weber, Inc. and provided its U.S. counterpart no information regarding Provisur's patents. Appx40884 (398:1-14). And at trial, Weber could offer no evidence that it had a good-faith belief that its products did not infringe or that Provisur's patents were invalid. Particularly in combination with the

evidence of concealment discussed below, the patent matrix offered powerful proof of Weber's willful infringement.

### 3.  Weber's Concealment Was Highly Relevant To Willfulness.

Finally, Weber is wrong to contend (Br. 59-61) that Provisur's willfulness case rested on irrelevant evidence of "discovery misconduct."  In fact, the evidence showed not merely "discovery misconduct," but that Weber sought to conceal its knowledge of Provisur's patents.

Indeed, even though Weber's knowledge was documented in black and white in Weber's "Patent Scoring Matrix" (Appx47610-47614 (PX893)), Weber's deposition witnesses took advantage of the fact that Weber had withheld the patent matrix to deny knowledge of Provisur's patents under oath.  Appx41083 (597:7); Appx47680 (Ex. 52.1 at 0:01-2:17 (Schaub); Ex. 52.2 at 0:01-0:23, 1:09-2:27, 3:38-4:14 (Nichau); Ex. 52.3 at 0:50-2:26 (Schmeiser); Ex. 52.4 at 0:01-5:17 (Rother)).  Moreover, Weber Inc.'s CEO signed numerous *verified* interrogatory responses relating to each Defendants' knowledge of the asserted patents.  Appx47622-47634 (PX1038A);  Appx47636-47641  (PX1038B);  Appx47643-47649  (PX1038C);  Appx47651-47664 (PX1038F); Appx47666-47571 (PX1038G); Appx47673-47678 (PX1038H).  And Mr. White testified that he did not have access to the PATOffice spreadsheet until after his initial report and deposition.  Appx41182-41183 (696:14-697:12).

This evidence thus permitted the jury to find that Weber had attempted to conceal its knowledge (and rating) of the asserted patents. Weber appears to contend (Br. 60) that, because Weber's concealment occurred during litigation, it went only to the egregiousness of Weber's conduct—and hence to the question of enhanced damages. But the fact that litigation misconduct will generally be relevant to the egregiousness of the infringer's conduct does not imply that it cannot *also* be relevant to willfulness vel non. And here, the logical connection between Weber's concealment and its deliberate infringement is clear: The jury could reasonably infer that Weber sought to conceal its knowledge (and rating) of the asserted patents precisely because it understood that, with knowledge of the patents established, it would lack any evidence of a good-faith belief that its products did not infringe. After all, it is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)). Again, the jury was entitled to weigh this evidence to conclude Weber had knowledge of the infringement.

For that reason, an infringer's attempt to conceal evidence bearing on willfulness is itself powerful incremental evidence of deliberate and intentional infringement. *See, e.g.*, *Afros S.p.A. v. Krauss–Maffei Corp.*, 671 F. Supp. 1402, 1439-40 (D. Del. 1987) ("The defendant's unacceptable tactics bear directly on the

issue of willfulness because the documents it attempted to shield from discovery form part of the core proof on this question."). The jury was entitled to treat Weber's concealment regarding the patent matrix as evidence of willful infringement.

Contrary to Weber's suggestion (Br. 59), that finding does not rest on a theory of spoliation and thus does not implicate any limitations on the use of adverse-inference instructions that may follow from a finding of spoliation. As Weber's cited case demonstrates, spoliation refers to a situation in which a party has *destroyed* relevant evidence—conduct that, in appropriate cases, may authorize the find-finder to draw an adverse inference about what the missing evidence would have shown. *See Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 459 (8th Cir. 2013). Here, although Weber *attempted* to conceal its knowledge of Provisur's patents, that attempt was ultimately unsuccessful: Weber was forced to produce the patent matrix, which meant that the jury was free to consult its contents. There was thus no need for an adverse-inference instruction about what the matrix *might* have contained, as would be the case when spoliation prevents a party from obtaining relevant evidence.

## B. Weber Is Not Entitled To A New Trial On Willfulness.

After arguing at length that the evidence was insufficient to establish willfulness, Weber adds a single paragraph (Br. 61) contending that it is entitled to

a new trial on willfulness. Weber's conclusory fallback position should also be rejected.

Contrary to Weber's contention (Br. 61), the admission of Mr. White's expert testimony does not justify a new trial. As explained above, the district court did not err in admitting Mr. White's testimony. *See* pp. 40-44, *supra*. In any event, Weber cannot show prejudice stemming from the admission of Mr. White's testimony, even if the jury could have understood it as faulting Weber for failing to seek legal advice. That sort of testimony could be prejudicial in a case where the defendant seeks to show that investigation or analysis by *non-legal* personnel established a good-faith belief in non-infringement or invalidity, and the plaintiff responds with a suggestion—in violation of Section 298—that only *legal* investigation or analysis counts. But Weber did not pursue that line of defense here: It did not offer evidence of *any* investigation of Provisur's patents, and no Weber witness testified to a good-faith belief that Weber's products did not infringe or that Provisur's patents were invalid. Thus, any violation of Section 298 would at most be harmless error.

Weber's reliance (Br. 61) on supposedly improper comments by Provisur's counsel during closing is likewise misplaced. That argument is not preserved for appellate review because Weber did not press any meaningful objection to Provisur's closing at trial. To the contrary, Weber's counsel stated merely that she "just want[ed] to note three objections for the record" relating to Provisur's closing

*after the closing and after the jury retired*. Appx42616 (2130:8-9). Weber did not purport to "note" any objection to two of the categories of argument that it now targets on appeal—namely, Provisur's reliance on the patent matrix as evidence of willful infringement (Weber Br. 58) and Provisur's reliance on Weber's discovery misconduct (*id.* at 59-30). *See* Appx42616 (2130:9-18). And although Weber's counsel did "note" an objection that Provisur had improperly referenced the absence of an opinion of counsel, *see id.*, Weber did not request any ruling or remedial action from the district court. The court responded that Weber's objections were "noted," Appx42616 (2130:19), and Weber expressed no discontent with that resolution. That is not enough to preserve a claim of error. *See Owen v. Patton*, 925 F.2d 1111, 1115 (8th Cir. 1991) (noting that preservation requires "an objection *and a proper request for relief*") (emphasis added).

In any event, even if Weber's halfhearted statement had been sufficient to preserve an objection to Provisur's closing under Section 298, Weber cannot demonstrate reversible error. Weber wholly fails to grapple with the demanding showing that would be required to obtain a new trial based on allegedly improper argument during closing—namely, that counsel "made improper remarks that were so 'plainly unwarranted and clearly injurious' that they warrant a new trial." *Gilster v. Primebank*, 747 F.3d 1007, 1010 (8th Cir. 2014) (quoting *Morrissey v. Welsh Co.*, 821 F.2d 1294, 1303 (8th Cir. 1987)). Here, Weber targets counsel's statement that

Weber did not "go out and get a freedom-to-operate opinion. They don't go out and do further analysis. They do nothing. . . . It's pretty dishonest conduct." Appx42613 (2127:9-18). But that remark did not expressly fault Weber for failing to obtain a *legal* opinion, and even if counsel's reference to a "freedom-to-operate opinion" is understood to have implicitly raised that argument, it would at most represent a "'minor aberration' made in passing." *Gilster*, 747 F.3d at 1011 (quoting *Whittenburg v. Werner Enterprises, Inc.*, 561 F.3d 1122, 1131 (10th Cir. 2009)). Weber targets only a single remark, which was couched as part of the broader—and plainly permissible—argument that Weber had taken *no steps at all* to determine that its product did not infringe Provisur's valid patents. *See* pp. 41-43, *supra*.

Moreover, the jury was specifically instructed that "[t]he absence of a legal opinion may not be used . . . to find that Weber acted willfully." Appx43 (Instruction 23). Thus, although Weber did not even *ask* the district court to do anything in response to counsel's allegedly improper argument, the court's instructions in fact provided "specific curative action," *Gilster*, 747 F.3d at 1012 (quoting *Whittenburg*, 561 F.3d at 1131), directed to the claimed error that Weber now asserts on appeal. That defeats any conceivable showing of prejudice.

## III. Weber Is Not Entitled To A New Trial On Damages.

Weber launches a broadside attack on the jury's damages award based on *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965 (Fed.

Cir. 2018), where this Court held that the entire market value rule's "alternative to [the] general rule of apportionment" can be invoked "when the patented feature is the sole driver of customer demand or substantially creates the value of the component parts." *Id.* at 977, 979. In particular, Weber contends that the testimony of Provisur's technical expert, Dr. Vorst, should have been excluded under *Daubert*—and then, in what largely amounts to a re-hash of the same points, that Dr. Vorst's trial testimony was insufficient to support application of the entire market value rule. Weber Br. 64-67. Weber also contends that the district court's jury instructions misstated the law on the entire market value rule. *Id.* at 67-69.

Weber's contentions are meritless. Consistent with *Power Integrations'* articulation of the governing law, Dr. Vorst testified that the predicate for application of the entire market value rule was satisfied here. Weber's myriad critiques go only to the weight of Dr. Vorst's testimony—not to its admissibility or to its legal sufficiency to support the jury's damages award. And the district court properly instructed the jury on the entire market value rule, using language drawn verbatim from this Court's decision in *Power Integrations*. There is thus no basis to disturb the jury's damages award.

### A. Dr. Vorst's Expert Opinion Was Properly Admitted And Amply Supports The Jury's Award Of Damages Under Of The Entire Market Value Rule.

At trial, Dr. Vorst testified that "[i]t was the patented features identified in the Provisur patents" that "drove the demand or substantially created the value for each customer of the accused products slicing lines in this case." Appx41310 (824:17-21). He also explained that he was unaware of any other features of the accused slicing lines that substantially created their value. Appx41310 (824:22-24). That testimony thus provided the predicate necessary for Provisur to invoke the entire market value rule—namely, that "the patented feature[s] [were] the sole driver of customer demand or substantially create[] the value of the component parts." *Power Integrations*, 904 F.3d at 979.

1. Weber characterizes Dr. Vorst's opinion as resting on a "subjective assessment," and Weber hints that Dr. Vorst should have conducted customer surveys and other forms of market analysis to support his opinion. Weber Br. 65, 69. But Weber does not argue that those critiques required exclusion of Dr. Vorst's testimony or make it insufficient to support the jury's damages award. Nor could Weber seriously press such an argument: Dr. Vorst has significant and unique technical expertise and experience in evaluating slicing lines and their components. *E.g.*, Appx33785 (487:6-488:20). He employed that expertise to evaluate the value and contribution to consumer demand of the patented features at issue here. *Id.*

Weber's apparent belief that other approaches would have been superior does not render the ones that Dr. Vorst employed unreliable.

2. Weber contends (Br. 65-66) that Dr. Vorst's testimony should have been excluded because his expert report did not opine that the patented features drove demand for Weber's slicing lines, but rather stated that the accused products drove purchases. But Weber did not seek to exclude Dr. Vorst's testimony on that basis before the district court, so this claim is not preserved. In any case, Weber's *Daubert* briefing confirmed that Weber understood Dr. Vorst to have expressed the opinion that Weber now insists was absent from his report—namely, "that the *patented features* drive demand for the entire slicing line." Appx33179 (emphasis added); *see also* Appx33178, Appx33185, Appx33187, Appx33188, Appx33190.

3. Weber's remaining arguments seek to attack Dr. Vorst's bottom-line conclusion that the patented features substantially create the value of Weber's slicing lines by pointing to supposed inconsistencies within Dr. Vorst's testimony or between that testimony and other evidence in the case. *See* Weber Br. 66-67, 70-71. At bottom, however, those arguments go to the weight of Dr. Vorst's testimony— not to its admissibility or its legal sufficiency. Weber was free to stress supposed inconsistencies as reasons that the jury should have not have credited Dr. Vorst's opinion. But the jury rejected Weber's critiques and instead credited Dr. Vorst's testimony, and a court "is not free to . . . set aside a jury verdict" even if it were to

conclude that "other results are more reasonable." *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992). Weber thus "has not met the high standard needed to disregard the jury's fact-finding function" in weighing competing expert testimony. *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1262 (Fed. Cir. 2013).

## B.     The District Court Properly Instructed The Jury On Damages.

This Court should also reject Weber's contentions (Br. 67-68) that instructional errors warrant a new trial on damages.

1. Contrary to Weber's argument (Br. 68-69), the district court was correct to instruct the jury that Provisur could invoke the entire market value rule "if the patented feature is either (1) the sole driver of customer demand, or (2) substantially creates the value of the component parts." Appx45 (Jury Instruction No. 25). That instruction merely restates this Court's articulation of the entire market value rule as applying when "the patented feature is the sole driver of customer demand or substantially creates the value of the component parts." *Power Integrations*, 904 F.3d at 979.

Weber insists that "sole driver of customer demand" and "substantially creates the value of the component parts" are two ways of saying the same thing, and that it was therefore wrong for the district court's instruction to frame them as alternative options that could both trigger application of the entire market value the rule. But this Court's decisions contradict Weber's understanding: This Court has stated that

the entire market value rule applies when "the patented feature is the sole driver of customer demand *or* substantially creates the value of the component parts." *Power Integrations*, 904 F.3d at 979 (emphasis added); *see also, e.g.*, *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014); *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013). If this Court had understood the second prong to be equivalent to the first, it presumably would have indicated as much, either with punctuation (*e.g.*, parentheses setting off the "substantially creates the value of the component parts" clause, to make clear that it is just a parenthetical restatement of "sole driver of customer demand") or with text (*e.g.*, "that is to say" or "in other words"). This Court's opinions have instead treated them as two distinct concepts.

In any event, Weber's challenge to the court's instruction is internally inconsistent. It proceeds from the premise that "sole driver of customer demand" and "substantially creates the value of the component parts" are equivalent concepts. But if that were true, there would be no reason to think that the jury would interpret "substantially creates the value of the component parts" to impose a standard that is easier to meet than "sole driver of customer demand." Weber's argument thus provides no basis for reversal even on its own terms.

2. Weber is also wrong to contend (Br. 69) that the district court erred by declining to add an instruction that a royalty "must reflect the value attributable to

56

the infringing features of the product, and no more." That language would have appeared as the last sentence at the end of the second paragraph of Instruction No. 25. But that instruction—as delivered by the district court—conveyed precisely the same message as the language that Weber insists should have been appended:

> If the claimed patented features are not the sole driver of customer demand for the accused infringing product, or substantially creates the value of the component parts, then you must perform what is called apportionment. *When damages are apportioned, the amount you find as damages should be based on the value attributed to the patented invention, as distinct from the unpatented features of the accused product* or other factors such as marketing to advertising, or Provisur's size or market position.

Appx45 (emphasis added). Indeed, although Weber's brief truncates the quotation, the sentence that Weber proposed to add began with "put differently," Appx42405 (1919:14-15)—thereby confirming that the sentence merely restated what the instruction *already* conveyed. The district court was therefore correct to view that sentence as "redundant," *id.*, and its decision not to add redundant language to an otherwise unchallenged instruction is not reversible error. *See, e.g., Sulzer Textil A.G.*, 358 F.3d at 1366; *United States v. Ribaste,* 905 F.2d 1140, 1143 (8th Cir. 1990) ("A party is not . . . entitled to a specific formulation of an instruction and the district court is given broad discretion in framing . . . an instruction.").

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted.

Dated: July 28, 2023

/s/ Craig C. Martin
Craig C. Martin
   *Counsel of Record*
Michael G. Babbitt
Sara Tonnies Horton
Ren-How H. Harn
Henry C. Thomas
WILLKIE FARR &
   GALLAGHER LLP
300 North LaSalle
Chicago, Illinois 60654
Tel.: (312) 728-9000
cmartin@willkie.com
mbabbitt@willkie.com
shorton@willkie.com
rharn@willkie.com
hthomas@willkie.com

*Counsel for Cross-Appellant
Provisur Technologies, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2023-1438, -1476

**Short Case Caption:** Provisur Technologies, Inc. v. Weber, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under <u>Fed. R. App. P. 5(c)</u>, <u>Fed. R. App. P. 21(d)</u>, <u>Fed. R. App. P. 27(d)(2)</u>, <u>Fed. R. App. P. 32(f)</u>, or <u>Fed. Cir. R. 32(b)(2)</u>.

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,134 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 07/28/2023

Signature: /s/ Michael G. Babbitt

Name: Michael G. Babbitt